**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MURRAY RUBINSTEIN, JEFFREY F. ST. CLAIR, WILLIAM MCWADE, HARJOT DEV and VIKAS SHAH, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) | Case No. _____ |
| | ) | |
| Plaintiffs, | ) | Judge: |
| | ) | |
| | ) | Magistrate Judge: |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| RICHARD GONZALEZ and ABBVIE INC., | ) | |
| | ) | |
| Defendants. | ) | |

**CLASS ACTION COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS**

This is a securities class action brought by Murray Rubinstein, Jeffrey F. St. Clair, William McWade, Harjot Dev and Vikas Shah ("Plaintiffs") individually and on behalf of all persons who purchased or otherwise acquired American Depository Shares or "ADS" or purchased call options or sold put options (collectively, "Securities") of Shire plc ("Shire") between June 20, 2014 and October 14, 2014, inclusive (the "Class Period"), against AbbVie Inc. ("AbbVie") and its Chief Executive Officer ("CEO"), Richard Gonzalez ("Gonzalez"), for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder. The allegations in this complaint are based upon information and belief, except as to allegations specifically pertaining to Plaintiffs, which are based on personal knowledge. Plaintiffs base their belief upon information uncovered through an investigation by Plaintiffs' counsel that included: review of AbbVie's and Shire's public filings with the Securities and Exchange Commission ("SEC"); review of AbbVie's press releases and other

public statements; and review of regulatory filings and reports, court filings, securities analyst reports, and media reports about AbbVie.

**INTRODUCTION**

1.      Plaintiffs bring this class action on behalf of all similarly situated purchasers of Shire Securities in connection with statements distributed by, or on behalf of, AbbVie to purchasers of Shire Securities regarding AbbVie's rationale for pursuing a business combination with Shire.

2.      On June 20, 2014, AbbVie confirmed media reports that it had approached Shire with an initial combination proposal, and AbbVie had until July 18, 2014 to announce a firm offer or a decision to abandon talks with Shire. Thereafter, on July 18, 2014, AbbVie disclosed that the boards of AbbVie and Shire entered into a cooperation agreement (the "Cooperation Agreement"), and agreed to definitive terms of a proposed business combination of Shire and AbbVie (the "Combination"). The terms of the Combination provided that AbbVie would merge with and into Shire, with AbbVie as the surviving entity, which would reincorporate in Ireland. News of the proposed Combination sent Shire Securities to rise to a high of $264.98 per share during the proposed Class Period.

3.      In connection with the announcement of the Combination, AbbVie disclosed presentations to both holders of Shire Securities and AbbVie common stock informing that the combination was based on various strategic rationales. Further, at an open investor call on July 21, 2014, Defendant Richard Gonzalez (AbbVie's CEO and Chair of the Board) told investors and analysts that an expected tax benefit as a result of reincorporation in Ireland (a practice known as a tax inversion) was "not the primary rationale" for the combination and that "we would not be doing it if it was just for the tax impact."

4.      In contrast to these (false) public statements of AbbVie and Gonzalez, the tax considerations were the critical, if not the sole factors for AbbVie's decision to enter into the Combination.  Specifically, when the U.S. Department of Treasury announced a change with respect to the treatment of tax inversions, AbbVie announced on October 14, 2014 that it was reconsidering the Combination.  As a result, Shire Securities dropped from a closing price of $244.57 on October 14, 2014 to a low of $156.25 on October 15, 2014.  On October 21, 2014, AbbVie and Shire announced that the companies agreed to terminate the cooperation agreement.

## JURISDICTION AND VENUE

5.      The claims asserted arise under Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act and 28 U.S.C. §§1331 and 1337.  Venue is proper pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  AbbVie has its principle executive offices located in this District, and the statements alleged herein originated from this District.

6.      In connection with the acts alleged in this Complaint, defendants directly or indirectly used the means and instrumentalities of interstate commerce, including without limitation the mails, interstate telephone communications, and the facilities of the national securities exchanges.

