## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MURRAY RUBINSTEIN, JEFFREY F. ST. CLAIR, WILLIAM MCWADE, HARJOT DEV and VIKAS SHAH, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | Case No. 14-cv-9465 Judge Robert M. Dow, Jr. |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| RICHARD GONZALEZ and ABBVIE INC., | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Murray Rubinstein, Jeffrey F. St. Clair, William McWade, Harjot Dev and Vikas Shah (collectively, "Plaintiffs") filed this class action lawsuit against Defendants Richard Gonzalez ("Gonzalez") and AbbVie, Inc. ("AbbVie") (collectively, "Defendants") for alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Act"). See 15 U.S.C. §§ 78j(b) and 78t. Before the Court is Defendants' motion to dismiss [26]. For the reasons stated below, Defendant's motion [26] is granted and Plaintiffs' complaint is dismissed without prejudice. Plaintiffs are given until May 2, 2016 to file an amended complaint.

### I.     Background

For purposes of Defendants' motions to dismiss, the Court assumes as true all well-pled allegations set forth in Plaintiff's amended complaint. See *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). In addition, the Court takes judicial notice of the documents referred to and quoted in the complaint, which Defendants attach to their motion to dismiss. See *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *Wright v.*

*Associated Ins. Companies Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994) ("[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss.").

AbbVie is a biopharmaceutical company with its principal executive offices in Chicago, Illinois. On June 20, 2014, AbbVie publicly confirmed media reports that it had approached another biopharmaceutical company, Shire (which is not a party to this lawsuit), with an initial proposal for a merger. Shire has its principal executive offices in Dublin, Ireland and its securities are traded on the NASDAQ under the symbol "SHPG." In its announcement, AbbVie explained that it had until July 18, 2014 to announce a firm offer or a decision to abandon talks with Shire. (In their response to the motion to dismiss, Plaintiffs refer to this announcement as **alleged misstatement/omission 1**. See [33] at 15-16 n.4.)

On June 25, 2014, AbbVie issued a press release (**alleged misstatement/omission 2**) announcing that the AbbVie Board of Directors believed that the Shire merger had "compelling strategic rationale for all shareholders." [1] at 4. The rationale included:

- **Combination to accelerate growth of both companies through multiple catalysts** – AbbVie believes a merger of AbbVie and Shire would potentially accelerate growth and profitability by leveraging AbbVie's capabilities and infrastructure to make Shire's pipeline and products more successful than its standalone prospects. AbbVie believes that this merger would result in incremental sustainable leadership positions within high value market segments of significant unmet need, including: immunology, rare diseases, neuroscience, metabolic diseases and liver disease (HCV), as well as multiple emerging oncology programs.

- **Strong complementary fit across existing platforms is better than standalone capabilities** – AbbVie believes that Shire's platform has a strong complementary fit with AbbVie's existing specialty focus, including physician access relationships, regulatory and market access capabilities, and patient-centric focus. AbbVie's existing expertise and development capabilities across areas such as GI, neuroscience, rare oncology indications, combined with AbbVie's resources and

scale, could develop global franchises from Shire's platform and utilize M&A to supplement organic growth.

- **Leverage AbbVie's substantial and well-established global infrastructure** – AbbVie believes that Shire could achieve immediate broader geographic penetration and scale by leveraging AbbVie's existing, well-established global infrastructure across more than 170 countries, including our existing commercial, regulatory and medical affairs, and market access in key emerging markets. A combination would provide Shire with the desired scale and infrastructure along with:
  A diversified portfolio of leading marketed products;
  Stronger growth platforms with the potential for further development; and
  A complementary specialty focus combined with global pharma capabilities.

- **Broader and deeper pipeline of attractive development programs** – By leveraging AbbVie's established R&D infrastructure and expertise, AbbVie believes the combination would enhance innovation and end-to-end R&D capabilities, generating:
  A best-in-class product development platform, with near-term new product launches in liver disease (HCV), neuroscience, immunology, oncology, rare diseases, ophthalmology, and renal; and
  Expertise and infrastructure, including regulatory, health economics and outcomes research, and market access to expand product indications to meet patient needs. AbbVie's track record of product optimization is evidenced by its growth of the Humira® franchise through increased penetration in existing indications, geographic expansion, and approvals for new indications.

- **Substantial combined financial capacity** – *The enhanced financial profile of New AbbVie would offer greater strategic and financial flexibility*, enabling:
  The opportunity to maximize Shire's rare disease and neuroscience franchises including resources to fully globalize Shire's planned launches;
  The potential for strengthened sustainability of top-tier EPS growth, attractive free cash flow and enhanced return of capital policy; and
  A world-class business development group to drive continued portfolio expansion with access to cash and financial wherewithal not available on a standalone basis.

[1] at 4-6 (emphasis added).

