## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MURRAY RUBINSTEIN, JEFFREY F. ST. CLAIR, WILLIAM MCWADE, HARJOT DEV and VIKAS SHAH, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | Case No. 14-cv-9465 |
| | ) | Judge Robert M. Dow, Jr. |
| Plaintiffs, | ) ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | |
| RICHARD GONZALEZ and ABBVIE INC., | ) ) | |
| Defendants. | ) | |

## AMENDED CLASS ACTION COMPLAINT FOR
## VIOLATION OF THE FEDERAL SECURITIES LAWS

This is a securities class action brought by appointed Lead Plaintiffs Dawn Bradley, Murray Rubinstein, Vikas Shah, and Harjot Dev (collectively "Lead Plaintiffs") individually and on behalf of all persons who purchased or otherwise acquired American Depository Shares or "ADS" or purchased call options or sold put options (collectively, "Securities") of Shire plc ("Shire") between July 21, 2014 and October 14, 2014, inclusive (the "Class Period"), against AbbVie Inc. ("AbbVie") and its Chairman and Chief Executive Officer ("CEO") Richard Gonzalez ("Gonzalez") for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.  The allegations in this complaint are based upon information and belief, except as to allegations specifically pertaining to Lead Plaintiffs, which are based on personal knowledge.  Lead Plaintiffs base their belief upon information uncovered through an investigation by Lead Plaintiffs' counsel that included: review of AbbVie's and Shire's public filings with the Securities and Exchange Commission ("SEC"); review of

AbbVie's press releases and other public statements; and review of regulatory filings and reports, court filings, securities analyst reports, and media reports about AbbVie.

## INTRODUCTION

1.      Lead Plaintiffs bring this class action on behalf of all similarly situated purchasers of Shire Securities in connection with statements distributed by, or on behalf of, AbbVie to purchasers of Shire Securities regarding AbbVie's rationale for pursuing and abandoning a business combination with Shire.

2.      On June 20, 2014, AbbVie confirmed media reports that it had approached Shire with an initial combination proposal, and that AbbVie had until July 18, 2014 to announce a firm offer or a decision to abandon talks with Shire.  Thereafter, on July 18, 2014, AbbVie disclosed that the boards of AbbVie and Shire entered into a cooperation agreement (the "Cooperation Agreement"), and agreed to definitive terms of a proposed business combination of Shire and AbbVie (the "Combination").  The terms of the Combination provided that AbbVie would merge with and into Shire, with AbbVie as the surviving entity, which would reincorporate in Ireland. News of the Combination sent Shire Securities to rise to a high of $264.98 per share during the proposed Class Period.

3.      AbbVie was one of many companies engaging in mergers with foreign companies in so-called "inversion" transactions where a U.S.-based corporation would re-domicile in a foreign county in order to avoid U.S. tax obligations.  Absent the tax break, these mergers had no legitimate business purpose; rather, they were designed to take advantage of the tax loophole. President Obama, numerous U.S. Senators, and the Secretary of the U.S. Treasury all publicly denounced such transactions (whose only purpose was to reduce a company's tax burden) as unpatriotic, and sought to close the loophole.

4.      In connection with the announcement of the Combination, AbbVie and Gonzalez ("Defendants") made presentations to both holders of Shire Securities and AbbVie common stock informing that the combination was based on various strategic rationales. While these strategic rationales were valid and projected to provide the Company, coincidentally, with much needed diversification to assist in its long term growth plans, as subsequent events proved, they were not the primary reason for the transaction. Rather than tell investors the truth that the tax benefits of reincorporating in Ireland were the primary rationale for the Combination – indeed, the *sine qua non* for the Combination – AbbVie chose to downplay the tax benefits in light of the negative stigma of these inversions and dupe investors into believing this transaction made strategic sense with or without the tax inversion benefits when subsequent events proved that the Combination would not proceed absent the tax benefits.

5.      At an open investor call on July 21, 2014, Gonzalez falsely told investors and analysts that an expected tax benefit as a result of reincorporation in Ireland was "not the primary rationale" for the combination, and that "we would not be doing it if it was just for the tax impact."

6.      In contrast to these (false) public statements of AbbVie and Gonzalez, the tax considerations were the critical, if not the sole factor for AbbVie's decision to enter into the Combination. When the U.S. Department of Treasury on September 22, 2014 announced a change with respect to the treatment of tax inversions, AbbVie announced on October 14, 2014 that it was reconsidering the Combination.

7.      Because tax inversions were highly controversial and subject to intense public criticism, AbbVie and Gonzalez sought to conceal the fact that the tax benefit was the primary –

indeed, crucial – reason for the Combination and that a loss of the controversial tax benefit would eliminate the value of the Combination and result in a termination of the transaction.

8.     In stark contrast to Gonzalez's previous statements denying that the tax inversion was the primary rationale for the Combination, the Company changed its tune, admitting that the change to the tax regulations eliminated the "***fundamental financial benefits of the transaction***." *Fortune* magazine reported that Gonzalez's statement that the tax inversion was not the primary reason for the Combination was "***outright deceit***,"

9.     As a result, as soon as the tax benefits were eliminated, and with no other announced change to the purported economic benefits of the Combination, Shire Securities dropped from a closing price of $244.57 on October 14, 2014 to a low of $156.25 on October 15, 2014.  On October 21, 2014, without disclosing any change to the underlying economics of the Combination (other than the loss of the favorable tax treatment), AbbVie and Shire announced that the companies agreed to terminate the Cooperation Agreement and end plans for the Combination, with AbbVie paying a $1.64 billion termination fee to Shire for its decision to terminate the Cooperation Agreement.

## JURISDICTION AND VENUE

10.     The claims asserted arise under Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act and 28 U.S.C. §§1331 and 1337.  Venue is proper pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  AbbVie has its principle executive offices located in this District, and the statements alleged herein originated from this District.

11.     In connection with the acts alleged in this Complaint, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including without

limitation the mails, interstate telephone communications, and the facilities of the national securities exchanges.

## THE PARTIES

12.     Lead Plaintiffs purchased or otherwise acquired Shire Securities at artificially inflated prices during the Class Period (as described in their PSLRA certifications previously filed with the Court), and were damaged thereby.

13.     Defendant AbbVie is biopharmaceutical company incorporated in the State of Delaware, with principal executive offices located at 1 North Waukegan Road, North Chicago, Illinois, 60064.  AbbVie was spun-off from Abbott Laboratories ("Abbott"), and became an independent public company on January 1, 2014.

