# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| MURRAY RUBINSTEIN, JEFFREY F. ST. CLAIR, WILLIAM MCWADE, HARJOT DEV and VIKAS SHAH, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | Case No. 14-cv-9465 Judge Robert M. Dow, Jr. |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| RICHARD GONZALEZ and ABBVIE INC., | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Dawn Bradley, Murray Rubinstein, Harjot Dev, and Vikas Shah (collectively, "Plaintiffs") bring this class action lawsuit against Defendants Richard Gonzalez ("Gonzalez") and AbbVie, Inc. ("AbbVie") (collectively, "Defendants") for alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Act"). See 15 U.S.C. §§ 78j(b) and 78t. Before the Court is Defendants' motion to dismiss Plaintiff's amended complaint [42]. For the reasons stated below, Defendant's motion [42] is denied. This case is set for further status hearing on March 29, 2017 at 9:00 a.m.

## I. Background

For purposes of Defendants' motions to dismiss, the Court assumes as true all well-pled allegations set forth in Plaintiff's amended complaint. See *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 946 (7th Cir. 2013). In addition, the Court may consider the documents referred to and quoted in the amended complaint, some of which Defendants attach to their memorandum in support of the motion to dismiss. See [44-1] through [44-3]; see also *Geinosky v. City of*

*Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994) ("[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss.").

AbbVie is a biopharmaceutical company with its principal executive offices in Chicago, Illinois. On June 20, 2014, AbbVie publicly confirmed media reports that it had approached another biopharmaceutical company, Shire (which is not a party to this lawsuit), with an initial proposal for a merger. Shire has its principal executive offices in Dublin, Ireland.

On June 25, 2014, AbbVie issued a press release announcing that the AbbVie Board of Directors believed that the Shire merger had "compelling strategic rationale for all shareholders." [38] at 9. The press release listed five rationales, none of which mentioned the tax benefits that AbbVie might enjoy by structuring the transaction as a corporate inversion. See *id.* at 8-9. A corporate inversion is a transaction in which a U.S.-based multinational entity restructures so that the U.S. parent is replaced by a foreign parent, in order to avoid paying U.S. taxes. See *id*. at 19. According to the amended complaint, this omission was made and other strategic rationales were listed "to avoid the negative stigma associated with tax inversion in the then (and now) current political climate, and to conceal the fact that the inversion was so important to the Combination that it would not proceed if the controversial tax benefits were lost." *Id*. at 10. The amended complaint further asserts that investors had no reason to doubt that the proposed merger was strategic, "[g]iven that AbbVie was highly dependent on its Humira patent, a drug that accounted for 66% of its sales, and that patent was set to expire in 2016." *Id*.

Also on June 25, 2014, AbbVie issued a presentation titled "AbbVie's proposed combination with Shire: creating immediate and long-term value for all shareholders." [38] at 9. AbbVie provided seven strategic reasons for the merger: (1) "Larger and more diversified biopharmaceutical company with multiple leading franchises"; (2) "Adds leading franchises within specialty therapeutic areas, including rare disease and neuroscience"; (3) "Broad and deep pipeline of diverse development programs and enhanced R&D capabilities"; (4) "Global resources and experienced teams positioned to continue to deliver strong shareholder returns to both AbbVie and Shire shareholders"; (5) "*Transaction expected to achieve a competitive tax structure and provide New AbbVie with enhanced access to its global cash flows*"; (6) "Transaction expected to be accretive to adjusted EPS in the first year following completion, and will increase to more than $1.00 per share by 2020"; and (7) "Significant financial capacity for future acquisitions, investment and opportunity for enhanced shareholder distributions and value creation." [38] at 11 (emphasis added).

On July 18, 2014, AbbVie disclosed that its Board had agreed to terms for the merger, which was valued at approximately $54 billion. AbbVie also disclosed that, in connection with the merger, AbbVie Ventures, LLC had entered into a Cooperation Agreement with Shire, which would require AbbVie to pay a termination fee of $1.64 billion if (1) the AbbVie Board withdrew or modified its recommendation of the merger; and (2) either (a) AbbVie stockholders voted and did not adopt the merger agreement at a stockholder meeting following the Board's change in recommendation, or (b) no stockholder meeting took place with 60 days after the Board's change in recommendation. [38] at 12. However, if the stockholders rejected the combination without the Board changing its recommendation, then the Cooperation Agreement only required AbbVie to reimburse Shire for its actual costs in an amount no less than $500

million or more than $545 million.  *Id*. at 12-13.  The Cooperation Agreement required AbbVie to pay the termination fee to Shire within 7 days of the event causing the breakup.  The Cooperation Agreement "did not contain any provision to allow AbbVie to terminate the contract in the event of a tax law change despite the fact that other such provisions had been included in similar transactions."  *Id*. at 13.