## THE PARTIES

7.      Plaintiffs purchased or otherwise acquired Shire Securities at artificially inflated prices during the Class Period as described in their attached certifications, and were damaged thereby.

8.      Defendant AbbVie is biopharmaceutical company with principal executive offices located at 1 North Waukegan Road, North Chicago, Illinois, 60064.  AbbVie was spun-off from

Abbott Laboratories ("Abbott"), and became an independent public company on January 1, 2014.

9.      Defendant Gonzalez is the CEO of AbbVie and Chairman of its Board of Directors (the "Board").  He served as Abbott's executive vice president of the pharmaceutical products group from July 2010 to December 2012, and was responsible for Abbott's worldwide pharmaceutical business, including commercial operations, research and development, and manufacturing.  Gonzalez made numerous statements regarding AbbVie's rationale for the Combination.  In addition, Gonzalez signed an August 21, 2014, Form S-4 Registration Statement ("S-4") that was filed by AbbVie Private Limited in connection with the Combination.

10.      Non-party Shire is a biopharmaceutical company Shire is incorporated in Jersey (Channel Islands), with principal executive offices located at 5 Riverwalk, Citywest Business Campus, Dublin 24, Republic of Ireland.  Shire Securities are traded on the NASDAQ under the symbol "SHPG."

## FACTS

### *AbbVie Publicly Discloses Its Pursuit of a Combination with Shire*

11.      On June 20, 2014, AbbVie publicly confirmed media reports that it had approached Shire with an initial combination proposal.  AbbVie further disclosed that, in accordance with the U.K. City Code on Takeovers and Mergers (the "Code"), AbbVie had until July 18, 2014 to announce a firm offer or a decision to abandon talks with Shire.

12.      On June 25, 2014, AbbVie issued a press release announcing the Board's belief that the Shire "[c]ombination has compelling strategic rationale for all shareholders."  According to the press release, the rationale for the proposed combination included:

- **Combination to accelerate growth of both companies through multiple catalysts —** AbbVie believes a merger of AbbVie and Shire would potentially accelerate growth and profitability by leveraging AbbVie's capabilities and

infrastructure to make Shire's pipeline and products more successful than its standalone prospects. AbbVie believes that this merger would result in incremental sustainable leadership positions within high value market segments of significant unmet need, including: immunology, rare diseases, neuroscience, metabolic diseases and liver disease (HCV), as well as multiple emerging oncology programs.

- **Strong complementary fit across existing platforms is better than standalone capabilities** — AbbVie believes that Shire's platform has a strong complementary fit with AbbVie's existing specialty focus, including physician access relationships, regulatory and market access capabilities, and patient-centric focus. AbbVie's existing expertise and development capabilities across areas such as GI, neuroscience, rare oncology indications, combined with AbbVie's resources and scale, could develop global franchises from Shire's platform and utilize M&A to supplement organic growth.

- **Leverage AbbVie's substantial and well-established global infrastructure** — AbbVie believes that Shire could achieve immediate broader geographic penetration and scale by leveraging AbbVie's existing, well-established global infrastructure across more than 170 countries, including our existing commercial, regulatory and medical affairs, and market access in key emerging markets. A combination would provide Shire with the desired scale and infrastructure along with:

    - A diversified portfolio of leading marketed products;

    - Stronger growth platforms with the potential for further development; and

    - A complementary specialty focus combined with global pharma capabilities.

- **Broader and deeper pipeline of attractive development programs** — By leveraging AbbVie's established R&D infrastructure and expertise, AbbVie believes the combination would enhance innovation and end-to-end R&D capabilities, generating:

    - A best-in-class product development platform, with near-term new product launches in liver disease (HCV), neuroscience, immunology, oncology, rare diseases, ophthalmology, and renal; and

    - Expertise and infrastructure, including regulatory, health economics and outcomes research, and market access to expand product indications to meet patient needs. AbbVie's track record of product optimization is evidenced by its growth of the Humira® franchise through increased penetration in existing indications, geographic expansion, and approvals for new indications.