Also on June 25, 2014, AbbVie issued a presentation titled "AbbVie's proposed combination with Shire: creating immediate and long-term value for all shareholders" (**alleged misstatement/omission 3**). AbbVie provided seven strategic reasons for the merger: (1) "Larger and more diversified biopharmaceutical company with multiple leading franchises"; (2) "Adds

leading franchises within specialty therapeutic areas, including rare disease and neuroscience";
(3) "Broad and deep pipeline of diverse development programs and enhanced R&D capabilities";
(4) "Global resources and experienced teams positioned to continue to deliver strong shareholder
returns to both AbbVie and Shire shareholders"; (5) "*Transaction expected to achieve a
competitive tax structure and provide New AbbVie with enhanced access to its global cash
flows*"; (6) "Transaction expected to be accretive to adjusted EPS in the first year following
completion, and will increase to more than $1.00 per share by 2020"; and (7) Significant
financial capacity for future acquisitions, investment and opportunity for enhanced shareholder
distributions and value creation." [1] at 7 (emphasis added).

On July 18, 2014, AbbVie disclosed that its Board had agreed to terms for the merger,
which was valued at approximately $54 billion. [1] at 7. AbbVie also disclosed that, in
connection with the merger, AbbVie Ventures, LLC had entered into a Cooperation Agreement
with Shire, which would require AbbVie to pay a termination fee of $1.64 billion if the deal was
not consummated. *Id.* at 7-8. AbbVie also issued another presentation to investors (**alleged
misstatement/omission 4**), which listed the same seven factors in favor of the merger as the
June 25, 2014 presentation.

AbbVie and Gonzalez also hosted a telephonic conference with investors on July 18,
2014 (**alleged misstatement/omission 5**). On the call, Gonzalez explained that AbbVie and
Shire intended "to incorporate the merged business in Jersey," Channel Islands and to domicile it
"in the UK for tax purposes." [27-2] at 20. Gonzalez also took questions concerning tax
inversions. A call participant from JPMorgan stated that "there has been a lot of noise coming
out of Washington recently on the topic of inversion" and asked Gonzalez to "talk a little bit
about how you thought about that risk as you considered the Shire deal and potentially re-

domiciling the Company into the UK." *Id.* at 22. Gonzalez told investors that the "transaction has significant, both strategic and financial, rationale," and while "[t]ax is clearly a benefit, * * * *it's not the primary rationale for this*." *Id.* (emphasis added). Gonzalez also noted that, from his point of view, the "debate" over inversions "would be more appropriately shifted toward tax reform and making companies more competitive in the global economy that we operate in," because "[c]ompanies like ours need access to our global cash flows to be able to make investments all around the world, but specifically to be able to make investments in the United States." *Id.* Gonzalez further stated that AbbVie was "at a disadvantage versus many of [its] foreign competitors" and opined that this is the "debate that we should be having around inversion and all aspects of the US tax code." *Id.* at 22-23. A call participant from Credit Suisse then asked a follow-up question about the "discussions in Washington around inversions." *Id.* at 23. He stated: "There is obviously the breakup fee you guys mentioned around this deal. I'm just trying to understand kind of how important the ex-US domiciling for tax purposes is to this deal and if something were to come up where retroactively you are not able to actually change your domicile outside the US, is that something where the breakup fee would not restrict you from then going ahead and breaking up this deal and not going forward?" *Id.* Gonzalez responded that he was "somewhat limited in what we can say," but continued: "this is a transaction that we believe has excellent strategic fit and has compelling financial impact well beyond the tax impact. *We would not be doing it if it was just for the tax impact*. This is an additional benefit that we have. We have looked carefully at that aspect of it and we believe it is executable at a high level." *Id.* at 23-24 (emphasis added).[1]

---

[1] The complaint alleges that this investor call occurred on July 21, 2014. [1] at 8-9. However, the language quoted in the complaint comes from the transcript of a call that occurred on July 18, 2014. [27-2] at 22-24. Defendants attached a copy of the transcript to their motion to dismiss. See *Id.* at 17 (showing "event date" of July 18, 2014).

On August 21, 2014, AbbVie Private Limited issued the Form S-4 for the proposed transaction (**alleged misstatement/omission 6**).[2]  The Form S-4 listed ten benefits of the transaction:

- the creation of a global market leader with unique characteristics and a compelling investment thesis by combining two companies with leadership positions in specialty pharmaceuticals;

- the opportunity to leverage AbbVie's capabilities and infrastructure to make Shire's pipeline and products more successful than its stand-alone prospects;

- the incremental sustainable leadership positions New AbbVie would be expected to have within high value market segments of significant unmet need, including immunology, rare diseases, neuroscience, metabolic diseases and liver disease (HCV), as well as multiple emerging oncology programs;

- the strong complementary fit of Shire's platform with AbbVie's existing specialty focus, including physician access relationships, regulatory and market access capabilities, and patient-centric focus and the potential to develop global franchises from Shire's platform with AbbVie's existing expertise and development capabilities across areas such as gastrointestinal medicine, neuroscience, and rare oncology indications, combined with AbbVie's resources and scale;

- *the potential realization of tax and operational synergies by New AbbVie as a result of the Combination*;