14.     Defendant Gonzalez is the CEO of AbbVie and Chairman of its Board of Directors (the "Board").  He served as Abbott's executive vice president of the pharmaceutical products group from July 2010 to December 2012, and was responsible for Abbott's worldwide pharmaceutical business, including commercial operations, research and development, and manufacturing.  Gonzalez made numerous statements regarding AbbVie's rationale for the Combination.  In addition, Gonzalez signed an August 21, 2014, Form S-4 Registration Statement ("S-4") that was filed with the SEC by AbbVie Private Limited in connection with the Combination.

15.     Non-party Shire is a biopharmaceutical company incorporated in Jersey (Channel Islands), with principal executive offices located at 5 Riverwalk, Citywest Business Campus, Dublin 24, Republic of Ireland.  Shire Securities are traded on the NASDAQ under the symbol "SHPG."

# FACTS

## *Tax Inversions Gain Popularity and Criticism by the Government and Public*

16.     The United States has the highest corporate tax rates amongst developed nations, causing many companies, in and out of the pharmaceutical sector, to seek lower taxes through mergers with overseas entities.   These types of tax-avoidance inversion transactions began increasing in popularity in 2012, after companies found a loophole in a 2004 law that was intended to curb this practice.

17.     During the first nine months of 2014 alone, there were fourteen tax inversion deals according to data from Dealogic and Credit Suisse.  *See* Arash Massoudi, David Crow and Barney Jopson, FINANCIAL TIMES, "AbbVie's Reconsiders $54b Shire deal" (October 15, 2014).

18.     Congress, concerned about the drain this corporate exodus could have on the U.S. tax base, sought to crack down on corporations seeking to evade their U.S. tax obligations.  For example, U.S. Senator Carl Levin introduced a bill to make tax-avoiding inversions, such as this, illegal.  Senator Levin commented that:

> These transactions are about tax avoidance plain and simple.   Our legislation would clamp down on this loophole to prevent corporations from shifting their tax burdens onto their competitors and average Americans.

Press Release, Senator Carl Levin, Senators introduce bill to clamp down on 'inversions' tax loophole (May 20, 2014) (available at: http://www.levin.senate.gov/newsroom/press/release/senators-introduce-bill-to-clamp-down-on-inversions-tax-loophole).

19.     The legislation proposed and announced after AbbVie's initial overture to Shire but in advance of its final offer, would impose a two-year moratorium on inversions, and adopt more stringent criteria for mergers between U.S.-domiciled corporations and corporations domiciled outside of the U.S.

20.    On July 26, 2014, the Associated Press ("AP") reported that during his weekly radio address President Obama called tax inversion unpatriotic.  The AP reported that President Obama said "Americans don't get to pick which rules they follow and neither should companies."  *See* ASSOCIATED PRESS, "Overseas 'tax inversions' are unpatriotic: Obama" (July 26, 2014).

21.    On July 27, 2014, U.S. Treasury Secretary Jacob Lew asked Congress to pass legislation blocking inversions in an editorial published in the Washington Post.  Lew noted that:

> Many of these transactions have been motivated by – and even expressly justified by – the tax savings.  In touting these transactions, individual firms have projected saving as much as $1 billion per year. . . . By moving their tax homes overseas, these companies are making the decision to reduce their taxes, forcing a greater share of the responsibility of maintaining core public functions on small businesses and hardworking Americans.  That includes paying for the things all of us, particularly U.S. businesses, depend on: our national defense, education, medical research, courts and vital infrastructure such as roads, bridges and airports.  In addition, by allowing these transactions to continue, we run the risk of eroding our corporate tax base and undoing the progress we have made to reduce our budget deficit.

*See* Jacob J. Lew, WASHINGTON POST, "Close the Loophole on Tax Inversions" (July 27, 2014).

22.    President Obama also weighed in on the debate.  On July 28, 2014, *The New York Times* reported that President Obama had criticized inversions, calling the companies seeking to avoid U.S. taxes to be "corporate deserters."  *See* Andrew Ross Sorkin, THE NEW YORK TIMES, "Banks Cash in on Inversion Deals to Elude Taxes" (July 28, 2014).

23.    On July 29, 2014, Richard Trumka, President of the AFL-CIO, also argued in a HUFFINGTON POST blog that Congress needed to close the tax inversion loophole.  Trumka wrote:

> The real problem is that many of these so-called "U.S." corporations want to keep dictating our economic policies and dominating our politics, yet they have less and less loyalty to the people who actually live and work in America.  They want to keep benefiting from all the things our government does for them so they can make profits – our legal system to protect their investments and patents, our

> education and training system to train their workers, our transportation system to get their products to market, our federally sponsored research, our military – but they want the rest of us to front their share of the bill.

See Richard Trumka, HUFFPOST POLITICS, "Let's Call 'Corporate Inversion' for What It Is: A Gaping Unpatriotic Tax Loophole" Blog (July 29, 2014).

24.     AbbVie knew it needed to downplay the tax inversion aspect of the Combination to obtain required regulatory approvals from the U.S. Department of Justice and the U.S. Federal Trade Commission given the government's opposition to tax inversions despite the primary importance of the inversion to the Combination.

### *AbbVie Publicly Discloses Its Pursuit of a Combination with Shire*

25.     AbbVie began to court Shire to engage in a combination in February 2014.

26.     Despite the fact that AbbVie already pays a discounted 22% tax rate in the U.S. as opposed to the full 35% corporate tax rate of which it complains, it was not content to even meet these tax obligations in exchange for all the benefits the U.S. has to offer.  In fact, AbbVie was sheltering $23 billion in 35 foreign tax havens rather than bringing it into the U.S. to avoid having to pay even this lower tax rate of 22% on that money.  AbbVie was one of Illinois's largest holders of money in other countries.  Hence, it sought to zealously pursue Shire to reap the benefits of Ireland's 13% corporate tax rate.

27.     AbbVie made its first proposal to combine with Shire for £39.50 per share.  When that price was rejected, AbbVie was undeterred raising its offer a number of times to: £40.97 per share, £46.26 per share, £51.15 per share, £52.25 per share, and finally £53.20 per share.

28.     On June 20, 2014, AbbVie publicly confirmed media reports that it had approached Shire with an initial combination proposal.  AbbVie further disclosed that, in accordance with the U.K. City Code on Takeovers and Mergers (the "Code"), AbbVie had until July 18, 2014 to announce a firm offer or a decision to abandon talks with Shire.