Also on July 18, 2014, AbbVie and Gonzalez hosted a telephonic conference with investors.  Gonzalez told investors that the "transaction has significant, both strategic and financial, rationale," and while "[t]ax is clearly a benefit, * * * *it's not the primary rationale for this*."  [38] at 14 (emphasis by Plaintiffs).  Gonzalez also noted that, from his point of view, the "debate" over inversions "would be more appropriately shifted toward tax reform and making companies more competitive in the global economy that we operate in," because "[c]ompanies like ours need access to our global cash flows to be able to make investments all around the world, but specifically to be able to make investments in the United States."  *Id.* at 14.  Gonzalez further stated that AbbVie was "at a disadvantage versus many of [its] foreign competitors" and opined that this is the "debate that we should be having around inversion and all aspects of the US tax code."  *Id.* at 15.  A call participant from Credit Suisse then asked a follow-up question about the "discussions in Washington around inversions."  *Id.* He stated: "There is obviously the breakup fee you guys mentioned around this deal.  I'm just trying to understand kind of how important the ex-US domiciling for tax purposes is to this deal and if something were to come up where retroactively you are not able to actually change your domicile outside the US, is that something where the breakup fee would not restrict you from then going ahead and breaking up this deal and not going forward?"  *Id.*  Gonzalez responded that he was "somewhat limited in what we can say," but continued: "this is a transaction that we believe has excellent strategic fit

and has compelling financial impact well beyond the tax impact. *We would not be doing it if it was just for the tax impact*. This is an additional benefit that we have. We have looked carefully at that aspect of it and we believe it is executable at a high level." *Id*. at 16 (emphasis by Plaintiff).

According to the amended complaint, Gonzalez's statement that the tax benefit was not the primary rationale for the Combination was false and misleading, as demonstrated by subsequent events described below. The amended complaint further asserts that Gonzalez's statement that he was "limited in what we can say" about whether AbbVie would break up the deal if it were not able to change its domicile for taxing purposes was "not enough to provide him a safe harbor," because "[g]iven his voluntary comments regarding the impact of the tax inversion, he had a duty to then speak the whole truth about the significance of the tax implications on the Combination." [38] at 16.

On August 5, 2014, the Treasury Department announced that it was "reviewing a broad range of authorities for possible administrative actions to limit inversions as well as approaches that could meaningfully reduce the tax benefits after inversions took place." [38] at 17.

On August 21, 2014, AbbVie Private Limited issued the Form S-4 for the proposed transaction, signed by Gonzalez.[1] The Form S-4 listed ten benefits of the transaction:

- the creation of a global market leader with unique characteristics and a compelling investment thesis by combining two companies with leadership positions in specialty pharmaceuticals;

- the opportunity to leverage AbbVie's capabilities and infrastructure to make Shire's pipeline and products more successful than its stand-alone prospects;

- the incremental sustainable leadership positions New AbbVie would be expected to have within high value market segments of significant unmet need, including

---

[1] Form S-4 is a form filed with the SEC relating to a business combination or exchange offer. This filing contains details relating to share distribution, amounts, terms, and other information relating to any merger or exchange offers.

immunology, rare diseases, neuroscience, metabolic diseases and liver disease (HCV), as well as multiple emerging oncology programs;

- the strong complementary fit of Shire's platform with AbbVie's existing specialty focus, including physician access relationships, regulatory and market access capabilities, and patient-centric focus and the potential to develop global franchises from Shire's platform with AbbVie's existing expertise and development capabilities across areas such as gastrointestinal medicine, neuroscience, and rare oncology indications, combined with AbbVie's resources and scale;

- *the potential realization of tax and operational synergies by New AbbVie as a result of the Combination*;

- the immediate broader geographic penetration and scale of Shire as a result of the Combination, by leveraging AbbVie's existing, well-established global infrastructure across more than 170 countries, including commercial, regulatory and medical affairs, and market access in key emerging markets;

- the enhancement of innovation and end-to-end R&D capabilities by leveraging AbbVie's established R&D infrastructure and expertise, which the AbbVie Board expects will generate:

  o a best-in-class product development platform, with near-term new product launches in liver disease (HCV), neuroscience, immunology, oncology, rare diseases, ophthalmology, and renal; and

  o expertise and infrastructure, including regulatory, health economics and outcomes research, and market access to expand product indications to meet patient needs;