- **Substantial combined financial capacity —** The enhanced financial profile of New AbbVie would offer greater strategic and financial flexibility, enabling:

  - The opportunity to maximize Shire's rare disease and neuroscience franchises including resources to fully globalize Shire's planned launches;

  - ·The potential for strengthened sustainability of top-tier EPS growth, attractive free cash flow and enhanced return of capital policy; and

  - A world-class business development group to drive continued portfolio expansion with access to cash and financial wherewithal not available on a standalone basis.

13.     AbbVie further issued a presentation, also dated June 25, 2014, entitled "AbbVie's proposed combination with Shire: creating immediate and long-term value for all shareholders."   According to AbbVie, the strategic rationale for the combination was based on seven categories– only one of which (listed fifth) included tax considerations:



## A strategically compelling and financially attractive combination

**Larger and more diversified biopharmaceutical company with** multiple leading franchises

**Adds leading franchises** within specialty therapeutic areas, including **rare disease** and **neuroscience**

**Broad and deep pipeline of diverse development programs** and enhanced R&D capabilities

Global resources and experienced teams positioned to continue to deliver **strong shareholder returns to both AbbVie and Shire shareholders**

Transaction expected to achieve **a competitive tax structure** and provide New AbbVie with **enhanced access to its global cash flows**

Transaction expected **to be accretive to adjusted EPS[1] in the first year** following completion, and will **increase to more than $1.00 per share by 2020**

**Significant financial capacity** for future acquisitions, investment and opportunity for **enhanced shareholder distributions and value creation**

[1] Adjusted EPS excludes intangible asset amortization expense and purchase accounting adjustments and other specified items. The statement that the Transaction is earning accretive should not be construed as a profit forecast and is therefore not subject to the requirements of Rule 28 of the Code. It should not be interpreted to mean that the earnings per share in any future financial period will necessarily match or be greater than those for the relevant preceding financial period

abbvie  Shire                                                                2

14.     On July 18, 2014, AbbVie disclosed that the boards of AbbVie and Shire agreed to the terms of the Combination, valued at approximately $54 billion of a combination of cash and stock of AbbVie Private Limited.

15.     AbbVie further disclosed that, in connection with the Combination, (i) Shire and AbbVie entered into a Cooperation Agreement (the "Cooperation Agreement"); (ii) AbbVie, AbbVie Private Limited, and AbbVie Ventures LLC entered into an Agreement and Plan of Merger, dated as of July 18, 2014 (the "Merger Agreement"); and (iii) AbbVie Holdings Private Limited, JPMorgan Chase Bank, N.A. ("JPMorgan"), as administrative agent and lender, and certain other parties entered into a 364-Day Bridge Credit Agreement, dated as of July 17, 2014. The Co-Operation Agreement provided for a payment of a termination fee by AbbVie to Shire if

the Combination was not consummated.  This termination fee (paid in U.S. dollars) equaled "three per cent of the product of the indicative value of the cash and shares to be delivered per Shire Share multiplied by the number of issued Shire Shares . . . and converted pursuant to the exchange rate . . . ." or $1.64 billion.

16.    In connection with the announcement of the Combination, AbbVie provided investors with another presentation touting the Combination, and once again listed tax benefits as only one of the seven strategic rationales for the Combination, which included:

- **Larger and more diversified biopharmaceutical company with multiple leading franchises**

- **Adds leading franchises** with specialty therapeutic areas, including **rare disease** and **neurosciences**

- **Broad and deep pipeline of diverse development programs** and enhanced R&D capabilities

- Global resources and experienced teams positioned to continue to deliver **strong shareholder returns to both AbbVie and Shire shareholders.**

- Transaction expected to achieve **a competitive tax structure** and provide New AbbVie with **enhanced access to its global cash flows.**

- Transaction expected **to be accretive to adjusted EPS in the first year** following completion, and will **increase to more than $1.00 per share by 2020**

- **Significant financial capacity** for future acquisitions, investment and opportunity for enhanced shareholder distributions and value creation.