- the immediate broader geographic penetration and scale of Shire as a result of the Combination, by leveraging AbbVie's existing, well-established global infrastructure across more than 170 countries, including commercial, regulatory and medical affairs, and market access in key emerging markets;

- the enhancement of innovation and end-to-end R&D capabilities by leveraging AbbVie's established R&D infrastructure and expertise, which the AbbVie Board expects will generate:

  - a best-in-class product development platform, with near-term new product launches in liver disease (HCV), neuroscience, immunology, oncology, rare diseases, ophthalmology, and renal; and

---

[2] Form S-4 is a form filed with the SEC relating to a business combination or exchange offer. This filing contains details relating to share distribution, amounts, terms, and other information relating to any merger or exchange offers.

    o   expertise and infrastructure, including regulatory, health economics and outcomes research, and market access to expand product indications to meet patient needs;

- the combined financial strength and R&D experience of New AbbVie;

- the Combination's expected accretion to AbbVie's adjusted earnings per share in the first year following completion, growing to above $1.00 per share by 2020, with material ongoing financial and operating benefits;

- the opportunity for New AbbVie to have an enhanced financial profile and greater strategic and financial flexibility as compared to AbbVie and Shire on a standalone basis, which would provide:

    o   the opportunity to maximize Shire's rare disease and neuroscience franchises including resources to fully globalize Shire's planned launches;

    o   the potential for strengthened sustainability of top-tier EPS growth, attractive available cash flow and enhanced return of capital policy; and

    o   the basis for a world-class business development group to drive continued portfolio expansion and utilize M&A to supplement organic growth with access to cash and financial resources not available on a standalone basis.

[1] at 10-11 (emphasis added).

On September 22, 2014, the U.S. Treasury Department issued a notice ("Notice") that it would be taking steps to curb the practice of corporate inversions. See [27-2] at 3-78 (copy of Notice). A corporate inversion is a transaction in which a U.S. based multinational restructures so that the U.S. parent is replaced by a foreign parent, in order to avoid paying U.S. taxes. See [1] at 11. The Treasury Department stated that the Notice "eliminates certain techniques inverted companies currently use to access the overseas earnings of foreign subsidiaries of the U.S. company that inverts without paying U.S. tax" and would apply "to deals closed today or after today." *Id*.

On September 29, 2014, AbbVie and Gonzalez issued a statement to Shire's employees, which AbbVie also filed with the SEC (**alleged misstatement/omission 7**). Gonzalez stated that

he was "more energized than ever about our two companies coming together, especially because I can already see many shared traits and values in the people at AbbVie and Shire." [1] at 12. Gonzalez explained that, "[w]hen we first considered Shire joining together with AbbVie it was because we saw the opportunity to lead and grown in important therapeutic areas" and also "because we saw a complementary pipeline that would be positioned to enhance innovation." *Id.* Gonzalez stated that he was "more confident than ever about the potential of our combined organizations now that I've had a chance to meet with many of you." *Id.* He told Shire employees, "[w]e have a very busy few months ahead as we work on integration planning." *Id.* Gonzalez concluded that he "look[ed] forward to working with [Shire employees] much more closely in the near future." *Id.*

On October 14, 2014, Gonzalez announced that AbbVie's Board would be reconsidering its recommendation to shareholders to adopt the merger agreement. Gonzalez stated that "AbbVie's Board will consider, among other things, the impact of the U.S. Department of Treasury's proposed unilateral changes to the tax regulations announced on September 22, 2014, including the impact to the fundamental financial benefits of the transaction." [1] at 13.

On October 15, 2014, two columnists from *Bloomberg* published an article stating that "AbbVie's move surprised investors after the drug company had said the deal was driven mostly by strategic, not tax, reasons." [1] at 15 (quoting Oliver Stanley and Cynthia Koons, BLOOMBERG, "AbbVie's Threat on Shire Deal is Latest Tax Rule Fallout" (Oct. 15, 2014)). They quoted an analyst from Credit Suisse who stated, "AbbVie's management's credibility may now be called into question given the non-inversion benefits they touted when initially selling the deal and the fact that their limited public comments since the Treasury Notice was released have stressed the merits of getting the deal done." *Id.* at 16.

On October 20, 2014, AbbVie issued a press release stating that it had decided to terminate the merger with Shire. See [1] at 12-13. See also [27-2] at 80-83 (copy of press release). AbbVie was required to pay the $1.64 billion break-up fee. According to the press release, AbbVie's decision "was based upon its assessment of the September 22, 2014 notice issued by the U.S. Department of Treasury, which re-interpreted longstanding tax principles in a uniquely selective manner designed specifically to *destroy the financial benefits of these types of transactions*." [27-2] at 80 (emphasis added). AbbVie further stated that the Notice "introduced an unacceptable level of risk and uncertainty, given the magnitude of the proposed changes and the stated intention of the Department of Treasury to continue to revise tax principles to further impact such transactions." *Id.* AbbVie explained that after thoroughly reviewing the Notice and obtaining advice from external tax, legal, and financial advisors, its "executive management team ultimately concluded that the transaction was no longer in the best interests of stockholders *at the agreed upon valuation*, and the Board fully supported that conclusion." *Id.* (emphasis added). Gonzalez publicly commented on the termination of the transaction. He stated, among other things, that "[t]he unprecedented unilateral action by the U.S. Department of Treasury *may have destroyed the value of this transaction*, but it does not resolve" the need for comprehensive tax reforms to stimulate investment in the U.S. economy. *Id.* (emphasis added).