29.     On June 25, 2014, AbbVie issued a press release announcing the Board's belief that the Shire "Combination has compelling strategic rationale for all shareholders."  According to the press release, the rationale for the proposed combination included:

- **Combination to accelerate growth of both companies through multiple catalysts —** AbbVie believes a merger of AbbVie and Shire would potentially accelerate growth and profitability by leveraging AbbVie's capabilities and infrastructure to make Shire's pipeline and products more successful than its standalone prospects.  AbbVie believes that this merger would result in incremental sustainable leadership positions within high value market segments of significant unmet need, including: immunology, rare diseases, neuroscience, metabolic diseases and liver disease (HCV), as well as multiple emerging oncology programs.

- **Strong complementary fit across existing platforms is better than standalone capabilities —** AbbVie believes that Shire's platform has a strong complementary fit with AbbVie's existing specialty focus, including physician access relationships, regulatory and market access capabilities, and patient-centric focus.  AbbVie's existing expertise and development capabilities across areas such as GI, neuroscience, rare oncology indications, combined with AbbVie's resources and scale, could develop global franchises from Shire's platform and utilize M&A to supplement organic growth.

- **Leverage AbbVie's substantial and well-established global infrastructure —** AbbVie believes that Shire could achieve immediate broader geographic penetration and scale by leveraging AbbVie's existing, well-established global infrastructure across more than 170 countries, including our existing commercial, regulatory and medical affairs, and market access in key emerging markets.  A combination would provide Shire with the desired scale and infrastructure along with:

    - A diversified portfolio of leading marketed products;

    - Stronger growth platforms with the potential for further development; and

    - A complementary specialty focus combined with global pharma capabilities.

- **Broader and deeper pipeline of attractive development programs —** By leveraging AbbVie's established R&D infrastructure and expertise, AbbVie believes the combination would enhance innovation and end-to-end R&D capabilities, generating:

- A best-in-class product development platform, with near-term new product launches in liver disease (HCV), neuroscience, immunology, oncology, rare diseases, ophthalmology, and renal; and

- Expertise and infrastructure, including regulatory, health economics and outcomes research, and market access to expand product indications to meet patient needs. AbbVie's track record of product optimization is evidenced by its growth of the Humira® franchise through increased penetration in existing indications, geographic expansion, and approvals for new indications.

- **Substantial combined financial capacity —** The enhanced financial profile of New AbbVie would offer greater strategic and financial flexibility, enabling:

  - The opportunity to maximize Shire's rare disease and neuroscience franchises including resources to fully globalize Shire's planned launches;

  - ·The potential for strengthened sustainability of top-tier EPS growth, attractive free cash flow and enhanced return of capital policy; and

  - A world-class business development group to drive continued portfolio expansion with access to cash and financial wherewithal not available on a standalone basis.

30. Notably, when AbbVie announced these reasons for the Combination the word tax was nowhere to be found. Instead, in an apparent attempt to avoid the negative stigma associated with tax inversions in the then (and now) current political climate, and to conceal the fact that the inversion was so important to the Combination that would not proceed if the controversial tax benefits were lost, AbbVie told investors that there were numerous strategic and financial benefits to a combination that apparently had nothing to do with an inversion.

31. Given that AbbVie was highly dependent on its Humira patent, a drug that accounted for 66% of its sales, and that patent was set to expire in 2016, investors had no reason to doubt Gonzalez's sincerity in describing the Combination as a strategic one. AbbVie generates about two-thirds of its sales from Humira. Shire, on the other hand, is more diversified

and has seen its sales double between 2007 and 2013 making it an attractive strategic partner for AbbVie.

32.     Further, because AbbVie was not paying the actual 35% corporate tax rate of which it so vehemently complained but was instead paying a rate of about 22%, investors had further comfort that this was not a tax motivated transaction.

33.     AbbVie also issued a presentation, dated June 25, 2014, entitled "AbbVie's proposed combination with Shire: creating immediate and long-term value for all shareholders." According to AbbVie, the strategic rationale for the combination was based on seven categories–only one of which (listed fifth) included tax considerations:

## A strategically compelling and financially attractive combination



Larger and more diversified biopharmaceutical company with multiple leading franchises

Adds leading franchises within specialty therapeutic areas, including rare disease and neuroscience

Broad and deep pipeline of diverse development programs and enhanced R&D capabilities

Global resources and experienced teams positioned to continue to deliver strong shareholder returns to both AbbVie and Shire shareholders

Transaction expected to achieve a competitive tax structure and provide New AbbVie with enhanced access to its global cash flows

Transaction expected to be accretive to adjusted EPS[1] in the first year following completion, and will increase to more than $1.00 per share by 2020

Significant financial capacity for future acquisitions, investment and opportunity for enhanced shareholder distributions and value creation

[1] Adjusted EPS excludes intangible asset amortization expense and purchase accounting adjustments and other specified items. The statement that the Transaction is earning accretive should not be construed as a profit forecast and is therefore not subject to the requirements of Rule 28 of the Code. It should not be interpreted to mean that the earnings per share in any future financial period will necessarily match or be greater than those for the relevant preceding financial period.

abbvie Shire                                                                                                                    2

34.     On July 18, 2014, AbbVie disclosed that the boards of AbbVie and Shire agreed to the terms of the Combination, valued at approximately $54 billion of a combination of cash and stock of AbbVie Private Limited.

35.     AbbVie told investors that, in connection with the Combination, (i) Shire and AbbVie entered into the Cooperation Agreement; (ii) AbbVie, AbbVie Private Limited, and AbbVie Ventures LLC entered into an Agreement and Plan of Merger, dated as of July 18, 2014 (the "Merger Agreement"); and (iii) AbbVie Holdings Private Limited, JPMorgan Chase Bank, N.A. ("JPMorgan"), as administrative agent and lender, and certain other parties entered into a 364-Day Bridge Credit Agreement, dated as of July 17, 2014.   The Cooperation Agreement provided for a payment of a termination fee by AbbVie to Shire if the Combination was not consummated.   This termination fee (paid in U.S. dollars) equaled "three per cent of the product of the indicative value of the cash and shares to be delivered per Shire Share multiplied by the number of issued Shire Shares . . . and converted pursuant to the exchange rate . . . ." or $1.64 billion.

36.     Section 7.2 of the Cooperation Agreement provided the circumstances under which the $1.64 billion termination fee would need to be paid including:  (1) the AbbVie Board withdraws or modifies in a manner adverse to the Combination or its recommendation of the Combination; and (2) either (a) the AbbVie stockholders vote and do not adopt the Merger Agreement at a stockholder meeting following the Board's change in recommendation, or (b) no stockholder meeting takes place within 60 days after the Board's change in recommendation.