- the combined financial strength and R&D experience of New AbbVie;

- the Combination's expected accretion to AbbVie's adjusted earnings per share in the first year following completion, growing to above $1.00 per share by 2020, with material ongoing financial and operating benefits;

- the opportunity for New AbbVie to have an enhanced financial profile and greater strategic and financial flexibility as compared to AbbVie and Shire on a standalone basis, which would provide:

  o the opportunity to maximize Shire's rare disease and neuroscience franchises including resources to fully globalize Shire's planned launches;

  o the potential for strengthened sustainability of top-tier EPS growth, attractive available cash flow and enhanced return of capital policy; and

o the basis for a world-class business development group to drive continued portfolio expansion and utilize M&A to supplement organic growth with access to cash and financial resources not available on a standalone basis.

[38] at 17-19 (emphasis added).

On September 22, 2014, the U.S. Treasury Department issued a notice ("Notice") that it would be taking steps to curb the practice of corporate inversions. See [38] at 19. The Treasury Department stated that the Notice "eliminates certain techniques inverted companies currently use to access the overseas earnings of foreign subsidiaries of the U.S. company that inverts without paying U.S. tax" and would apply "to deals closed today or after today." *Id.* According to the Amended Complaint, the Notice "made investors doubt whether the Combination would go forward," and "Shire's share price dropped 6% to a low of $247.98" by the following day. [38] at 19.

On September 29, 2014, AbbVie and Gonzalez issued a statement to Shire's employees, which AbbVie also filed with the SEC. Gonzalez stated that he was "more energized than ever about our two companies coming together, especially because I can already see many shared traits and values in the people at AbbVie and Shire." [38] at 20. Gonzalez explained that, "[w]hen we first considered Shire joining together with AbbVie it was because we saw the opportunity to lead and grown in important therapeutic areas" and also "because we saw a complementary pipeline that would be positioned to enhance innovation." *Id.* at 20-21. Gonzalez stated that he was "more confident than ever about the potential of our combined organizations now that I've had a chance to meet with many of you." *Id.* at 21. He told Shire employees, "[w]e have a very busy few months ahead as we work on integration planning." *Id.* Gonzalez concluded that he "look[ed] forward to working with [Shire employees] much more closely in the near future." *Id.* at 21.

On October 14, 2014, Gonzalez announced that AbbVie's Board would be reconsidering its recommendation to shareholders to adopt the merger agreement. Gonzalez stated that "AbbVie's Board will consider, among other things, the impact of the U.S. Department of Treasury's proposed unilateral changes to the tax regulations announced on September 22, 2014, including the impact to the fundamental financial benefits of the transaction." [38] at 22.

On October 15, 2014, AbbVie's Board withdrew its recommendation that stockholders vote in favor of the combination, and issued a press release stating:

> AbbVie and its Board of Directors made this determination following a detailed consideration of the impact of the U.S. Department of Treasury's unilateral changes to the tax rules, as issued on September 22, 2014. The breadth and scope of the changes, including the unexpected nature of the exercise of administrative authority to impact longstanding tax principles, and to target specifically a subset of companies that would be treated differently than either other inverted companies or foreign domiciled entities, introduced an unacceptable level of uncertainty to the transaction. Additionally, the changes eliminated certain of the financial benefits of the transaction, most notably the ability to access current and future global cash flows in a tax efficient manner as originally contemplated in the transaction. This fundamentally changed the implied value of Shire to AbbVie in a significant manner.

[38] at 22-23.

On October 15, 2014, *Bloomberg* published an article stating that "AbbVie's move surprised investors after the drug company had said the deal was driven mostly by strategic, not tax, reasons." [38] at 26 (quoting Oliver Stanley and Cynthia Koons, BLOOMBERG, "AbbVie's Threat on Shire Deal is Latest Tax Rule Fallout" (Oct. 15, 2014)). They quoted an analyst from Credit Suisse who stated, "AbbVie's management's credibility may now be called into question given the non-inversion benefits they touted when initially selling the deal and the fact that their limited public comments since the Treasury Notice was released have stressed the merits of getting the deal done." *Id.* The Chicago Tribune also reported on October 16, 2014 that AbbVie's announcement "came as a surprise to investors and analysts because Gonzalez and

other executives had expressed support for the deal a week after the Treasury Department unveiled the new rules Sept. 22." *Id.*