(Emphasis added.)

17.    Moreover, Gonzalez specifically told investors that tax benefits were not the primary rationale for the Combination and that the AbbVie would not be pursuing the Combination "if it was just for the tax impact."  At a July 21, 2014 investor conference following announcement of the Combination, Gonzalez told investors:

> What I would tell you is that this transaction has a significant, both strategic and financial, rationale. ***Tax is clearly a benefit, but <u>it's not the primary rationale for this</u>***.
>
> * * *
>
> When we look at this particular transaction we are excited about the pipeline. We are excited about the growth aspects of several of their franchises and being able to incorporate that into our business. ***There are opportunities for different kinds of synergies beyond tax.***

(Emphasis added.)

18.     Indeed, when Gonzalez was asked whether a change in tax benefit would change the calculus, Gonzalez flatly replied that it would not:

> **Vamil Divan**: Thanks for taking the question. Vamil Divan, Credit Suisse. So just two quick questions. ***One is a follow-up to Chris's around the discussions in Washington around inversions. There is obviously the breakup fee you guys mentioned around this deal. I'm just trying to understand kind of how important the ex-US domiciling for tax purposes is to this deal and if something were to come up where retroactively you are not able to actually change your domicile outside the US***, is that something where the breakup fee would not restrict you from then going ahead and breaking up this deal and not going forward?
>
> * * *
>
> **Rick Gonzalez**: Jim, both of those questions we're somewhat limited in what we can say. ***As I mentioned in my comments a moment ago, this is a transaction that we believe has excellent strategic fit and has compelling financial impact well beyond the tax impact. <u>We would not be doing it if it was just for the tax impact.</u> That is an additional benefit that we have. We have looked carefully at that aspect of it and we believe it is executable at a high level***.

(Emphasis added.)

19.     On August 21, 2014, AbbVie Private Limited issued the S-4 in connection with the planned vote of AbbVie stockholders to approve the Combination. The S-4 was signed by Gonzalez, among others. According to the S-4, in deciding to approve the Combination, the AbbVie Board concluded that the Combination is likely to result in significant strategic and financial benefits to AbbVie and its stockholders. These benefits included:

- the creation of a global market leader with unique characteristics and a compelling investment thesis by combining two companies with leadership positions in specialty pharmaceuticals;

- the opportunity to leverage AbbVie's capabilities and infrastructure to make Shire's pipeline and products more successful than its stand-alone prospects;

- the incremental sustainable leadership positions New AbbVie would be expected to have within high value market segments of significant unmet need, including immunology, rare diseases, neuroscience, metabolic diseases and liver disease (HCV), as well as multiple emerging oncology programs;

- the strong complementary fit of Shire's platform with AbbVie's existing specialty focus, including physician access relationships, regulatory and market access capabilities, and patient-centric focus and the potential to develop global franchises from Shire's platform with AbbVie's existing expertise and development capabilities across areas such as gastrointestinal medicine, neuroscience, and rare oncology indications, combined with AbbVie's resources and scale;

- the potential realization of tax and operational synergies by New AbbVie as a result of the Combination;

- the immediate broader geographic penetration and scale of Shire as a result of the Combination, by leveraging AbbVie's existing, well-established global infrastructure across more than 170 countries, including commercial, regulatory and medical affairs, and market access in key emerging markets;

- the enhancement of innovation and end-to-end R&D capabilities by leveraging AbbVie's established R&D infrastructure and expertise, which the AbbVie Board expects will generate:

  - a best-in-class product development platform, with near-term new product launches in liver disease (HCV), neuroscience, immunology, oncology, rare diseases, ophthalmology, and renal; and

  - expertise and infrastructure, including regulatory, health economics and outcomes research, and market access to expand product indications to meet patient needs;

- the combined financial strength and R&D experience of New AbbVie;