On October 22, 2014, a columnist for *Fortune* wrote a column stating that AbbVie had "kill[ed] its $54 billion buyout of Shire" and "come[] clean about its original intentions," which the columnist posited to be the tax benefits gained from the corporate inversion. [1] at 15 (quoting Dan Primack, FORTUNE, "AbbVie Finally Admits it was Trying to Dodge U.S. Taxes" (Oct. 22, 2014)). The columnist opined that due to the Treasury Notice, Gonzalez was "free from having to pretend that [the proposed merger] wasn't about the taxes." *Id.*

9

On November 25, 2014, Plaintiffs filed suit against AbbVie and Gonzalez on behalf of all persons who purchased or otherwise acquired Shire ADS or purchased call options or sold put options during the period June 20, 2014 (when AbbVie disclosed it had approached Shire) through October 14, 2014 (when Gonzalez announced the Board was reconsidering its decision to approve the merger). [1] at 18-19.

## II. Analysis

Plaintiffs allege in their complaint that AbbVie and Gonzalez violated Section 10(b) of the Act and Rule 10b-5 and that Gonzalez also violated Section 20(a) of the Act. Section 10(b) of the Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security * * * any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). "Rule 10b–5 forbids a company or an individual 'to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008) (quoting 17 C.F.R. § 240.10b–5(b)). "The elements of a private securities fraud claim based on violations of § 10(b) and Rule 10b–5 are: '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 131 S. Ct. 2179, 2184 (2011) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011)).

Section 20(a) of the Act "provides a basis for holding individuals liable for acts of securities fraud if they control other individuals or businesses that violate the securities laws."

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 886 (N.D. Ill. 2011) (quoting 15 U.S.C. § 78t). Thus, "to state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008).

Defendants move to dismiss Plaintiffs' complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and 15 U.S.C. § 78u-4(b)(3)(a). Defendants argue that Plaintiffs fail to allege sufficient facts to support three of the elements of their Section 10(b) and Rule 10b-5 claim: (1) a misrepresentation of material fact; (2) scienter; and (3) loss causation. Defendants also argue that Plaintiffs' Section 20(a) claim should be dismissed because Plaintiffs have failed to state a primary violation of the securities laws.

### A.     Legal Standards

"In an ordinary civil action, the Federal Rules of Civil Procedure require only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). "Although the rule encourages brevity, the complaint must say enough to give the defendant 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Id.* (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)). A complaint that does not comply with Rule 8(a) is subject to dismissal under Rule 12(b)(6), which tests the sufficiency of the complaint. See Fed. R. Civ. P. 12(b)(6); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Prior to the enactment of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), "the sufficiency of a complaint for securities fraud was governed not by Rule 8, but by the heightened pleading standard set forth in Rule 9(b)." *Tellabs*, 551 U.S. at 319. Under Rule 9(b), a party alleging fraud or mistake "must state with particularity the circumstances

constituting fraud or mistake," but "intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

The PSLRA "raise[d] the pleading standard for securities fraud claims beyond the requirements of even Rule 9(b)." *Van Noppen v. InnerWorkings, Inc.*, -- F. Supp. 3d --, 2015 WL 5770138, at *1 (N.D. Ill. Sept. 30, 2015). These heightened pleading standards, which are discussed in detail below, apply to the "misrepresentation of material fact" and "scienter" elements of Section 10(b) and Rule 10b-5 claims. See generally *Tellabs*, 551 U.S. at 320. The Court is required to grant a motion to dismiss if these standards are not met. 15 U.S.C. § 78u-4(b)(3)(A).

In evaluating Defendants' motion to dismiss, the Court must accept all factual allegations in the complaint as true. *Van Noppen*, 2015 WL 5770138 at *17. The Court must also "draw all reasonable inferences in favor of the plaintiff," *except* when it is evaluating the scienter element. See *Makor*, 513 F.3d at 705. The standard that applies to the scienter element is discussed below.

**B.      Material Misrepresentations or Omissions**

The PSLRA requires that in any action where "the plaintiff alleges that the defendant (A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading," the complaint must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(A), (B). In a case where, as here, the allegations are based on information and belief, the plaintiff is also required to "state with particularity all facts on which that belief is formed." *Id.* § 78u-4(b)(1).[3]

---

[3] Plaintiffs' complaint states that all allegations are based on information and belief except allegations specifically pertaining to Plaintiffs. [1] at 1.