37.     However, if the stockholders rejected the Combination without the Board changing its recommendation, Section 10.3 of the Cooperation Agreement provided that AbbVie only needed to reimburse Shire for its actual costs incurred in an amount of no less than $500

million and no more than approximately $545 million, or approximately one-third of the termination fee payable if AbbVie's Board withdrew from the Combination.

38.     The termination was due to be paid from AbbVie to Shire within 7 days of the event causing the break up.

39.     The Cooperation Agreement did not contain any provision to allow AbbVie to terminate the contract in the event of a tax law change despite the fact that other such provisions had been included in similar transactions, such as in the Medtronic/Covidien merger (announced on June 15, 2014, and successfully completed on January 26, 2015).

40.     In fact, *The Wall Street Journal* reported that "AbbVie can't walk away if President Obama gets his way" in closing the "loophole allowing U.S. companies to head abroad in search of lower tax rates."  The *Journal* concluded that in light of the termination fee the "board could stick with its favorable recommendation, relying on investors to vote down the deal for it and incurring a lower breakup fee. . . AbbVie may have limited room for maneuver in the face of the growing political storm over the so-called inversion deals.  The U.K. Takeover Panel can take a skeptical view of terms that allow a buyer to abandon a deal."  *See* Helen Thomas, THE WALL STREET JOURNAL, "Taxing Terms in AbbVie's Shire Deal" (July 18, 2014).

***AbbVie Falsely Claims the Tax Benefits Are Not the Reason for the Combination***

41.     Following the initial announcements regarding the Combination, AbbVie, through Gonzalez, affirmatively misrepresented to investors that tax benefits were not the primary rationale for the Combination, and that the AbbVie would not be pursuing the Combination "if it was just for the tax impact."

42.     At an investor conference on July 21, 2014 (the first day of the Class Period), Gonzalez told investors:

What I would tell you is that this transaction has a significant, both strategic and financial, rationale. ***Tax is clearly a benefit, but <u>it's not the primary rationale for this</u>***.

\* \* \*

When we look at this particular transaction we are excited about the pipeline. We are excited about the growth aspects of several of their franchises and being able to incorporate that into our business. ***There are opportunities for different kinds of synergies beyond tax.***

(Emphasis added.)

43. Gonzalez's statement that the tax benefit was not the primary rationale for the Combination was false and misleading. In fact, as subsequent events demonstrated, when the tax benefit was lost, with no apparent change to any of the purported strategic benefits of the Combination, the transaction was terminated by AbbVie, even though that decision to terminate the Combination cost AbbVie $1.64 billion.

44. The session was then opened for questions, where Gonzalez was asked a number of times about the significance of the tax benefits:

**Chris Schott, JPMorgan**: . . .The first, there has been a lot of noise coming out of Washington recently on the topic of inversion. Can you just talk a little bit about how you thought about that risk as you considered the Shire deal and potentially re-domiciling the Company into the UK?

**Rick Gonzalez**: Okay, maybe let me chat a little bit about your comment on inversion. ***What I would tell you is that this transaction has a significant, both strategic and financial, rationale. Tax is clearly a benefit, but it's not the primary rationale for this***. We have studied this transaction very, very carefully. We believe it is highly executable. I would say from your perspective about the noise, I would tell you my own point of view as you look at the debate that's going on right now is that the debate would be more appropriately shifted towards tax reform and making companies more competitive in the global economy that we operate in.

> Companies like ours need access to our global cash flows to be able to make investments all around the world, but to specifically be able to make investments in the United States. Today we are at a disadvantage versus many of our foreign competitors and, in my personal opinion, that is the important debate that we should be having around inversion and all aspects of the US tax code.

(Emphasis added.)

45. Gonzalez, in addressing a direct question about the U.S. government's criticism of inversions, stated that he thought lawmakers should take action to implement tax reform to make companies more competitive in a global market. By answering the question in conjunction with an explicit representation that the tax benefit was "*not the primary rationale for this*," Gonzalez's statement was intended to and did lead reasonable investors to believe that Gonzalez was not concerned by the government's criticism of tax inversions, and simply hoped that it would make changes in the future to make companies who stay incorporated in the United States more competitive.

46. Indeed, when Gonzalez was asked a follow-up question whether a change in tax benefit would change the calculus, Gonzalez flatly replied that it would not:

> **Vamil Divan**: Thanks for taking the question. Vamil Divan, Credit Suisse. So just two quick questions. *One is a follow-up to Chris's around the discussions in Washington around inversions. There is obviously the breakup fee you guys mentioned around this deal. I'm just trying to understand kind of how important the ex-US domiciling for tax purposes is to this deal and if something were to come up where retroactively you are not able to actually change your domicile outside the US*, is that something where the breakup fee would not restrict you from then going ahead and breaking up this deal and not going forward?

* * *

**Rick Gonzalez**: Jim, both of those questions we're somewhat limited in what we can say. *As I mentioned in my comments a moment ago, this is a transaction that we believe has excellent strategic fit and has compelling financial impact well beyond the tax impact. <u>We would not be doing it if it was just for the tax impact</u>. That is an additional benefit that we have. We have looked carefully at that aspect of it and we believe it is executable at a high level*.

(Emphasis added.)

47.     While Gonzalez attempted to hide behind a statement that he was "limited in what we can say" this statement is not enough to provide him a safe harbor. Given his voluntary comments regarding the impact of the tax inversion, he had a duty to then speak the whole truth about the significance of the tax implications on the Combination. Gonzalez knew that he was providing the market with material half truths about the significance of the tax benefits, and as a result investors were led to believe this deal would happen with or without the tax benefits.

48.     Instead of saying nothing at all, Gonzalez answered direct questions about a potential change in the tax laws and explicitly stated that they would not be doing the Combination if it was just about the tax. This was not surprising given the public and governmental outcry against inversions. Gonzalez knew in order to continue to obtain support of the Combination he needed to show it was not just an inversion. And, understandably, Shire investors relied on these direct answers stating that the Combination was about more than the taxes in choosing to purchase or retain their holdings given the touted strategic benefits.

49.     In the wake of reports that companies seeking to avoid their U.S. tax obligations were suffering a reputational hit, AbbVie and Gonzalez chose instead conceal the fact that the tax benefit was, in truth, the real reason for the Combination and that, without the tax benefit, the transaction had no value (or, at least, insufficient value to pursue).