On October 20, 2014, AbbVie issued a press release stating that AbbVie and Shire were terminating the merger. See [38] at 23. AbbVie was required to pay the $1.64 billion break-up fee. According to the press release, AbbVie's decision "was based upon its assessment of the September 22, 2014 notice issued by the U.S. Department of Treasury, which re-interpreted longstanding tax principles in a uniquely selective manner designed specifically to destroy the financial benefits of these types of transactions." *Id.* AbbVie further stated that the Notice "introduced an unacceptable level of risk and uncertainty, given the magnitude of the proposed changes and the stated intention of the Department of Treasury to continue to revise tax principles to further impact such transactions." *Id.* AbbVie explained that after thoroughly reviewing the Notice and obtaining advice from external tax, legal, and financial advisors, its "executive management team ultimately concluded that the transaction was no longer in the best interests of stockholders at the agreed upon valuation, and the Board fully supported that conclusion." *Id.*

Gonzalez also publicly commented on the termination of the transaction. He stated, among other things, that "[t]he unprecedented unilateral action by the U.S. Department of Treasury may have destroyed the value of this transaction, but it does not resolve" the need for comprehensive tax reforms to stimulate investment in the U.S. economy. [38] at 24. According to the amended complaint, AbbVie and Gonzales delayed this "ultimate announcement for as long as possible to avoid paying the hefty termination fee," which "had to be paid within 7 days of the termination of the Combination," so that AbbVie could "retain those funds and interest thereon." [38] at 27.

On October 22, 2014, a columnist for *Fortune* wrote an article stating that AbbVie had "kill[ed] its $54 billion buyout of Shire" and "come[] clean about its original intentions," which the columnist posited to be the tax benefits gained from the corporate inversion. [38] at 25 (quoting Dan Primack, FORTUNE, "AbbVie Finally Admits it was Trying to Dodge U.S. Taxes" (Oct. 22, 2014)). The columnist opined that due to the Treasury Notice, Gonzalez was "freed from having to pretend that [the proposed merger] wasn't about the taxes." *Id.*

On November 25, 2014, Plaintiffs filed suit against AbbVie and Gonzalez on behalf of all persons who purchased or otherwise acquired Shire ADS or purchased call options or sold put options during the period June 20, 2014 (when AbbVie disclosed that it had approached Shire) through October 14, 2014 (when Gonzalez announced that the Board was reconsidering its decision to approve the merger). The complaint alleged that seven statements made by AbbVie and Gonzalez—which all allegedly downplayed the importance of the tax inversion to the proposed merger—were false and misleading and violated Section 10(b) of the Act and Rule 10b-5. The complaint also alleged that Gonzalez also violated Section 20(a) of the Act.

Defendants filed a motion to dismiss the complaint for failure to state a claim [25], which the Court granted. See [37]. The Court determined that although Plaintiffs alleged facts sufficient to support a reasonable belief that Gonzalez's September 29, 2014 letter to Shire employees was false or misleading at the time made, Plaintiffs' scienter allegations were not cogent or compelling under the Private Securities Litigation Reform Act's heightened pleading standards for Section 10(b) claims. The Court explained that the complaint did not allege facts constituting strong circumstantial evidence of conscious misbehavior or recklessness because the timing of Gonzales' letter alone was not strong evidence that Gonzalez knew as of September 29, 2014 that AbbVie was going to reconsider or call off the deal. In addition, the Court determined

that Plaintiffs' Section 20(b) claim must be dismissed because Plaintiffs failed to plead a primary violation of the securities laws.  *Id*. at 24.

The Court granted Plaintiffs leave to file an amended complaint, which they did on May 2, 2016 [38].  Currently before the Court is Defendants' motion to dismiss the amended complaint for failure to state a claim [42].

## II.  Analysis

Plaintiffs allege in their amended complaint that AbbVie and Gonzalez violated Section 10(b) of the Act and Rule 10b-5 and that Gonzalez also violated Section 20(a) of the Act. Section 10(b) of the Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security * * * any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  "Rule 10b–5 forbids a company or an individual 'to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'"  *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008) (quoting 17 C.F.R. § 240.10b–5(b)).  "The elements of a private securities fraud claim based on violations of Section 10(b) and Rule 10b–5 are: '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 131 S. Ct. 2179, 2184 (2011) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011)); see also *Halliburton Co. v. Erica P. John Fund, Inc*., 134 S. Ct. 2398, 2407 (2014).