- the Combination's expected accretion to AbbVie's adjusted earnings per share in the first year following completion, growing to above $1.00 per share by 2020, with material ongoing financial and operating benefits;

- the opportunity for New AbbVie to have an enhanced financial profile and greater strategic and financial flexibility as compared to AbbVie and Shire on a standalone basis, which would provide:

  - the opportunity to maximize Shire's rare disease and neuroscience franchises including resources to fully globalize Shire's planned launches;

  - the potential for strengthened sustainability of top-tier EPS growth, attractive available cash flow and enhanced return of capital policy; and

  - the basis for a world-class business development group to drive continued portfolio expansion and utilize M&A to supplement organic growth with access to cash and financial resources not available on a standalone basis.

20.     On September 22, 2014, the U.S. Treasury Department issued a notice (the "Notice") that it will take steps to curb the practice of corporate inversions.  A corporate inversion is a transaction in which a U.S. based multinational restructures so that the U.S. parent is replaced by a foreign parent, in order to avoid U.S. taxes.  According to the U.S. Treasury Department, "the Notice eliminates certain techniques inverted companies currently use to access the overseas earnings of foreign subsidiaries of the U.S. company that inverts without paying U.S. tax.  Today's actions apply to deals closed today or after today."

21.     Even following the issuance of the Notice, AbbVie and Gonzalez continued to represent that AbbVie's rationale for the Combination was based on business and strategic reasons.  On September 29, 2014, AbbVie and Gonzalez issues a statement to Shire's employees, which AbbVie also filed with the SEC and which indicated AbbVie's continued interest in the Combination:

Dear Shire Colleague,

I had the wonderful opportunity last week to sit down and meet with many of you — both in Chicago for the Integration Team Planning Kickoff Meeting, and in Lexington, when I was able to visit your offices.

*I wanted to send a note saying that I'm more energized than ever about our two companies coming together, especially because I can already see many shared traits and values in the people at AbbVie and Shire.* We have similar cultures that will strengthen the opportunities we have together.

Colleagues at both companies are focused on one thing — helping people. At AbbVie, we call that making a remarkable impact in people's lives. We're committed to science, to R&D and to increasing our knowledge of biology and the current standards of care. And it's all for the same purpose — to advance those standards and improve the care of patients the world over.

*When we first considered Shire joining together with AbbVie it was because we saw the opportunity to lead and grow in important therapeutic areas. It was also because we saw a complementary pipeline that would be positioned to enhance innovation.*

But more than that, we saw people who shared our vision. I'm happy to say I'm more confident than ever about the potential of our combined organizations now that I've had a chance to meet with many of you.

We have a very busy few months ahead as we work on integration planning. It's more important than ever to keep focused on our business priorities. Meeting our objectives as individual companies will only make our combined organization that much stronger.

Thank you for your continued support and commitment. I look forward to working with you much more closely in the near future. I will continue to keep you updated as events unfold during this very exciting time, and remember, you can always access the announcements and materials regarding the transaction by visiting our microsite.

Best regards,

Rick

(Emphasis added.)

22.    Following this filing and AbbVie's signaling that it would continue with the Combination, Shire Securities traded as high as $263.24 per share.

### AbbVie Abandons the Proposed Combination

23.    Although AbbVie and Gonzalez repeatedly told investors that tax benefits were "not the primary rationale" of the proposed Combination, in mid-October, AbbVie issued a statement that the Board will meet to consider whether to recommend against the Combination.

For the first time after trading closed on October 14, 2014, Gonzalez revealed, contrary to his prior statements, the tax impact of the Combination was of critical importance to AbbVie and its Board:

> AbbVie Inc. ("AbbVie") announces it has notified Shire plc ("Shire") of its Board of Directors' intention to reconsider the recommendation made on July 18, 2014 that AbbVie stockholders adopt the merger agreement needed to complete the proposed combination of AbbVie and Shire.
>
> AbbVie's Board will consider, among other things, the impact of the U.S. Department of Treasury's proposed unilateral changes to the tax regulations announced on September 22, 2014, including the impact to the fundamental financial benefits of the transaction.
>
> Accordingly, AbbVie has notified Shire under the Co-operation Agreement that AbbVie's Board of Directors intends to meet to consider whether to withdraw or modify its recommendation. Under the Agreement, AbbVie must provide three business days' notice of any intention to consider a change in recommendation. Accordingly, AbbVie's Board plans to meet on October 20, 2014, unless Shire agrees to waive the notice.