In determining whether a statement is misleading, the Court "consider[s] the context in which the statement was made" and "must determine 'whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission.'" *Constr. Workers Pension Fund-Lake Cty. & Vicinity v. Navistar Int'l Corp.*, 114 F. Supp. 3d 633, 651 (N.D. Ill. 2015) (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 596 (7th Cir. 2006), *vacated and remanded*, 551 U.S. 308 (2007)); see also *Van Noppen*, 2015 WL 5770138 at *5.

Defendants argue that the complaint should be dismissed because it fails to specify each statement or omission alleged to have been misleading and the reason or reasons why. Plaintiffs respond that the complaint identifies the following seven misleading statements or omissions of material fact:

1. AbbVie's June 20, 2014 announcement that it had approached Shire about a business combination ([27-1] at 20-23);

2. AbbVie's June 25, 2014 press release listing five "compelling strategic rationale for all shareholders" for the proposed merger with Shire, including "[s]ubstantial combined financial capacity" and "[a] world-class business development group to drive continued portfolio expansion with access to cash and financial wherewithal not available on a standalone basis" ([27-1] at 25-38);

3. AbbVie's June 25, 2014 presentation listing seven strategic rationale for the merger, including "achiev[ing] a competitive tax structure and provid[ing] New AbbVie with enhanced access to its global cash flows" ([27-1] at 40-79);

4. AbbVie's July 18, 2014 presentation listing the same seven strategic rationale as the June 25, 2014 presentation ([27-2] at 2-15);

5. AbbVie's and Gonzalez's July 18, 2014 investor call, on which Gonzalez said AbbVie would "not be doing [the merger] if it was just for the tax impact" and that "[t]ax is clearly a benefit, but it's not the primary rationale for this" ([27-2] at 17-31);

6. AbbVie's August 21, 2014 S-4 tax filings describing the strategic reasons for the merger, including "the potential realization of tax and operational

13

> synergies by New AbbVie as a result of the Combination" ([27-1] at 3-18); and

> 7.    Gonzalez's September 29, 2014 thank-you letter to Shire employees stating that he is "more confident than ever about the potential of our combined organizations" and that "[w]e have a very busy few months ahead as we work on integration planning" ([27-2] at 33-35).

[33] at 15 & n.4. Plaintiffs assert that these seven statements or omissions "emphasiz[ed] the purported strategic benefits of the merger" and "downplay[ed] or den[ied] the tax inversion." *Id.* at 18. These statements or omissions were "false and misleading," according to Plaintiffs, "because the tax inversion was the make-or-break reason for the merger." *Id.*

The Court concludes that Plaintiffs have not alleged facts that are "sufficient to support a reasonable belief" that statements 1, 2, 3, 4, 5, or 6 were misleading, but have met their burden with regard to statement 7. *Constr. Workers Pension Fund*, 114 F. Supp. 3d at 651.

Statement 1 confirmed press speculation that AbbVie had approached Shire with a merger proposal. Plaintiffs do not identify anything in Statement 1 that is untrue. Nor do Plaintiffs allege facts showing that Defendants omitted to state a material fact necessary to make Statement 1 not misleading. Statement 1 does not explain why the parties were considering a merger and does not contain any information from which an investor might infer that the tax benefits were a make-or-break reason for the contemplated merger. See [27-1] at 20. Therefore, Defendant was under no duty to disclose that the tax benefits were (according to Plaintiffs) the make-or-break reason for the transaction. "Mere silence about even material information is not fraudulent absent a duty to speak." *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995).

In statements 2, 3, 4 and 6, Defendants identified various benefits, including tax benefits, that they hoped to realize through the proposed merger. Plaintiffs have not pled facts indicating that statements 2, 3, 4 or 6 are false. For instance, they do not allege that Defendants simply

14

made up the non-tax rationales for the transaction. Instead, Plaintiffs state in their response brief that they "do *not* dispute that the Merger may have provided some strategic benefits to AbbVie" other than tax benefits. [33] at 17 (emphasis added).

Plaintiffs also have not pled facts indicating that statements 2, 3, 4, or 6 contain actionable omissions. Plaintiffs' theory of the case assumes that, because Defendants disclosed the various benefits they hoped to realize from the transaction, Defendants also had a duty to disclose that Defendants would (or might) call off the transaction and pay the break-up fee if the tax benefits evaporated. Plaintiffs argue that "[b]ecause the market was not told that the Merger depended on the tax inversion, * * * investors did not know that completion of the Merger was dependent on the tax inversion." [33] at 19. Certainly, this is information that an investor would likely *want* to know before deciding to invest in a company that is in the midst of a merger. But Section 10(b) and Rule 10(b)(5) only "proscribe[] omissions that render affirmative statements misleading; thus, incomplete disclosures, or 'half-truths,' implicate a duty to disclose whatever additional information is necessary to rectify the misleading statements." *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 944 (7th Cir. 1989). Thus, "[e]ven with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market." *Matrixx*, 563 U.S. at 45.