50.     For example, THE GUARDIAN reported that "[s]ocially responsible investors and watchdog NGOs say tax avoidance carries risks for companies that care about their reputation, as

all companies should." The article explained that "[m]any billions of dollars in tax revenue are at stake" in connection with inversion transactions. *See* Marc Gunter, THE GUARDIAN, "Ending the race to the bottom: why responsible companies should pay taxes" (July 22, 2014).

51. Nevertheless, when ultimately the only thing to change was the loss of the inversion tax benefit, notwithstanding the prior assertions that the tax benefits were not the primary reason for the transaction, Gonzalez and other members of AbbVie's Board abruptly pulled the recommendation for this purportedly strategic Combination, cancelled the stockholder vote, which among other things avoided the risk that AbbVie stockholders might not vote it down despite the loss of the essential purpose for the Combination, and AbbVie paid a $1.64 billion termination fee.

52. On August 5, 2014 the U.S. Treasury Department announced that it was "reviewing a broad range of authorities for possible administrative actions to limit inversions as well as approaches that could meaningfully reduce the tax benefits after inversions took place." Despite this announcement, AbbVie continued to tell investors it planned to move forward with the Combination.

53. On August 21, 2014, AbbVie Private Limited issued the S-4 in connection with the planned vote of AbbVie stockholders to approve the Combination. The S-4 was signed by Gonzalez, among others. According to the S-4, in deciding to approve the Combination, the AbbVie Board concluded that the Combination is likely to result in significant strategic and financial benefits to AbbVie and its stockholders. These benefits included:

- the creation of a global market leader with unique characteristics and a compelling investment thesis by combining two companies with leadership positions in specialty pharmaceuticals;

- the opportunity to leverage AbbVie's capabilities and infrastructure to make Shire's pipeline and products more successful than its stand-alone prospects;

- the incremental sustainable leadership positions New AbbVie would be expected to have within high value market segments of significant unmet need, including immunology, rare diseases, neuroscience, metabolic diseases and liver disease (HCV), as well as multiple emerging oncology programs;

- the strong complementary fit of Shire's platform with AbbVie's existing specialty focus, including physician access relationships, regulatory and market access capabilities, and patient-centric focus and the potential to develop global franchises from Shire's platform with AbbVie's existing expertise and development capabilities across areas such as gastrointestinal medicine, neuroscience, and rare oncology indications, combined with AbbVie's resources and scale;

- the potential realization of tax and operational synergies by New AbbVie as a result of the Combination;

- the immediate broader geographic penetration and scale of Shire as a result of the Combination, by leveraging AbbVie's existing, well-established global infrastructure across more than 170 countries, including commercial, regulatory and medical affairs, and market access in key emerging markets;

- the enhancement of innovation and end-to-end R&D capabilities by leveraging AbbVie's established R&D infrastructure and expertise, which the AbbVie Board expects will generate:

  - a best-in-class product development platform, with near-term new product launches in liver disease (HCV), neuroscience, immunology, oncology, rare diseases, ophthalmology, and renal; and

  - expertise and infrastructure, including regulatory, health economics and outcomes research, and market access to expand product indications to meet patient needs;

- the combined financial strength and R&D experience of New AbbVie;

- the Combination's expected accretion to AbbVie's adjusted earnings per share in the first year following completion, growing to above $1.00 per share by 2020, with material ongoing financial and operating benefits;

- the opportunity for New AbbVie to have an enhanced financial profile and greater strategic and financial flexibility as compared to AbbVie and Shire on a standalone basis, which would provide:

  - the opportunity to maximize Shire's rare disease and neuroscience franchises including resources to fully globalize Shire's planned launches;

- the potential for strengthened sustainability of top-tier EPS growth, attractive available cash flow and enhanced return of capital policy; and

- the basis for a world-class business development group to drive continued portfolio expansion and utilize M&A to supplement organic growth with access to cash and financial resources not available on a standalone basis.

54.    Once again, because inversions were highly controversial and under intense public criticism, AbbVie misled investors to believe that the tax benefits were not the only (or even primary) reason for the Combination.  When the tax benefits were lost, even though all the other purported strategic benefits of the transaction remained unchanged, AbbVie terminated the Combination, even though it cost AbbVie $1.64 billion to do so.

55.    On September 21, 2014, Treasury Secretary Jack Lew held a press conference where he announced that the "Treasury is completing its work on administrative action to use our existing authority to limit the economic benefits of inversion."

56.    The next day, on September 22, 2014, the U.S. Treasury Department issued a notice (the "Notice") that it will take steps to curb the practice of corporate inversions.  A corporate inversion is transaction in which a U.S. based multinational restructures so that the U.S. parent is replaced by a foreign parent, in order to avoid U.S. taxes.  According to the U.S. Treasury Department, "the Notice eliminates certain techniques inverted companies currently use to access the overseas earnings of foreign subsidiaries of the U.S. company that inverts without paying U.S. tax.  Today's actions apply to deals closed today or after today."

57.    On September 23, 2014, after the U.S. Treasury Department's announcement, which made investors doubt whether the Combination would go forward, Shire's share price dropped 6% to a low of $247.98.

58.     On September 23, 2014, *The Wall Street Journal* reported that following the announcements by Treasury that at least one analyst, Alistair Campbell of Berenberg, stated that AbbVie will "have to argue the strategic rationale for the deal remains intact."  The article noted that if stockholders vote down the Combination "AbbVie must pay Shire a $500 million fee, rather than the full $1.6 billion break-fee," a major incentive to have AbbVie continue to be seen as supporting the Combination.  *See* Hester Plumridge, Shayndi Raice, and Alex MacDonald, THE WALL STREET JOURNAL, "New U.S. Inversion Rules Drag Down Shares of Deal Targets" (September 23, 2014).

59.     Even following Chairman Lew's press conference and the issuance of the Notice, AbbVie and Gonzalez continued to represent that AbbVie's rationale for the Combination was based on business and strategic reasons.  In an effort to continue to convince the market of the viability of the Combination (and stop the stock price drop) and alleviate Shire employees fears, on September 29, 2014, AbbVie and Gonzalez issued a statement to Shire's employees, which AbbVie also filed with the SEC, proclaiming AbbVie's continued interest in the Combination:

Dear Shire Colleague,

I had the wonderful opportunity last week to sit down and meet with many of you – both in Chicago for the Integration Team Planning Kickoff Meeting, and in Lexington, when I was able to visit your offices.

*I wanted to send a note saying that I'm more energized than ever about our two companies coming together, especially because I can already see many shared traits and values in the people at AbbVie and Shire.*  We have similar cultures that will strengthen the opportunities we have together.