Section 20(a) of the Act "provides a basis for holding individuals liable for acts of securities fraud if they control other individuals or businesses that violate the securities laws." *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 886 (N.D. Ill. 2011) (quoting 15 U.S.C. § 78t); *see also Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 952 (N.D. Ill. 2015). Thus, "to state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008).

Defendants move to dismiss Plaintiffs' amended complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and 15 U.S.C. § 78u-4(b)(3)(a). Defendants argue that Plaintiffs once again fail to allege sufficient facts to support two of the elements of their Section 10(b) and Rule 10b-5 claim: (1) a misrepresentation of material fact; and (2) scienter. Defendants also argue, once again, that Plaintiffs' Section 20(a) claim should be dismissed because Plaintiffs have failed to state a primary violation of the securities laws.

### A.    Legal Standards

"In an ordinary civil action, the Federal Rules of Civil Procedure require only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). "Although the rule encourages brevity, the complaint must say enough to give the defendant 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Id.* (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)). A complaint that does not comply with Rule 8(a) is subject to dismissal under Rule 12(b)(6), which tests the sufficiency of the complaint. *See* Fed. R. Civ. P. 12(b)(6); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Prior to the enactment of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), "the sufficiency of a complaint for securities fraud was governed not by Rule 8, but

by the heightened pleading standard set forth in Rule 9(b)." *Tellabs*, 551 U.S. at 319. Under Rule 9(b), a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake," but "intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

The PSLRA "raise[d] the pleading standard for securities fraud claims beyond the requirements of even Rule 9(b)." *Van Noppen*, 136 F. Supp. 3d at 927. These heightened pleading standards, which are discussed in detail below, apply to the "misrepresentation of material fact" and "scienter" elements of Section 10(b) and Rule 10b-5 claims. See generally *Tellabs*, 551 U.S. at 320. The Court is required to grant a motion to dismiss if these standards are not met. 15 U.S.C. § 78u-4(b)(3)(A).

In evaluating Defendants' motion to dismiss, the Court must accept all factual allegations in the complaint as true. *Van Noppen*, 136 F. Supp. 3d at 945-46. The Court must also "draw all reasonable inferences in favor of the plaintiff," *except* when it is evaluating the scienter element. See *Makor*, 513 F.3d at 705. The standard that applies to the scienter element is discussed below.

### B. Material Misrepresentations or Omissions

The PSLRA requires that in any action where "the plaintiff alleges that the defendant (A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading," the complaint must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(A), (B). In a case where, as here, the allegations are based on information and belief, the plaintiff is also

required to "state with particularity all facts on which that belief is formed." *Id.* § 78u-4(b)(1).[2] In determining whether a statement is misleading, the Court "consider[s] the context in which the statement was made" and "must determine 'whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission.'" *Constr. Workers Pension Fund-Lake Cty. & Vicinity v. Navistar Int'l Corp.*, 114 F. Supp. 3d 633, 651 (N.D. Ill. 2015) (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 596 (7th Cir. 2006), *vacated and remanded*, 551 U.S. 308 (2007)).

In their amended complaint, Plaintiffs identify the following three statements as misleading or containing omissions of material fact:

1.   Gonzales' July 18, 2014 comments on an investor call, that "AbbVie would "not be doing [the merger] if it was just for the tax impact," that "[t]ax is clearly a benefit, but it's not the primary rationale for this," and that "[t]his is an additional benefit that we have";

2.   AbbVie's August 21, 2014 S-4 tax filings identifying ten "strategic benefits" of the merger, including "the potential realization of tax and operational synergies by New AbbVie as a result of the Combination"; and

3.   Gonzalez's September 29, 2014 thank-you letter to Shire employees stating that he is "more energized than ever about our two companies coming together" and "more confident than ever about the potential of our combined organizations" and that "[w]e have a very busy few months ahead as we work on integration planning."

See [45] at 9-11.  Plaintiffs assert that these statements "downplay the tax inversion aspect of the Combination * * * despite the primary importance of the inversion to the Combination."  [38] at 8.

---

[2] Plaintiffs' amended complaint states that all allegations are based on information and belief except allegations specifically pertaining to Plaintiffs.  [38] at 1.

The Court concludes that Plaintiffs have not alleged facts that are "sufficient to support a reasonable belief" that statements 1 or 2 were false misleading, but have met their burden with regard to statement 3.