24.     As a result of this disclosure, Shire's stock price, which closed at $244.57 on October 14, 2014, the last trading day prior to the announcement, fell $74.08 per share (or 30.29%), to a closing price of $170.49 on October 15, 2014.

25.     On October 21, 2014, AbbVie further announced that, as the result of the Notice, Shire and AbbVie agreed to terminate the proposed Combination, and that AbbVie would be required to pay Shire the hefty $1.64 billion termination fee:

> AbbVie Inc. ("AbbVie") and Shire plc ("Shire") have agreed to terminate their proposed merger following the decision by AbbVie's Board to withdraw support for the proposed transaction. ***The Company's decision was based upon its assessment of the September 22, 2014 notice issued by the U.S. Department of Treasury, which re-interpreted longstanding tax principles in a uniquely selective manner designed specifically to destroy the financial benefits of these types of transactions.*** The notice introduced an unacceptable level of risk and uncertainty given the magnitude of the proposed changes and the stated intention of the Department of Treasury to continue to revise tax principles to further impact such transactions.

The Company conducted a thorough review of the September 22, 2014 notice to explore available options to preserve the transaction. This review included the advice of external tax, legal, and financial advisors in both the U.S. and the U.K. The executive management team ultimately concluded that the transaction was no longer in the best interests of stockholders at the agreed upon valuation, and the Board fully supported that conclusion.

Commenting on the transaction termination, AbbVie's Chairman and Chief Executive Officer, Richard A. Gonzalez said:

"AbbVie has built a strong, sustainable strategy with a robust pipeline. Over the past 22 months we have delivered industry leading stockholder returns, our performance and business fundamentals remain strong, and we are on the cusp of a major new product launch with our treatment for HCV. We remain focused on building AbbVie's business through enhanced internal R&D platforms, partnerships, strong commercial execution and licensing and acquisitions."

"The unprecedented unilateral action by the U.S. Department of Treasury may have destroyed the value in this transaction, but it does not resolve a critical issue facing American businesses today. The U.S. tax code is outdated and is putting global U.S.- based companies at a disadvantage to foreign competitors in an area of critical importance, specifically investing in the United States. Comprehensive tax reform is essential to create competitiveness and to stimulate investment in the economy."

\* \* \*

AbbVie has agreed to pay Shire the break fee of approximately USD$1.635 billion. Shire's right to receive the break fee will be Shire's sole and exclusive remedy for all losses and damages in connection with the transaction.

(Emphasis added.)

26. This change of heart from AbbVie prompted a *Fortune* columnist to conclude that AbbVie's earlier statements that the Combination was not premised on tax benefits were "outright deceit":

AbbVie kills its $54 billion buyout of Shire, and comes clean about its original intentions.

There's an old saying in pro sports that when a player says "it isn't about the money," it's always about the money. The same thing seems to be true in some of these massive "tax inversion" deals, in which a U.S. company agrees to buy a smaller foreign business and relocate its headquarters overseas.

*After all, what conclusion other than outright deceit can we draw from yesterday's news that Chicago-based pharma giant AbbVie Inc.* ABBV 4.60% has canceled its proposed $54 billion acquisition of Ireland-based Shire PLC SHP.