Here, Plaintiffs have failed to allege facts sufficient to support a reasonable belief that statements 2, 3, 4, or 6 were misleading by omission such that AbbVie had a duty to disclose that it might call off the merger if the tax rules changed. In these statements Defendants identified various benefits—including specifically the tax benefits—that they hoped to realize, without ranking the benefits or stating which benefits were substantial enough to justify paying the breakup fee. Therefore, Defendants had no duty to rectify these statements by disclosing their

15

position on whether AbbVie would call off the merger if the tax rules changed. Cf. *Schlifke*, 866 F.2d at 944-45 (omissions cited by purchasers of limited partnership interests in oil and gas exploration program in connection with loan documents that were included with partnership prospectus did not give rise to duty on part of bank to disclose other material facts regarding loan transaction; contrary to purchasers' contention, loan documents did not give rise to any implication that bank believed partnership would be successful); *City of Edinburgh Council v. Pfizer, Inc*., 754 F.3d 159, 168-69 (3d Cir. 2014) (statements made during earnings calls to pharmaceutical manufacturer's investors, which described phase 2 interim results of experimental Alzheimer's drug trial as one factor in the "composite decision" to move to phase 3—but did not disclose known problems with the phase 2 tests— were not false and misleading in violation of § 10(b), as such statements were consistent with manufacturer's prior press release and accurately conveyed that the interim results were one of several factors manufacturer considered in deciding to initiate phase 3).

The Court next considers Statement 5. On the July 18, 2014 investor call, Gonzalez told investors that while "[t]ax is clearly a benefit, * * * it's not the primary rationale" for the merger and "[w]e would not be doing it if it was just for the tax impact." [1] at 9. Plaintiffs argue that the statement's falsity can be inferred by AbbVie's decision, following the Treasury Notice, to terminate the transaction and pay the break-up fee. Other than this, Plaintiffs do not allege any facts showing that the tax benefits were more important than any of the other rationales identified in statements 2, 3, 4 or 6. The Court concludes that the facts alleged do not support a reasonable belief as to the falsity of Gonzalez's statement that tax was not the primary rationale for the merger. At most, Plaintiffs' allegations would permit the Court "'to infer * * * the mere possibility of misconduct,'" which is insufficient to "show" that the pleader is entitled to relief

16

under Rule 8(a)(2).  *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); citing Fed. R. Civ. P. 8(a)(2)).

According to the complaint, the total value of the deal was $54 billion.  [1] at 7.  The break-up fee was $1.64 billion, or approximately 3% of the total value.  *Id.* at 8.  Given this deal structure, it would be expected that AbbVie's loss of any benefit worth 3% or more of the total deal value could cause AbbVie to terminate the deal.  But it does not follow that any benefit of the deal that is worth at least 3% of the transaction value must be the "primary"—*i.e.* the "most important"[4]—reason for the deal.  As Defendants point out, "[s]aying a benefit is not the 'primary rationale' is not the same as saying it is immaterial or unimportant."  [27] at 19. Moreover, Plaintiffs' argument that Gonzalez's statement that taxes were not the "primary reason" for the deal was misleading ignores the context of statement 5.  When Gonzalez said that the tax consequences of the deal were a benefit, but not the "primary rationale" for the deal, he also stated that the tax issue was important because American companies need access to global cash flows and are at a disadvantage to foreign competitors.  [27-2] at 22.  And when Gonzalez said that "[w]e would not be doing it if it was just for the tax impact," he also stated that he was "limited in what we can say" on whether AbbVie would call off the transaction if the tax rules changed and avoided taking any position on that issue.  *Id.* at 23.  Therefore, the Court concludes that Plaintiffs' allegations that Defendants terminated the transaction following Treasury's Notice and paid the break-up fee are insufficient to support a reasonable belief that Statement 5 was false at the time made or that Statement 5 contained actionable omissions that AbbVie needed to clarify.

---

[4] Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/primary (last accessed Mar. 29, 2015).

Finally, the Court considers Statement 7, the September 29, 2014 letter that Gonzalez sent to Shire employees and filed with the SEC a week after Treasury issued its Notice. Gonzalez stated that he was "more energized than ever about our two companies coming together" and "more confident than ever about the potential of our combined organizations." [27-2] at 33. Gonzalez also stated that "[w]e have a very busy few months ahead as we work on our integration planning" and that he "look[ed] forward to working with [Shire employees] much more closely in the near future." *Id.* The Court concludes that Plaintiffs have alleged facts that are sufficient to support a reasonable belief that Gonzalez's statement was false or misleading at the time made. The Court cannot, as Defendants urge, conclude based on the pleadings that Gonzalez's statements were "mere puffing" or "corporate optimism" that are too immaterial to be actionable. *Plumbers & Pipefitters Local Union*, 778 F. Supp. 2d at 871-72. Gonzalez sent the letter a week after Treasury issued its Notice, at which time Defendants could have known that the transaction would not result in the tax savings AbbVie had expected and could have been reconsidering or planning to call off the deal. Gonzalez told Shire workers that they would continue to work on integration planning over the next few months, and expressed enthusiasm about the transaction. [1] at 12. Less than a month later, however, AbbVie called off the deal on the basis that the tax change "destroy[ed]" the financial benefits of the transaction and paid the $1.64 million break-up fee. [1] at 13. The Court concludes that these facts are sufficient to support a reasonable belief that AbbVie's omission of the fact that it was reconsidering the merger rendered misleading Gonzalez's statement about the continued planning for the transaction.