Colleagues at both companies are focused on one thing – helping people.  At AbbVie, we call that making a remarkable impact in people's lives.  We're committed to science, to R&D and to increasing our knowledge of biology and the current standards of care. And it's all for the same purpose – to advance those standards and improve the care of patients the world over.

*When we first considered Shire joining together with AbbVie it was because we saw the opportunity to lead and grow in important therapeutic areas.  It was*

20

*also because we saw a complementary pipeline that would be positioned to enhance innovation.*

But more than that, we saw people who shared our vision. I'm happy to say I'm more confident than ever about the potential of our combined organizations now that I've had a chance to meet with many of you.

We have a very busy few months ahead as we work on integration planning. It's more important than ever to keep focused on our business priorities. Meeting our objectives as individual companies will only make our combined organization that much stronger.

Thank you for your continued support and commitment. I look forward to working with you much more closely in the near future. I will continue to keep you updated as events unfold during this very exciting time, and remember, you can always access the announcements and materials regarding the transaction by visiting our microsite.

Best regards,

Rick

(Emphasis added.)

60. Gonzalez's letter pronouncing this continued support for the Combination despite the tax regulation changes misled investors into believing that the Company's earlier rhetoric that this was not a tax based transaction was true. Gonzalez either knew his statements were false when made in an attempt to stave off an immediate $1.64 billion termination fee, or his recklessness in making these statements was so severe it was the functional equivalent of intent to deceive.

61. Following this filing and AbbVie's signaling that it would continue with the Combination, Shire Securities rebounded from the September 23, 2014 fall, trading as high as $263.24 per share.

### *AbbVie Abandons the Proposed Combination*

62. Although AbbVie and Gonzalez repeatedly told investors that tax benefits were "not the primary rationale" of the Combination, after trading closed on October 14, 2014 (the last

day of the Class Period), Gonzalez revealed, contrary to his prior statements, the tax impact of

the Combination was of critical importance to AbbVie and its Board:

> AbbVie Inc. ("AbbVie") announces it has notified Shire plc ("Shire") of its Board of Directors' intention to reconsider the recommendation made on July 18, 2014 that AbbVie stockholders adopt the merger agreement needed to complete the proposed combination of AbbVie and Shire.

> AbbVie's Board will consider, among other things, the impact of the U.S. Department of Treasury's proposed unilateral changes to the tax regulations announced on September 22, 2014, including the impact to the *fundamental financial benefits of the transaction*.

> Accordingly, AbbVie has notified Shire under the Co-operation Agreement that AbbVie's Board of Directors intends to meet to consider whether to withdraw or modify its recommendation. Under the Agreement, AbbVie must provide three business days' notice of any intention to consider a change in recommendation. Accordingly, AbbVie's Board plans to meet on October 20, 2014, unless Shire agrees to waive the notice.

(Emphasis added.)

63.     As a result of this disclosure, Shire's stock price, which closed at $244.57 on

October 14, 2014, the last trading day prior to the announcement, fell $74.08 per share (or

30.29%), to a closing price of $170.49 on October 15, 2014.

64.     Rather than risk a vote by the stockholders (who had been misled to believe there

were sufficient strategic reasons to approve the Combination without the favorable tax benefit) in

favor of the Combination after the tax benefit was lost, the Company announced on October 15,

2014, that the Board withdrew its recommendation that stockholders vote in favor of the

Combination, triggering the $1.64 billion termination fee.

65.     The October 15, 2014 press release stated:

> AbbVie and its Board of Directors made this determination *following a detailed consideration of the impact of the U.S. Department of Treasury's unilateral changes to the tax rules, as issued on September 22, 2014*. The breadth and scope of the changes, including the unexpected nature of the exercise of administrative authority to impact longstanding tax principles, and to target specifically a subset of companies that would be treated differently than either

22

other inverted companies or foreign domiciled entities, introduced an unacceptable level of uncertainty to the transaction. Additionally, the changes eliminated certain of the financial benefits of the transaction, most notably the ability to access current and future global cash flows in a tax efficient manner as originally contemplated in the transaction. This fundamentally changed the implied value of Shire to AbbVie in a significant manner.

66. The press release admitted that Gonzalez was at least severely reckless in making his statements to the market on September 29, 2014 before the Board had conducted a "detailed consideration of the impact" of the change in the tax laws.

67. On October 20, 2014, AbbVie announced that, as the result of the Notice, Shire and AbbVie agreed to terminate the Combination, and that AbbVie would be required to pay Shire the hefty $1.64 billion termination fee:

> AbbVie Inc. ("AbbVie") and Shire plc ("Shire") have agreed to terminate their proposed merger following the decision by AbbVie's Board to withdraw support for the proposed transaction. ***The Company's decision was based upon its assessment of the September 22, 2014 notice issued by the U.S. Department of Treasury, which re-interpreted longstanding tax principles in a uniquely selective manner designed specifically to destroy the financial benefits of these types of transactions.*** The notice introduced an unacceptable level of risk and uncertainty given the magnitude of the proposed changes and the stated intention of the Department of Treasury to continue to revise tax principles to further impact such transactions.
>
> ***The Company conducted a thorough review of the September 22, 2014 notice to explore available options to preserve the transaction***. This review included the advice of external tax, legal, and financial advisors in both the U.S. and the U.K. The executive management team ultimately concluded that the transaction was no longer in the best interests of stockholders at the agreed upon valuation, and the Board fully supported that conclusion.
>
> Commenting on the transaction termination, AbbVie's Chairman and Chief Executive Officer, Richard A. Gonzalez said:
>
> "AbbVie has built a strong, sustainable strategy with a robust pipeline. Over the past 22 months we have delivered industry leading stockholder returns, our performance and business fundamentals remain strong, and we are on the cusp of a major new product launch with our treatment for HCV. We remain focused on building AbbVie's business through enhanced internal R&D platforms, partnerships, strong commercial execution and licensing and acquisitions."

"The unprecedented unilateral action by the U.S. Department of Treasury may have ***destroyed the value in this transaction***, but it does not resolve a critical issue facing American businesses today. The U.S. tax code is outdated and is putting global U.S.-based companies at a disadvantage to foreign competitors in an area of critical importance, specifically investing in the United States. Comprehensive tax reform is essential to create competitiveness and to stimulate investment in the economy."

* * *

AbbVie has agreed to pay Shire the break fee of approximately USD$1.635 billion. Shire's right to receive the break fee will be Shire's sole and exclusive remedy for all losses and damages in connection with the transaction.

(Emphasis added.)