As to statement 1, Plaintiffs argue that its false and misleading nature can be inferred from AbbVie's decision, following the Treasury Notice, to terminate the transaction and pay the break-up fee. Plaintiffs emphasize that the sole reason AbbVie provided, or has ever provided, for calling off the transaction was that the Treasury Notice "destroy[ed] [its] financial benefits." [45] at 12-13. They argue that this fact "make[s] it more than 'plausible' that defendants' statements were false and misleading in that the tax inversion was actually the central rationale for the Combination all along." *Id.* at 13. The Court disagrees and concludes that these facts are insufficient to "support a reasonable belief as to the misleading nature of the statement or omission'" under the PLRA's heightened pleading standard. *Constr. Workers Pension Fund*, 114 F. Supp. 3d at 651. Plaintiffs do not address the Court's prior analysis of this issue. As the Court explained, the total value of the deal was $54 billion. [38] at 6. The break-up fee was $1.64 billion, or approximately 3% of the total value. *Id.* at 12. Given this deal structure, it would be expected that AbbVie's loss of any benefit worth 3% or more of the total deal value could cause AbbVie to terminate the deal. But it does not follow that any benefit of the deal that is worth at least 3% of the transaction value must be the "primary"—*i.e.* the "most important"[3]—reason for the deal. As the Court previously concluded, "[s]aying a benefit is not the 'primary rationale' is not the same as saying it is immaterial or unimportant." [37-2] at 17.

Further, Plaintiffs' argument that statement 1 was misleading ignores the context of in which Gonzalez made it. Gonzalez recognized the tax issue was important when he explained

---

[3] Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/primary (last accessed Mar. 9, 2017).

that American companies need access to global cash flows and are at a disadvantage to foreign competitors. [38] at 14. But, when specifically asked, Gonzalez refused to take any position on whether AbbVie would call off the transaction if the applicable tax rules changed. *Id.* at 16. Plaintiffs assert in the amended complaint that Gonzalez's statement that he was "limited in what we can say" about whether AbbVie would pay the breakup fee if the tax rules changed "is not enough to provide him a safe harbor," because his "voluntary comments regarding the impact of the tax inversion"—and specifically his comment that "[w]e would not be doing it if it was just for the tax impact"—created a "duty to then speak the whole truth about the significance of the tax implications." *Id.* However, saying that AbbVie "would not be doing [the deal] if it was just for the tax impact" is simply not the same thing as telling investors that the "deal would happen with or without the tax benefits." *Id.* AbbVie provided at least ten rationale for the transaction, any one of which might have been important enough for AbbVie to call off the deal if it evaporated, but nonetheless might not have been the most important reason for entering into the deal in the first place. In short, the Court cannot conclude that investors would be led to believe that the deal would go through regardless of changes to the tax rules, when Gonzales refused to opine on that issue when directly asked.

In addition, other allegations in the amended complaint undermine Plaintiffs' argument that the tax benefit, standing alone, was the primary rationale for the deal. The amended complaint acknowledges that the other "strategic rationales *were valid* and projected to provide the Company, coincidentally, with much needed diversification to assist in its long term growth plans." [38] at 3 (emphasis added). For example, Shire was "an attractive strategic partner for Abbvie" because "Abbvie's Humira patent, which accounted for 66% of its sales, was set to expire in 2016, and Shire was "more diversified and ha[d] seen its sales double between 2007

and 2013." *Id.* at 33. If AbbVie was doing the deal just for the tax impact, then it could have chosen to merge with any company domiciled in a country with more favorable tax treatment. Instead, as Plaintiffs acknowledge, AbbVie chose a company that would allow AbbVie to diversify its business to enhance its prospects for long-term growth.

In statement 2, Defendants identified various benefits, including tax benefits, that they hoped to realize through the proposed merger. According to the amended complaint, statement 2 "misled investors to believe that the tax benefits were not the only (or even primary) reason for the Combination." [38] at 19. As with statement 1, this allegation is not a plausible basis of imposing liability in light of the amended complaint's recognition that the other "strategic rationales *were valid* and projected to provide the Company, coincidentally, with much needed diversification to assist in its long term growth plans." [38] at 3 (emphasis added). Plaintiffs argue that AbbVie nonetheless had a duty to "disclose that if the Treasury was successful AbbVie would (or even that they might) withdraw from the Combination," because Treasury had announced two weeks earlier that it was "planning to limit tax inversion transaction." [45] at 10. But since statement 2 does not rank the importance of the transaction's benefits, or state or imply which benefits would be important enough to justify paying the breakup fee if they evaporated, Defendants did not have a duty to disclose what it would or might do if Treasury eventually followed through on its announcement. As the Supreme Court has recognized, "[e]ven with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market." *Matrixx*, 563 U.S. at 45; cf. *Schlifke*, 866 F.2d at 944-45 (omissions cited by purchasers of limited partnership interests in oil and gas exploration program in connection with loan documents that were included with partnership prospectus did not give rise to duty on part of