*When the deal was first announced in July, AbbVie insisted that tax was only a secondary rationale.* Just read a few of these comments from AbbVie CEO Rick Gonzalez, during an analyst and investor call from July 21:

* * *

Subsequent to that call, the U.S. Treasury devised new rules that curtailed the tax benefits of such transactions. *Obviously not something that would please Rick Gonzalez, but not a deal-breaker. Right? I mean, the White House didn't meddle in all of those exciting pipeline synergies.*

Wrong, of course. In announcing its decision yesterday to kill the deal — which triggered a $1.6 billion termination fee — AbbVie explicitly stated that the change in course was promoted by Treasury's actions. Here is Gonzalez, now freed from having to pretend that it wasn't about the taxes:

"The unprecedented unilateral action by the U.S. Department of Treasury may have destroyed the value in this transaction, but it does not resolve a critical issue facing American businesses today. The U.S. tax code is outdated and is putting global U.S.-based companies at a disadvantage to foreign competitors in an area of critical importance, specifically investing in the United States. Comprehensive tax reform is essential to create competitiveness and to stimulate investment in the economy."

*See* Dan Primack, FORTUNE, "AbbVie Finally Admits it was Trying to Dodge U.S. Taxes" (October 22, 2014) (emphasis added).

27.     Similarly, *Bloomberg* columnists observed that AbbVie's response to the Notice surprised the Company's investors given its earlier statements that tax was not a primary basis for the Combination:

AbbVie's move surprised investors after the drug company had said the deal was driven mostly by strategic, not tax, reasons. AbbVie said it reconsidered the transaction after the U.S. Treasury Department announced rule changes designed to limit moves overseas by American companies.

"Investor reaction is one of confusion and shock and we hope this will be resolved quickly," Jeffrey Holford, an analyst at Jefferies LLC in New York, wrote in a report today. "The limited communication from AbbVie is exacerbating the level of concern."

\* \* \*

> "*AbbVie's management's credibility may now be called into question given the non-inversion benefits they touted when initially selling the deal* and the fact that their limited public comments since the Treasury Notice was released have stressed the merits of getting the deal done," Credit Suisse analyst Vamil Divan said in a note to clients yesterday.

*See* Oliver Stanley and Cynthia Koons, BLOOMBERG, "AbbVie's Threat on Shire Deal is Latest Tax Rule Fallout" (October 15, 2014) (emphasis added).

## ADDITIONAL SCIENTER ALLEGATIONS

28. As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated concerning the Combination were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated in or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding AbbVie's rationale for the Combination, their control over, and receipt or modification of AbbVie's allegedly materially misleading statements and their associations with AbbVie which made them privy to confidential proprietary information concerning AbbVie, participated in the fraudulent scheme alleged herein.

## PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

29. From the beginning of the Class Period, Shire Securities were traded on the NASDAQ. At all relevant times, Shire Securities traded in an efficient market that promptly digested current information with respect to Shire from publicly available sources and reflected such information in the prices of Shire's shares.

30.     The evidence that Shire Securities traded on an efficient market at all relevant times includes the following:

(a)     Shire Securities met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Shire filed periodic public reports with the SEC and the NASDAQ;

(c)     The average weekly trading volume during the Class Period was over one million Securities trades;

(d)     During the Class Period, Shire was followed by several securities analysts who wrote reports about Shire that were distributed to their clients.  Each of these reports were publicly available and entered the public marketplace;

(e)     Shire regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

31.     Based on these indicia, a presumption of reliance applies.

## LOSS CAUSATION/ECONOMIC LOSS

32.     By misrepresenting AbbVie's basis for the Combination and telling purchasers of Shire Securities that the expected tax benefit as a result of reincorporation in Ireland was "not the primary rationale" for the combination and that "we would not be doing it if it was just for the tax impact,"  Gonzalez made material misstatements concerning AbbVie's rationale for the Combination.  In contrast to these public statements, tax was a critical, if not the sole, factor for AbbVie and, when the U.S. Department of Treasury announced a change in treatment of tax inversions, AbbVie announced that it reconsidered the combination.