### C.    Scienter

"To establish liability under § 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or

defraud.'" *Tellabs*, 551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 & n.12 (1976)). A plaintiff may "demonstrate scienter 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Tricontinental Indus. Ltd. v. Anixter*, 215 F. Supp. 2d 942, 949 (N.D. Ill. 2002) (quoting *Rehm v. Eagle Fin. Corp.,* 954 F. Supp. 1246, 1253 (N.D. Ill. 1997)). In the Seventh Circuit, scienter can also be established by proving that the defendant acted with a "reckless disregard of the truth." *S.E.C. v. Bauer*, 723 F.3d 758, 775 (7th Cir. 2013).[5] In the context of omissions, reckless conduct is "'a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Sundstrand*, 553 F.2d at 1045 (quoting *Franke v. Midwestern Oklahoma Development Authority*, 428 F. Supp. 719 (W.D. Okl. 1976)). Thus, "[t]he question is not merely whether the [defendant] had knowledge of the undisclosed facts; rather, it is the '*danger of misleading buyers* [that] must be actually known or so obvious that any reasonable man would be legally bound as knowing." *Schlifke*, 866 F.2d at 946 (emphasis in *Sclifke*; quoting *Sundstrand,* 553 F.2d at 1045).

The PSLRA further requires the plaintiff to "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (emphasis added). To determine if a plaintiff has complied with this obligation, the

---

[5] See also *Tellabs*, 551 U.S. at 319 & n.3 (declining to decide whether reckless conduct can form the basis for a § 10(b) claim, but recognizing that "[e]very Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally or recklessly, though the Circuits differ on the degree of recklessness required"); *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1044 (7th Cir. 1977) ("[A] reckless omission of material facts upon which the plaintiff put justifiable reliance in connection with a sale or purchase of securities is actionable under Section 10(b) as fleshed out by Rule 10b-5.").

Court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 310. "The inference that the defendant acted with scienter need not be irrefutable, but it must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* "In making this determination, the court must review 'all the allegations holistically.'" *Matrixx*, 563 U.S. at 48 (quoting *Tellabs*, 551 U.S. at 326). In sum, this Court must ask: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 551 U.S. at 326.

Defendants argue that the complaint should be dismissed because Plaintiffs fail to adequately allege that Defendants acted with scienter when they made their alleged false and misleading statements. In analyzing scienter, the Court will focus on Gonzalez's September 29, 2014 letter to Shire employees because that is the only material misrepresentation or omission that Plaintiffs have adequately pled. The Court concludes that Plaintiffs fail to state with particularity facts giving rise to a strong inference that Gonzalez acted with scienter when he sent the September 29, 2014 letter to Shire employees. As explained above, Plaintiffs' allegations that AbbVie announced its intent to reconsider the deal just two weeks after Gonzalez wrote his letter could support an inference that Gonzalez's statements concerning his continued enthusiasm for the transaction were false or misleading. The Court concludes, nonetheless, that under the PLRA's heightened pleading requirements, the more cogent and compelling inference from Gonzalez's letter and the pleadings is that as of September 29, 2014, Gonzalez was still enthusiastic about the transaction.

The complaint does not allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Tricontinental*, 215 F. Supp. 2d at 949. While AbbVie

announced its intent to reconsider the deal a few weeks after Gonzalez sent his letter to Shire employees, this timing alone is not strong evidence that Gonzalez knew at the time he sent the letter that AbbVie was going to reconsider or call off the deal. If AbbVie was concerned about hiding the importance of the tax consequences even *after* Treasury issued its Notice, then why would its announcements that it was reconsidering and calling off the deal make clear that the Notice was the reason? Cf. *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 713-14 (N.D. Ill. 2005) (investor in corporation providing predictive analytics software and services did not satisfy scienter requirement through allegations that there were "red flags" in financial statements, as evidenced by later discovery that statements were incorrect, which were ignored by CEO and executive vice president, where there was no showing that executives were aware of "red flags" at time statements were issued).

In addition, the complaint does not allege any facts concerning Defendants' motive to lie in order to inflate Shire's share price. *Tricontinental*, 215 F. Supp. 2d at 949. While the absence of a motive allegation is not fatal, "motive can be a relevant consideration" and the "significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint." *Tellabs*, 551 U.S. at 325. Cf. *Van Noppen*, 2015 WL 5770138, at *15 (purchasers of corporation's common stock failed to show that CEO made allegedly false and misleading statements regarding direction of inside sales group's performance, and corporation's confidence about role group would play in long-term business growth, with requisite scienter, where CEO's stock sales amounted to low percentage of his stock holdings and there was no evidence that he made net profit on his sales).