68.     Notably, Gonzalez and the other AbbVie Board members elected to immediately end the Combination and pay Shire the full $1.64 billion termination fee without a stockholder vote, whereas AbbVie would only have to pay a maximum of $545 million if the vote went forward and AbbVie stockholders voted it down. Thus, Gonzalez and the other Board members were willing to pay an extra $1.1 billion to be absolutely sure the deal was dead, rather than run the risk that AbbVie stockholders might not vote it down.

69.     Also on October 20, 2014 Shire announced in a press release that "[i]n light of the AbbVie Board's decision to change its recommendation and to advise its shareholders to vote against the Offer, Shire believes there is now no realistic prospect of AbbVie completing its Offer." The press release stated that "[o]n 16 October 2014, the Board of AbbVie confirmed it had withdrawn its recommendation of its offer…***solely as a result of the anticipated impact of the US Treasury Notice***." (Emphasis added.)

70.     These subsequent events proved that the loss of the tax benefit – previously characterized as a mere incidental benefit of the Combination – in fact ***eliminated*** all the financial benefits of the Combination despite Gonzalez's statements, both before and after the change to the tax laws, that the tax benefits were not the primary rationale for the Combination.

71.     This abrupt change in how AbbVie characterized the inversion tax benefit prompted *Fortune* to report that AbbVie's earlier statements that the Combination was not premised on tax benefits were "outright deceit":

> AbbVie kills its $54 billion buyout of Shire, and comes clean about its original intentions.
>
> There's an old saying in pro sports that when a player says "it isn't about the money," it's always about the money.  The same thing seems to be true in some of these massive "tax inversion" deals, in which a U.S. company agrees to buy a smaller foreign business and relocate its headquarters overseas.
>
> ***After all, what conclusion other than outright deceit can we draw from yesterday's news that Chicago-based pharma giant AbbVie Inc.***  ABBV 4.60% has canceled its proposed $54 billion acquisition of Ireland-based Shire PLC SHP.
>
> ***When the deal was first announced in July, AbbVie insisted that tax was only a secondary rationale.***  Just read a few of these comments from AbbVie CEO Rick Gonzalez, during an analyst and investor call from July 21:
>
> * * *
>
> Subsequent to that call, the U.S. Treasury devised new rules that curtailed the tax benefits of such transactions.  ***Obviously not something that would please Rick Gonzalez, but not a deal-breaker.  Right?  I mean, the White House didn't meddle in all of those exciting pipeline synergies.***
>
> Wrong, of course.  In announcing its decision yesterday to kill the deal – which triggered a $1.6 billion termination fee – AbbVie explicitly stated that the change in course was promoted by Treasury's actions.  Here is Gonzalez, now freed from having to pretend that it wasn't about the taxes:
>
> "The unprecedented unilateral action by the U.S. Department of Treasury may have destroyed the value in this transaction, but it does not resolve a critical issue facing American businesses today.  The U.S. tax code is outdated and is putting global U.S.-based companies at a disadvantage to foreign competitors in an area of critical importance, specifically investing in the United States.  Comprehensive tax reform is essential to create competitiveness and to stimulate investment in the economy."

*See* Dan Primack, FORTUNE, "AbbVie Finally Admits it was Trying to Dodge U.S. Taxes" (October 22, 2014) (emphasis added).

72.     Similarly, *Bloomberg* reported that AbbVie's response to the Notice surprised the Company's investors given its earlier statements that tax was not a primary basis for the Combination:

> AbbVie's move surprised investors after the drug company had said the deal was driven mostly by strategic, not tax, reasons.  AbbVie said it reconsidered the transaction after the U.S.  Treasury Department announced rule changes designed to limit moves overseas by American companies.
>
> "Investor reaction is one of confusion and shock and we hope this will be resolved quickly," Jeffrey Holford, an analyst at Jefferies LLC in New York, wrote in a report today.  "The limited communication from AbbVie is exacerbating the level of concern."
>
>                     * * *
>
> "***AbbVie's management's credibility may now be called into question given the non-inversion benefits they touted when initially selling the deal*** and the fact that their limited public comments since the Treasury Notice was released have stressed the merits of getting the deal done," Credit Suisse analyst Vamil Divan said in a note to clients yesterday.

*See* Oliver Staley and Cynthia Koons, BLOOMBERG, "AbbVie's Threat on Shire Deal is Latest Tax Rule Fallout" (October 15, 2014) (emphasis added).

73.     The *Chicago Tribune* also reported that the tax reasons were clearly the only reason for the deal though it "came as a surprise to investors and analysts because Gonzalez and other executives had expressed support for the deal a week after the Treasury Department unveiled the new rules Sept. 22."  *See* Ameet Sachdev and Ellen Jean Hirst, CHICAGO TRIBUNE, "AbbVie says tax rule changes scuttled deal for Shire" (October 16, 2014).

74.     In responding to Gonzalez's post-Notice letter that he was "more energized than ever" about the Combination, *The New York Post* reported that a large shareholder in both Shire and AbbVie stated that "People are responsible for their own investment decisions, but ***the facts supplied by the company were absolutely misleading*.**"  *See* Josh Kosman, THE NEW YORK

POST, "Onus is on AbbVie investors to manage risk: Tilton" (October 27, 2014) (emphasis added).

## ADDITIONAL SCIENTER ALLEGATIONS

75. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated concerning the Combination were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated in or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Gonzalez, by virtue of his receipt of information reflecting the true facts regarding AbbVie's rationale for the Combination, his control over, and receipt or modification of AbbVie's allegedly materially misleading statements and his associations with AbbVie which made him privy to confidential proprietary information concerning AbbVie, participated in the fraudulent scheme alleged herein.

76. Throughout the Class Period, Defendants repeatedly told investors that the tax benefit was not the primary rational for the Combination when, as subsequent events proved, it was not just the primary reason for the transaction, but the essential reason for it. With only that one change, and without any known change to any of the purported strategic benefits of the Combination, AbbVie's Board withdrew its recommendation and cancelled the stockholder vote.

77. Defendants had an interest in delaying the ultimate announcement for as long as possible to avoid paying the hefty termination fee. While the termination fee ultimately had to be paid within 7 days of the termination of the Combination, by delaying the announcement that it was withdrawing its recommendation, AbbVie was able to retain those funds, and the interest thereon for as long as possible.

27

78.     By reaffirming his support for the Combination on September 29, 2014, Gonzalez bought himself 30 days of interest on the $1.64 billion termination fee that ultimately was required to be paid on October 28, 2014 (7 days after the October 21, 2014 press release announcing that the Combination was being terminated). Thirty days of interest on a payment of this size saved AbbVie millions of dollars.