bank to disclose other material facts regarding loan transaction; contrary to purchasers' contention, loan documents did not give rise to any implication that bank believed partnership would be successful); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 168-69 (3d Cir. 2014) (statements made during earnings calls to pharmaceutical manufacturer's investors, which described phase 2 interim results of experimental Alzheimer's drug trial as one factor in the "composite decision" to move to phase 3—but did not disclose known problems with the phase 2 tests— were not false and misleading in violation of § 10(b), as such statements were consistent with manufacturer's prior press release and accurately conveyed that the interim results were one of several factors manufacturer considered in deciding to initiate phase 3).

The Court next turns to statement 3, the September 29, 2014 letter that Gonzalez sent to Shire employees and filed with the SEC a week after Treasury issued its Notice. Gonzalez stated that he was "more energized than ever about our two companies coming together" and "more confident than ever about the potential of our combined organizations," and contemplated a "very busy few months ahead as we work on our integration planning." [45] at 11. The Court previously found that the facts alleged in support of this statement were sufficient to support a reasonable belief that AbbVie's omission of the fact that it was reconsidering the merger rendered misleading Gonzalez's statement about the continued planning for the transaction. [37-2] at 18. The Court finds no reason to reconsider its prior decision on statement 3, and proceeds to analyze the sufficiency of the amended complaint's scienter allegations.

## C.  Scienter

"To establish liability under [Section] 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs*, 551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425

U.S. 185, 193-94 & n.12 (1976)); see also *Gandhi v. Sitara Capital Mgmt., LLC*, 721 F.3d 865, 870 (7th Cir. 2013). A plaintiff may "demonstrate scienter 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Tricontinental Indus. Ltd. v. Anixter*, 215 F. Supp. 2d 942, 949 (N.D. Ill. 2002) (quoting *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1253 (N.D. Ill. 1997)). In the Seventh Circuit, scienter can also be established by proving that the defendant acted with a "reckless disregard of the truth." *S.E.C. v. Bauer*, 723 F.3d 758, 775 (7th Cir. 2013); see also *S.E.C. v. Ferrone*, 163 F. Supp. 3d 549, 568 (N.D. Ill. 2016).[4] In the context of omissions, reckless conduct is "'a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Sundstrand*, 553 F.2d at 1045 (quoting *Franke v. Midwestern Oklahoma Development Authority*, 428 F. Supp. 719 (W.D. Okl. 1976)). Thus, "[t]he question is not merely whether the [defendant] had knowledge of the undisclosed facts; rather, it is the '*danger of misleading buyers* [that] must be actually known or so obvious that any reasonable man would be legally bound as knowing." *Schlifke*, 866 F.2d at 946 (emphasis in *Sclifke*; quoting *Sundstrand*, 553 F.2d at 1045).

The PSLRA further requires a plaintiff to "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u–

---

[4] See also *Tellabs*, 551 U.S. at 319 & n.3 (declining to decide whether reckless conduct can form the basis for a § 10(b) claim, but recognizing that "[e]very Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally or recklessly, though the Circuits differ on the degree of recklessness required"); *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1044 (7th Cir. 1977) ("[A] reckless omission of material facts upon which the plaintiff put justifiable reliance in connection with a sale or purchase of securities is actionable under Section 10(b) as fleshed out by Rule 10b-5.").

4(b)(2) (emphasis added). To determine if a plaintiff has complied with this obligation, the Court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 310. "The inference that the defendant acted with scienter need not be irrefutable, but it must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* "In making this determination, the court must review 'all the allegations holistically.'" *Matrixx*, 563 U.S. at 48 (quoting *Tellabs*, 551 U.S. at 326). In sum, this Court must ask: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 551 U.S. at 326.

Defendants argue that the complaint should be dismissed because Plaintiffs fail to adequately allege that Defendants acted with scienter when they made their alleged false and misleading statements. As it did previously, the Court's analysis of the scienter element will focus on Gonzalez's September 29, 2014 letter to Shire employees because that is the only material misrepresentation or omission that Plaintiffs have adequately pled. After reviewing the amended complaint and the parties' arguments, the Court concludes that Plaintiffs' allegations are sufficient to give rise to a strong inference that Gonzales' September 29, 2014 letter was sent with a reckless disregard of the truth, but not with the intent to deceive, manipulate, or defraud. Therefore, Plaintiff's claim, to the extent it is based on Gonzales' September 29, 2014 letter, will be allowed to proceed.