33.     AbbVie's statements concerning its reasons for the Combination and expected non-tax benefits from the Combination caused the price of Shire Securities to rise to as high as $264.98 per share during the proposed Class Period, until AbbVie announced that the parties terminated the Agreement. Following AbbVie's announcement on October 15, 2014, the price of Shire Securities plummeted to as low as $156.25.

34.     Defendants' false and misleading statements had the intended effect and caused Shire's Securities to trade at artificially inflated levels throughout the Class Period, reaching its Class Period high of over $264.98 per share (on September 26, 2014).

## NO SAFE HARBOR

35.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements described in this Complaint. Many of the specific statements described herein were not identified as "forward-looking" when made. To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of AbbVie who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

36.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Shire ADS or purchased call options or sold put options during the period June 20, 2014 through and

including October 14, 2014 (the "Class"). Excluded from the Class are defendants, other officers and directors of AbbVie at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

37.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. At all relevant times, Shire had over 196.5 million ADS outstanding, which were owned publicly by at least hundreds of persons and entities.

38.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether Defendants violated Sections 10(b) of the Exchange Act;

(b)     whether Defendants omitted and/or misrepresented material facts;

(c)     whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     whether Gonzalez was a controlling person of AbbVie under Section 20(a) of the Exchange Act;

(f)     whether the price of Shire Securities was artificially inflated; and

(g)     the extent of damage sustained by Class members and the appropriate measure of damages.

39.     Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from defendants' wrongful conduct.

40.     Plaintiffs will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.   Plaintiffs have no interests which conflict with those of the Class.

41.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT ONE

**Against All Defendants for Violation of Section 10(b) of the Exchange Act and Rule 10b-5**

42.     Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

43.     Plaintiffs assert this Count pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, against defendants AbbVie and Gonzalez.

44.     During the Class Period, defendants disseminated or approved the false statements set forth above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

45.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

        (a)     employed devices, schemes and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Shire Securities during the Class Period.

46. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Shire Securities. Plaintiffs and the Class would not have purchased Shire ADS or purchased call options or sold put options at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT TWO

### Against Gonzalez for Violation of Section 20(a) of the Exchange Act

47. Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

48. Plaintiffs assert this Count pursuant to Section 20(a) of the Exchange Act against Gonzalez.

49. Gonzalez, by virtue of his leadership positions in AbbVie, had the power and authority to cause AbbVie to engage in the wrongful conduct complained of herein.

50. Gonzalez possessed the power and authority to control the contents of AbbVie's SEC filings and press releases. Gonzalez was aware of AbbVie's actual rationale for the Combination.

51.     AbbVie violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in the Complaint, and as a direct and proximate result of those violations, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

52.     By reason of his control of AbbVie, Gonzalez is liable pursuant to Section 20(a) of the Exchange Act for AbbVie's violations of Section 10(b) and Rule 10b-5, to the same extent as AbbVie.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding Plaintiffs and the members of the Class damages, including interest;

C.     Awarding Plaintiffs reasonable costs and attorneys' fees; and

D.     Awarding Plaintiffs such equitable/injunctive or other relief in Plaintiffs' favor as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury.


Dated: November 25, 2014                    /s/ Patrick H. Moran
                                            Patrick H. Moran
                                            Theodore B. Bell
                                            **WOLF HALDENSTEIN ADLER**
                                              **FREEMAN & HERZ LLC**
                                            55 West Monroe Street, Suite 1111
                                            Chicago, IL 60603
                                            Telephone: (312) 984-0000
                                            Facsimile: (312) 984-0001

Mark C. Gardy
James S. Notis
Jennifer Sarnelli
Meagan Farmer
**GARDY & NOTIS, LLP**
Tower 56
126 East 56th Street, 8th Floor
New York, NY 10022
Tel: 212-905-0509
Fax: 212-905-0508

Gregory M. Nespole
Benjamin Y. Kaufman
**WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
nespole@whafh.com
kaufman@whafh.com
Tel: 212-545-4600
Fax: 212-545-4758

*Counsel for Plaintiffs*