Plaintiffs assert in their brief (but not in their complaint) that Defendants' motive was to avoid "invit[ing] unwanted oversight regarding any regulatory approvals for the Merger." [33] at

21

19 n.7.  But Plaintiffs do not identify any regulatory approvals that were required before the transaction could close.  To the extent that Plaintiffs mean more generally that Defendants sought to avoid attention from regulators who might change the tax rules, this is not a plausible motive for Gonzalez's letter to Shire employees because Treasury had already issued the Notice by the time that Gonzalez wrote the letter.  In short, it is not apparent from the pleadings why Gonzalez would lie or act with a reckless disregard for the truth by implying that the transaction was still moving forward if he knew at that time that the Board was going to reconsider its approval for the transaction.  Cf. *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757-58 (7th Cir. 2007) (investors bringing securities fraud action against parent corporation whose Brazilian subsidiary had engaged in fraudulent accounting practices failed to state "strong inference" of scienter on part of parent's executives by alleging that executives had learned of fraud "in the May time frame," but had disclosed it only in late July; knowledge of subsidiary's fraud would lead reasonable person to conduct investigation, which parent did during June and July, and knowledge gained during May could not indicate intent to deceive as to financial statements issued through early May).

For these reasons, the Court concludes that Plaintiffs have failed to adequately plead scienter.

### D. Loss Causation

In a private securities fraud action, the plaintiff bears "the burden of proving that the act or omission of the defendant alleged to violate [the securities laws] caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4.  This concept, referred to as "loss causation," "requires a plaintiff to show that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss."  *Erica P. John Fund*, 131 S. Ct. at 2186 (emphasis in original).  "One way of establishing loss causation," which Plaintiffs rely on here,

22

"is to 'show both that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception.'" *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 864 (7th Cir. 2014) (quoting *Ray v. Citigroup Global Markets, Inc.,* 482 F.3d 991, 995 (7th Cir. 2007)).

Plaintiffs allege that Defendants' misrepresentations concerning the importance of tax inversion began on June 20, 2014, when AbbVie disclosed that it had approached Shire, and ended on October 14, 2014, when Gonzalez announced that the Board was reconsidering its decision to approve the merger due to, "among other things, the impact of the U.S. Department of Treasury's proposed unilateral changes to the tax regulations announced on September 22, 2014, including the impact to the fundamental financial benefits of the transaction." [1] at 13. Defendants argue that the complaint should be dismissed because Plaintiffs fail to adequately allege loss causation. The Court concludes that Plaintiffs' loss causation allegations are sufficient as to Plaintiffs McWade and Shah. The Court also concludes that the relevant period for examining loss causation is shorter than alleged by Plaintiffs due to Plaintiffs' inadequate pleading of material misleading statements/omissions and, therefore, the complaint's loss causation allegations are insufficient as to Plaintiffs Rubinstein, St. Clair, and Dev, who did not buy or sell stock during the relevant period.

The complaint does not support using June 20, 2014 as the date that Defendants began artificially inflating Shire's stock price because, as explained above, the only misrepresentation that Plaintiffs have adequately pled did not occur until September 29, 2014, when Gonzalez expressed continuing enthusiasm for the merger following the Treasury Notice. The correct period to examine for purposes of assessing loss causation would begin September 29, 2014 and end October 14, 2014, when AbbVie announced that the Board was reconsidering the merger due

to the Treasury Notice—which allegedly revealed that Gonzalez's expression of enthusiasm on September 29 was false, assuming that he knew at that time that AbbVie was reconsidering the transaction.  On September 29, 2014, Shire was trading at about $260.00 a share.  Between September 29 and October 14, 2014, the high price was about $263.00 on October 3.  The price fell to about $246.00 by October 14, and fell precipitously following the announcement.  Only Plaintiffs McWade and Shah bought or sold Shire shares between September 29 and October 14.  See [1-1] at 5 (McWade), 7 (Shah).  See also *id.* at 2 (Rubinstein); 3 (St. Clair); 6 (Dev).  The Court concludes based on these facts that Plaintiffs McWade and Shah have adequately pled loss causation for the period beginning September 29 and ending October 14, 2014, but that Plaintiffs Rubinstein, St. Clair and Dev have not.  Cf. *Construction Workers Pension Fund*, 114 F. Supp. 3d at 644-45 (shareholders lacked standing to act as named plaintiffs in securities fraud class action where defendants' alleged fraudulent statements were made after plaintiffs' last stock purchases).

### E.      Section 20(b) Claim

"[T]o state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws."  *Pugh*, 521 F.3d at 693.  For the reasons explained above, the Court concludes that Plaintiffs have not adequately pled a primary violation of the Act.  Therefore, the Court also grants Defendants' motion to dismiss Plaintiffs' Section 20(a) claim against Gonzalez.

**III.    Conclusion**

For the reasons stated above, Defendants' motion to dismiss [26] is granted.  Plaintiffs are given until May 2, 2016 to amend their complaint.


Dated: March 29, 2016

_____

Robert M. Dow, Jr.
United States District Judge