79.     Furthermore, when interviewed about the announcement to pull the recommendation, AbbVie's lead director, Glenn Tilton, stated that Gonzalez needed to make the post-Treasury announcement to "calm Shire employee unrest."

**PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE**

80.     From the beginning of the Class Period, Shire Securities were traded on the NASDAQ. At all relevant times, Shire Securities traded in an efficient market that promptly digested current information with respect to Shire from publicly available sources and reflected such information in the prices of Shire's shares.

81.     The evidence that Shire Securities traded on an efficient market at all relevant times includes the following:

(a)     Shire Securities met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Shire filed periodic public reports with the SEC and the NASDAQ;

(c)     The average weekly trading volume during the Class Period was over one million Securities trades;

(d)     During the Class Period, Shire was followed by several securities analysts who wrote reports about Shire that were distributed to their clients. Each of these reports were publicly available and entered the public marketplace;

(e)     Shire regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

82.     Based on these indicia, a presumption of reliance applies.

## LOSS CAUSATION/ECONOMIC LOSS

83.     By misrepresenting AbbVie's basis for the Combination and telling purchasers of Shire Securities that the expected tax benefit as a result of reincorporation in Ireland was "not the primary rationale" for the combination and that "we would not be doing it if it was just for the tax impact," Gonzalez made material misstatements concerning AbbVie's rationale for the Combination.  In contrast to these public statements, tax was a critical, if not the sole, factor for AbbVie and, when the U.S. Department of Treasury announced a change in treatment of tax inversions, AbbVie announced that it reconsidered the combination.

84.     AbbVie's statements concerning its reasons for the Combination and expected non-tax benefits from the Combination caused the price of Shire Securities to rise to as high as $264.98 per share during the proposed Class Period, until AbbVie announced that the parties terminated the Agreement.  Following AbbVie's announcement on October 15, 2014, the price of Shire Securities plummeted to as low as $156.25.

85.     Defendants' false and misleading statements had the intended effect and caused Shire's Securities to trade at artificially inflated levels throughout the Class Period, reaching its Class Period high of over $264.98 per share (on September 26, 2014).

## NO SAFE HARBOR

86.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements described in this

29

Complaint. Many of the specific statements described herein were not identified as "forward-looking" when made. To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of AbbVie who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

87. Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Shire ADS or purchased call options or sold put options during the period July 21, 2014 through and including October 14, 2014 (the "Class"). Excluded from the Class are Defendants, other officers and directors of AbbVie at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

88. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. At all relevant times, Shire had over 196.5 million ADS outstanding, which were owned publicly by at least hundreds of persons and entities.

89. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether Defendants violated Sections 10(b) of the Exchange Act;

(b)     whether Defendants omitted and/or misrepresented material facts;

(c)     whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     whether Gonzalez was a controlling person of AbbVie under Section 20(a) of the Exchange Act;

(f)     whether the price of Shire Securities was artificially inflated; and

(g)     the extent of damage sustained by Class members and the appropriate measure of damages.

90.     Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

91.     Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Lead Plaintiffs have no interests which conflict with those of the Class.

92.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT ONE

**Against All Defendants for Violation of Section 10(b) of the Exchange Act and Rule 10b-5**

93.     Lead Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

94. Lead Plaintiffs assert this Count pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, against Defendants AbbVie and Gonzalez.

95. During the Class Period, Defendants disseminated or approved the false statements set forth above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Those statements include:

(a) Gonzalez's direct representations that "Tax is clearly a benefit, but it's ***not the primary rationale for this***" and that "***We would not be doing it if it was just for the tax impact***," during an investor conference on July 21, 2014 (the first day of the Class Period) (emphasis added).

(b) The Company's statements showing that strategic benefits were the driver of the Combination in its S-4 in connection with the planned vote of AbbVie stockholders to approve the Combination filed on August 21, 2014; and

(c) AbbVie and Gonzalez September 29, 2014 statement to Shire's employees which proclaimed AbbVie's continued interest in the Combination.

96. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Shire Securities during the Class Period.

97.     Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Shire Securities.  Lead Plaintiffs and the Class would not have purchased Shire ADS or purchased call options or sold put options at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT TWO

### Against Gonzalez for Violation of Section 20(a) of the Exchange Act

98.     Lead Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

99.     Lead Plaintiffs assert this Count pursuant to Section 20(a) of the Exchange Act against Gonzalez.

100.     Gonzalez, by virtue of his leadership positions in AbbVie, had the power and authority to cause AbbVie to engage in the wrongful conduct complained of herein.

101.     Gonzalez possessed the power and authority to control the contents of AbbVie's SEC filings and press releases.  Gonzalez was aware of AbbVie's actual rationale for the Combination.

102.     AbbVie violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in the Complaint, and as a direct and proximate result of those violations, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

103.     By reason of his control of AbbVie, Gonzalez is liable pursuant to Section 20(a) of the Exchange Act for AbbVie's violations of Section 10(b) and Rule 10b-5, to the same extent as AbbVie.

### PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding Lead Plaintiffs and the members of the Class damages, including interest;

C.     Awarding Lead Plaintiffs reasonable costs and attorneys' fees; and

D.     Awarding Lead Plaintiffs such equitable/injunctive or other relief in Lead Plaintiffs' favor as the Court may deem just and proper.

### JURY DEMAND

Lead Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury.

Dated: May 2, 2016

> By: /s/ Theodore B. Bell
> Theodore B. Bell
> **WOLF HALDENSTEIN ADLER**
>   **FREEMAN & HERZ LLC**
> 55 West Monroe Street, Suite 1111
> Chicago, IL 60603
> tbell@whafh.com
> Tel: 312-984-0000
> Fax: 312-212-4401

Mark C. Gardy
James S. Notis
Jennifer Sarnelli
Meagan Farmer
**GARDY & NOTIS, LLP**
Tower 56
126 East 56th Street, 8th Floor
New York, NY 10022
mgardy@gardylaw.com
jnotis@gardylaw.com
jsarnelli@gardylaw.com
mfarmer@gardylaw.com
Tel:  212-905-0509
Fax:  212-905-0508

Gregory M. Nespole
Benjamin Y. Kaufman
Mark C. Rifkin
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
nespole@whafh.com
kaufman@whafh.com
rifkin@whafh.com
Tel: 212-545-4600
Fax: 212-545-4758

*Counsel for Lead Plaintiffs*