The Court will first address Plaintiffs' new scienter allegation which it did not find persuasive. The Amended Complaint alleges that Gonzales's September 29 statement was made intentionally "in an attempt to stave off an immediate $1.64 billion termination fee" and retain the interest on those funds for as long as possible. [38] at 21. This allegation does not support a

cogent and compelling inference of scienter, because the event triggering termination of the merger was the Board's withdrawal of its recommendation for the transaction, not Gonzales' statement. Plaintiffs do not identify, and the Court does not see, any way that Gonzales' statement had any effect on the timing of the Board's decision to withdraw from the transaction.

The Court finds more persuasive the amended complaint's allegation that "Gonzalez was at least severely reckless in making his statements to the market on September 29, 2014 before the Board had conducted a 'detailed consideration of the impact' of the change in the tax laws." [38] at 23. AbbVie's October 15, 2014 press release announcing that the Board was withdrawing its recommendation for the merger indicates that AbbVie performed a "detailed consideration of the impact of Treasury's rules" following the issuance of the Notice. [33] at 22. It is more than plausible that AbbVie began its detailed analysis as soon as Treasury issued the Notice—and that the analysis was ongoing when Gonzales issued his statement on September 29—given AbbVie's prior statements (including the S-4 filing) recognizing that the tax benefits were one of the rationale behind the merger. Indeed, given the fast paced nature of merger and acquisitions, one could expect AbbVie to have given immediate consideration to any legal changes that would or might impact any of the deal's strategic rationale—and, in view of the size of the potential transaction and termination fee, to have devoted considerable resources to the issue.

Further, according to the Amended Complaint, AbbVie's lead director acknowledged in an interview after the merger was terminated that Gonzales sent his September 29, 2014 letter to "calm Shire employee unrest." [38] at 28. This suggests that, as of September 29, Gonzales knew that there were public concerns that the merger would be called off due to the Notice, and calls into question whether he expressed his support for the merger not because AbbVie was

actually still "more energized" or "more confident" about it than ever, [45] at 11, but instead to appease worried Shire employees. Taken together, these facts satisfy Plaintiffs' obligation to include in their complaint strong circumstantial evidence that Gonzales' September 29 statement was made with a reckless disregard for the known or obvious danger of misleading buyers into believing that AbbVie still fully intended to go forward with the merger when, in fact, AbbVie was in the process of analyzing whether to walk away from the deal in light of the tax rule changes. Therefore, the Court denies Defendants' motion to dismiss Plaintiffs' Section 10(b)/Rule 10b-5 claim to the extent that it is based on statements made in Gonzales' September 29, 2014 letter to Shire employees.[5]

### D. Section 20(b) Claim

"[T]o state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws." *Pugh*, 521 F.3d at 693. Defendants argue that because Plaintiffs' Section 10(b)/Rule 10b-5 claim is deficient, their derivative Section 20(b) claim must be dismissed, as well. Since the Court concludes that Plaintiffs have adequately plead a primary violation of the Act based on Gonzales' September 29, 2014 letter, the Court must reject Defendants' argument and allow the Section 20(b) claim to proceed, as well.

---

[5] The Court finds it unnecessary to address the supplemental authority submitted by Plaintiffs, a decision of the Cook County Circuit Court denying a motion to dismiss state-law fraud and fraudulent concealment claims that investors brought against AbbVie based on allegations similar to the ones alleged by Plaintiffs here. See [49-1] (Order, *Elliot Associates, L.P. v. AbbVie Inc.*, Case No. 16 L 6279 (Cook Cty. Cir. Ct. Jan. 6, 2017). The elements of common law fraud and fraudulent concealment are different than the elements of federal securities fraud and not subject to Rule 9(b)'s heightened pleading requirements, making the two cases difficult to compare. Further, the Circuit Court's opinion does not identify specific statements that the court found sufficient to support the fraud claims, except one statement that Plaintiffs do not identify in their amended complaint: the AbbVie/Shire merger agreement's alleged inclusion of "a specific carve out that a lack of government restrictions as to the tax benefits achieved by the merger would not be a precondition to completing the deal." [49-1] at 3.

## III.    Conclusion

For the reasons stated above, Defendants' motion to dismiss [26] is denied.  This case is set for further status hearing on March 29, 2017 at 9:00 a.m.


Dated: March 10, 2017

_____
Robert M. Dow, Jr.
United States District Judge