# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| MURRAY RUBINSTEIN, *et al.*, | ) | |
| Individually and On Behalf of All Others | ) | |
| Similarly Situated, | ) | Case No. 14-cv-9465 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Honorable Robert M. Dow, Jr. |
| v. | ) | Honorable Maria Valdez |
| | ) | |
| RICHARD GONZALEZ and ABBVIE INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## LEAD PLAINTIFFS' MEMORANDUM OF LAW IN
## SUPPORT OF MOTION FOR CLASS CERTIFICATION

Theodore Bell
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLC**
70 West Madison Street
Suite 1400
Chicago, IL 60602
Tel: 312-984-0000
Fax: 312-214-3110

Mark C. Rifkin
Benjamin Y. Kaufman
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
Tel: 212-545-4600
Fax: 212-545-4758

Mark C. Gardy
James S. Notis
Jennifer Sarnelli
Meagan Farmer
**GARDY & NOTIS, LLP**
Tower 56
126 East 56th Street, 8th Floor
New York, NY 10022
Tel: 212-905-0509
Fax: 212-905-0508

*Attorneys for Lead Plaintiffs*

## TABLE OF CONTENTS

TABLE OF CITATIONS .................................................................................................. iii

I.   INTRODUCTION ................................................................................................. 1

II.  FACTUAL AND PROCEDURAL BACKGROUND .......................................... 3

III. THE COURT SHOULD CERTIFY THE CLASS ACTION WITH
     LEAD PLAINTIFFS AS CLASS REPRESENTATIVES ................................... 5

     A. Standards for Class Certification ................................................................... 5

     B. The Class Easily Meets All Four Prerequisites
        Of Rule 23(a) ................................................................................................. 7

        1. Members of the Class are Sufficiently Numerous and
           Geographically Dispersed that Joinder is Impracticable .......................... 7

        2. Questions of Fact and Law Are Common to the Class .............................. 8

        3. Plaintiffs' Claims are Typical of the Claims of the Class ......................... 9

        4. Plaintiffs Will Fairly and Adequately Represent the Class ..................... 10

     C. The Class is Clearly and Objectively Defined .............................................. 11

     D. The Class Easily Meets the Requirements of Rule 23(b)(3) .......................... 12

        1. Predominance ............................................................................................ 12

           a) Plaintiffs May Invoke the Presumption of Reliance .......................... 14

           b) Shire Securities Traded in an Efficient Market on NASDAQ ......................... 15

           c) The *Cammer* Factors of Market Efficiency ....................................... 16

              (1) Average Trading Volume .......................................................... 16

              (2) Number of Analysts.................................................................. 17

              (3) Presence of Market Makers ...................................................... 17

              (4) Eligibility to File an S-3 Registration Statement...................... 18

              (5) Reaction of Securities to Unexpected Corporate Events......................... 18

i

d) Other Factors Also Support Market Efficiency ................................................. 19

e) Plaintiffs are Also Entitled to Rely on the *Affiliated Ute* Presumption of Class-Wide Reliance.................................................................. 21

f) Calculation of Class-Wide Damages ............................................... 22

2. Superiority .................................................................................................. 23

IV. THE COURT SHOULD APPOINT GARDY & NOTIS AND WOLF HALDENSTEIN AS CLASS COUNSEL ......................................... 24

V. CONCLUSION ............................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                        **<u>Page(s)</u>**

*Affiliated Ute Citizens of Utah v. United States,*
    406 U.S. 128 (1972) ..................................................................................3, 21

*Amchem Products, Inc. v. Windsor,*
    521 U.S. 591 (1997) ...............................................................................6, 11, 12

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds,*
    133 S. Ct. 1184 (2013) ...........................................................................6, 13, 14

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988) ..................................................................................2, 14

*Bell v. PNC Bank, Nat. Ass'n,*
    800 F.3d 360 (7th Cir. 2015) ...........................................................................5

*Blackie v. Barrack,*
    524 F.2d 891 (9th Cir. 1975) .........................................................................22

*Brieger v. Tellabs, Inc.,*
    245 F.R.D. 345 (N.D. Ill. 2007) ....................................................................10

*Butler v. Sears, Roebuck and Co.,*
    727 F.3d 796, 801 (7th Cir. 2013) ............................................................13, 23

*Cammer v. Bloom,*
    711 F. Supp. 1264, 1286-87 (D.N.J. 1989)).,  ...................................15, 16, 17, 18

*Cooper v. Pac. Life Ins. Co.,*
    229 F.R.D. 245 (S.D. Ga. 2005) ....................................................................21

*De La Fuente v. Stokely-Van Camp, Inc.,*
    713 F.2d 225 (7th Cir. 1983) ...........................................................................9

*Erica P. John Fund v. Halliburton, Inc.,*
    131 S. Ct. 2179 (2011) .............................................................................6, 13

*Fogarazzo v. Lehman Bros., Inc.*
    263 F.R.D. 90 (S.D.N.Y. 2009) .....................................................................21

*Halliburton Co. v. Erica P. Fund, Inc.,*
    134 S. Ct. 2398 (2014) .............................................................................2, 13

*Healy v. Int'l Bhd. of Elec. Workers, Local Union No. 134,*
    296 F.R.D. 587 (N.D. Ill. 2013) ....................................................................13

*Hodges v. Akeena Solar, Inc.,*
   274 F.R.D. 259 (N.D. Cal. 2011) ........................................................................15

*In re Accredo Health, Inc. Sec. Litig.,*
   No. 03-2216 DP, 2006 WL 1716910 (W.D. Tenn. Apr. 19, 2006) ........................................16

*In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.,*
   281 F.R.D. 134, 138-39 (S.D.N.Y. 2012)................................................................7

*In re Bank One Sec. Litig./First Chicago S'holder Claims,*
   No. 00 CV 0767, 2002 WL 989454 (N.D. Ill. May 14, 2002) ....................................6, 9, 13

*In re Diamond Foods, Inc.,* Sec. Litig.,
   295 F.R.D. 240 (N.D. Cal. May 6, 2013) ..............................................................13

*In re DVI Inc. Sec. Litig.,*
   249 F.R.D. 196 (E.D. Pa. 2008) ...................................................................19, 20

*In re Dynegy Inc. Sec. Litig.,*
   226 F.R.D. 263 (S.D Tex. 2005) ........................................................................8

*In re Gen. Instrument Corp. Sec. Litig.,*
   No. 96 C 1129, 1999 WL 1072507 (N.D. Ill. Nov. 18, 1999) ...........................................7

*In re HealthSouth Corp. Sec. Litig.,*
   257 F.R.D. 260 (N.D. Ala. 2009) ......................................................................15

*In re IndyMac Mortgage-Backed Sec. Litig.,*
   286 F.R.D. 226 (S.D.N.Y. 2012) ....................................................................7, 13

*In re Initial Public Offering Sec. Litig.,*
   544 F. Supp. 2d 277 (S.D.N.Y. 2008) ..................................................................15

*In re Pfizer Inc. Sec. Litig.,*
   282 F.R.D. 38 (S.D.N.Y. 2012) ........................................................................14

*Ingram v. Corporate Receivables, Inc.,*
   No. 02 C 6608, 2003 WL 21982152 (N.D. Ill. Aug. 19, 2003) ...........................................24

*Keele v. Wexler,*
   149 F.3d 589 (7th Cir. 1998) ........................................................................6, 8

*Krogman v. Sterritt,*
   202 F.R.D. 467 (N.D. Tex. 2001) ...................................................................19, 20

*Kurgan v. Chiro One Wellness Centers LLC,*
   No. 10-cv-1899, 2014 WL 642092 (N.D. Ill. Feb. 19, 2014) ........................................ *passim*

*Lumen v. Anderson,*
   280 F.R.D. 451 (W.D. Mo. 2012) .......................................................................15

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.,*
  256 F.R.D. 586 (N.D. Ill. 2009) ........................................................9, 10

*Messner v. Northshore Univ. HealthSystem,*
  669 F.3d 802 (7th Cir. 2012) ..................................................... *passim*

*Mullins v. Direct Digital, LLC,*
  795 F.3d 654 (7th Cir. 2015) ......................................................6, 11

*Nauman v. Abbott Labs.,*
  No. 04 C 7199, 2007 WL 1052478 (N.D. Ill. Apr. 3, 2007) ...................................21

*Neil v. Zell,*
  275 F.R.D. 256 (N.D. Ill. 2011) ......................................................8

*Petrie v. Elec. Game Card, Inc.,*
  308 F.R.D. 336 (C.D. Cal. 2015) ......................................................20

*Roth v. Aon Corp.,*
  238 F.R.D. 603 (N.D. Ill. 2006) ..................................................... *passim*

*Schleicher v. Wendt,*
  No. 1:02-CV-1332-DFH-TAB, 2009 WL 761157 (S.D. Ind. Mar. 20, 2009) .......................16

*Schleicher v. Wendt,*
  618 F.3d 679, 681 (7th Cir. 2010) ......................................................8, 9, 14, 22

*SEC v. Gorsek,*
  222 F. Supp. 2d 1099 (C.D. Ill. 2001) ......................................................21

*Teachers' Ret. Sys. of Louisiana v. ACLN Ltd.,*
  No. 01 Civ. 11814(LAP), 2004 WL 2997957 (S.D.N.Y. Dec. 27, 2004) ..........................7, 8

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.,*
  No. 05 Civ. 1898, 2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006) ...............................15

*Todd v. STAAR Surgical Co.,*
  No. CV-14-05263-MWF-RZ, 2017 WL 821662 (C.D. Cal. Jan. 5, 2017) ............................15

*Unger v. Amedisys Inc.,*
  401 F.3d 316 (5th Cir. 2005) ......................................................19

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.,*
  No. CV 13-6731, 2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) ...............................15

*Wal-Mart Stores v. Dukes,*
  564 U.S. 338 (2011) ......................................................6

*Weiner v. Quaker Oats Co.,*
  No. 98 C 3123, 1999 WL 1011381 (N.D. Ill. Sept. 30, 1999) ...............................7

**Statutes, Rules, and Other Authorities**

Federal Rules of Civil Procedure

§23(a) ...........................................................................................................1, 5, 25

§23(a)(2) .......................................................................................................7

§23(a)(3) .......................................................................................................9

§23(a)(4) .......................................................................................................10

§23(b)(3) ....................................................................................................... *passim*

§23(g) ...........................................................................................................3, 24

§23(g)(1)(A) .................................................................................................25

§23(g)(4) .......................................................................................................24

PSLRA - 15 U.S.C. § 78u-4(a)(3)(B)
§21d(A)(3)(B) ..............................................................................................1

Securities and Exchange Act of 1934
§10b.............................................................................................................13
§10b5...........................................................................................................13
§20a.............................................................................................................9

SEC Release No. 6331,
1981 WL 30765 (Aug. 6, 1981) ....................................................................18

Lead Plaintiffs Vikas Shah and Dawn Bradley ("Plaintiffs"), by and through their counsel, respectfully submit this Memorandum of Law in Support of Lead Plaintiffs' Motion for Class Certification.

## I.     INTRODUCTION

Plaintiffs seek to represent a proposed class (the "Class") comprised of all persons who purchased or otherwise acquired American Depository Shares or "ADS" or purchased call options or sold put options (collectively, "Securities") of Shire plc ("Shire") during the short period between September 29 and October 14, 2014, inclusive (the "Class Period"). Plaintiffs also seek to be appointed Class Representatives and that their counsel, Gardy & Notis, LLP and Wolf Haldenstein Adler Freeman & Herz LLP, be appointed Class Counsel. On February 4, 2015, the Court appointed Plaintiffs as Lead Plaintiffs pursuant to Section 21d(A)(3)(B) of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(a)(3)(B), and approved Lead Plaintiffs' selection of Gardy & Notis and Wolf Haldenstein as Co-Lead Counsel. Dkt. No. 12.

This class action arises from the proposed and ultimately abrogated merger of AbbVie and Shire in a tax inversion transaction whereby AbbVie was to reincorporate in Ireland to achieve tax benefits by expatriating its income to that country (the "Combination"). Defendants' September 29, 2014 statement concerning the Combination was false and misleading because Defendants knew or should have known on that date that the Combination would not take place if AbbVie were to lose the tax benefits of an inversion.

For the reasons discussed below, this securities action easily meets all requirements for class certification under Federal Rules of Civil Procedure 23(a) and (b)(3):

**Numerosity.** With over 40 million ADSs freely tradable throughout the Class Period and more than 5.2 million ADSs (on average) traded weekly, there can be no reasonable dispute that

numerosity is satisfied here.

**Commonality.** This action arises out of a common course of conduct, namely the misrepresentations and omissions made to all investors in Defendants' public statements during the Class Period. All claims center around common questions of law and fact focused on Defendants' wrongdoing and the harm it caused to public investors.

**Typicality.** The proposed Class Representatives and all other members of the proposed Class suffered injuries of the exact same type, stemming from exactly the same events, practices, and unlawful conduct by Defendants. Like the other Class members, Plaintiffs purchased Securities during the Class Period at inflated prices and subsequently suffered losses when the truth was revealed. Therefore, Plaintiffs were impacted by the same materially false and misleading statements and in the same way as other members of the Class.

**Adequacy.** Plaintiffs are willing to represent the absent Class members, to monitor and supervise the litigation conducted by proposed Class Counsel, and to participate in discovery. The proposed Class Representatives have not conflict or antagonism with the other Class members, as they suffered injuries from the same materially false and misleading statements and the same conduct that injured the absent Class members. Plaintiffs are also adequate because they have selected and retained two highly experienced law firms to represent the Class here.

**Predominance.** The common issues identified above predominate over individual issues, and a trial would not be sidetracked by adjudicating each Class member's reliance. Class-wide reliance is presumed under the "fraud-on-the-market" presumption, *see Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and *Halliburton Co. v. Erica P. Fund, Inc.*, 134 S. Ct. 2398 (2014) ("*Halliburton II*"), because, as demonstrated by the analysis of Plaintiffs' expert, Chad Coffman, CFA, the Securities traded in an efficient market throughout the Class Period. *See* Expert Report

of Chad Coffman, CFA ("Coffman Rep.") ¶ 6 (filed concurrently herewith). Class-wide reliance is also presumed under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the securities claims involve omissions of material fact.

**Superiority.** Class adjudication is superior to a multitude of repetitive individual suits. A single adjudication for the class maximizes judicial efficiency, allows all the claims to be heard in one court, and given the prohibitive costs of litigation, is the only practical opportunity to adjudicate Defendants' federal securities law violations for many Class members who suffered relatively small investment losses. Moreover, there will be no difficulty in maintaining this securities litigation as a class action.

Finally, the appointment of Gardy & Notis and Wolf Haldenstein as Class Counsel is appropriate under Fed. R. Civ. P. 23(g). Gardy & Notis and Wolf Haldenstein have extensive experience in handling class actions and other complex litigation, including the kind of securities claims asserted in this action, and have expertise in the applicable law. Both firms have identified, investigated, and adequately pled the claims in this action, already committing substantial time, effort, and resources to representing the Class through active prosecution of this litigation. To date, Gardy & Notis and Wolf Haldenstein have fairly and adequately represented the interests of the Class, and they will continue to do so throughout the litigation.

## II. FACTUAL AND PROCEDURAL BACKGROUND

As Plaintiffs allege in their Amended Class Action Complaint (the "Amended Complaint"), AbbVie's *raison d'etre* for the Combination was to avoid paying U.S. corporate taxes through a tax avoidance transaction known as an "inversion." Comp. ¶¶ 3-4.[1] Ultimately,

---

[1] "Comp. ¶ __" refers to paragraphs of the Amended Complaint (Dkt. No. 38), which Plaintiffs filed on May 2, 2016, against defendants AbbVie, Inc. ("AbbVie") and its Chief Executive Officer Richard Gonzalez ("Gonzalez").

when it could not conceal that material fact any longer, AbbVie's board of directors ("Board") withdrew its recommendation in favor of the Combination, and soon thereafter, AbbVie cancelled the Combination. Comp. ¶ 64. That decision caused AbbVie to incur an enormous termination fee of $1.64 billion. Comp. ¶ 64. The sole stated reason given by Defendants for their about-face was that the new tax regulations eliminated the "***fundamental financial benefits of the transaction.***" Comp. ¶¶ 51, 62-70. Defendants told Shire that they were terminating the Combination "***solely as a result of the anticipated impact of the US Treasury Notice***." Comp. ¶ 69. As a result of these events, Shire lost nearly one-third of its value. Comp. ¶ 63.

During the Class Period, Defendants made false and misleading statements (including Defendant Gonzalez's statement to Shire's employees on the first day of the Class Period)[2] to cover up the fact that the tax inversion was the primary (if not only) reason for the Combination. When the tax benefits from an inversion were no longer a reality – without any other change whatsoever to any of the purported strategic benefits of the Combination – AbbVie's Board withdrew its recommendation, cancelled the stockholder vote, and incurred a $1.64 billion termination fee in lieu of completing the Combination. Comp. ¶¶ 67-68. Defendants were willing to pay more than $1 billion to be absolutely sure the deal was dead, rather than run the risk that AbbVie stockholders might not vote it down. Comp. ¶ 68.[3]

In a Memorandum Opinion and Order entered on March 10, 2017, the Court denied Defendants' motion to dismiss the Amended Complaint as to Defendant Gonzalez's statement to

---

[2] On September 29, 2014, a week after the Notice was issued, Gonzalez wrote a letter to Shire's employees, which was also filed with the SEC, that AbbVie was "more energized than ever" and "more confident than ever" about the combination between AbbVie and Shire (the "Letter"). Am. Comp. ¶59.

[3] Had stockholders rejected the Combination without the Board changing its recommendation, the Cooperation Agreement required AbbVie to pay between $500 and approximately $545 million in break-up fees. Comp. ¶ 37.

Shire's employees on September 29, 2014, filed with the SEC that same day, that he was "more energized than ever" about the Combination. Dkt. No. 53.

Discovery began following a pretrial status hearing on March 29, 2017, at which the Court adopted the parties' proposed discovery plan. Dkt. No. 61. To date, however, despite numerous requests, Defendants have yet to produce a single document to Plaintiffs.

## III. THE COURT SHOULD CERTIFY THE CLASS ACTION WITH PLAINTIFFS AS CLASS REPRESENTATIVES

### A. Standards for Class Certification

To be certified as a class action, a proposed class must satisfy all four prerequisites of Federal Rule of Civil Procedure 23(a) and, in addition, at least one of the three alternative requirements in Rule 23(b). *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012); *Kurgan v. Chiro One Wellness Centers LLC*, No. 10-cv-1899, 2014 WL 642092, at *4 (N.D. Ill. Feb. 19, 2014) (Dow, J.). Under Rule 23(a), a plaintiff may represent a proposed class of people if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

Once the Court determines that the four prerequisites of Rule 23(a) have been met, as they are here, the Court then must consider whether the proposed class action meets any of the requirements of Rule 23(b). *See Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 374 (7th Cir. 2015); *Kurgan*, 2014 WL 642092 at *4. When certification is sought under Rule 23(b)(3), as Plaintiffs seek here, the moving party must also show that: (1) the questions of law or fact common to the members of the proposed class predominate over any questions affecting only individual class members; and (2) a class action is superior to other available methods of

resolving the controversy. *See Messner*, 669 F.3d at 811; *Kurgan*, 2014 WL 642092 at *4. Finally, the proposed class also must be "defined clearly and based on objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015).

As the moving party, Plaintiffs bear the burden of showing by a preponderance of the evidence that the proposed Class satisfies the requirements of Rule 23. *Messner*, 669 F.3d at 811. "A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis original). The Court exercises broad discretion in determining whether class certification is appropriate under the particular facts of the case. *See Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1998).

The Supreme Court has long recognized that securities law claims are well-suited for class treatment. *See, e.g., Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (predominance of common issues "is a test readily met in certain cases alleging … securities fraud"). The Supreme Court continues to issue decisions favoring certification of securities class actions. *See, e.g., Erica P. John Fund v. Halliburton, Inc.*, 131 S. Ct. 2179, 2186 (2011) (vacating appellate court denial of class certification) ("*Halliburton I*"); *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013) (affirming order upholding class certification). Likewise, "[i]t is established law in the Northern District of Illinois and the Seventh Circuit that class certifications are the preferred method of dealing with securities fraud cases." *Roth v. Aon Corp.*, 238 F.R.D. 603, 605 (N.D. Ill. 2006); *In re Bank One Sec. Litig./First Chicago S'holder Claims*, No. 00 CV 0767, 2002 WL 989454, at *2 (N.D. Ill. May 14, 2002) ("The Seventh Circuit ... has liberally construed Rule 23 in shareholder suits.")

6

In securities litigation, "'any error, if there is one, should be committed in favor of allowing a class action.'" *In re Gen. Instrument Corp. Sec. Litig.*, No. 96 C 1129, 1999 WL 1072507 (N.D. Ill. Nov. 18, 1999) (*quoting Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3rd Cir. 1985)). There is a "strong public policy favoring class certification in securities fraud litigation." *Weiner v. Quaker Oats Co.*, No. 98 C 3123, 1999 WL 1011381, at *5 (N.D. Ill. Sept. 30, 1999). Securities Act claims, like the claims in this litigation, are "especially amenable" to class resolution. *See In re IndyMac Mortgage-Backed Sec. Litig.*, 286 F.R.D. 226, 232 (S.D.N.Y. 2012) (collecting cases).

**B.  The Class Easily Meets All Four Prerequisites of Rule 23(a)**

**1.  Members of the Class are Sufficiently Numerous and Geographically Dispersed that Joinder is Impracticable**

Under Rule 23(a)(1), Plaintiffs must demonstrate that the Class is sufficiently numerous that joinder of all Class members is impracticable. "While there is no threshold or magic number at which joinder is impracticable, a class of more than 40 members is generally believed to be sufficiently numerous for Rule 23 purposes." *Kurgan*, 2014 WL 642092, at *5 (citing *Ringswald v. County of DuPage*, 196 F.R.D. 509, 512 (N.D. Ill. 2000)).

"In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *Teachers' Ret. Sys. of Louisiana v. ACLN Ltd.*, No. 01 Civ. 11814(LAP), 2004 WL 2997957, at *3 (S.D.N.Y. Dec. 27, 2004); *see also In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 138-39 (S.D.N.Y. 2012) (same).

Shire Securities were actively traded on the Nasdaq Global Select Market during the Class Period. On average, more than 40 million Shire ADSs were outstanding and freely traded

during the Class Period. *See* Coffman Decl., ¶¶ 29. It is reasonable to presume the proposed Class includes thousands of injured shareholders. Here, the more than 40 million ADSs outstanding and tradable during the Class Period are six times higher than the seven million traded shares found to establish numerosity in *ACLN*. *See ACLN*, 2004 WL 2997957, at *3.

## 2. Questions of Fact and Law Are Common to the Class

Rule 23(a)(2) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This commonality requirement "has been characterized as a low hurdle, easily surmounted." *Roth*, 238 F.R.D. at 606 (quotation and citation omitted). It is satisfied by showing "a common nucleus of operative fact." *Keele*, 149 F.3d at 594. Such "[c]ommon nuclei" are found where, as here, "the defendants have engaged in standardized conduct towards members of the proposed class." *Id.; see also Neil v. Zell,* 275 F.R.D. 256, 260 (N.D. Ill. 2011) (same).

> Common issues of fact and law are nearly always present in securities class actions:
>
> Whether the statements are false is one common question. Whether the falsehoods are intentional (*i.e.*, whether each defendant acted with the required state of mind) is another. Whether the falsehoods affected the stock's price is a third. (If investors already know the truth, false statements won't affect the price.) Whether the magnitude of any effect shows that the false information was "material" is a fourth. There will be some person-specific issues, such as when (and how many shares) a given investor purchased or sold. Timing of each person's transactions, in relation to the timing of the supposedly false statements, determines how much a given investor lost (or gained) as a result of the fraud. But these questions can be resolved mechanically. A computer can sort them out using a database of time and quantity information.

*Schleicher v. Wendt*, 618 F.3d 679, 681 (7th Cir. 2010); *see also In re Dynegy Inc. Sec. Litig.*, 226 F.R.D. 263, 276 (S.D Tex. 2005) (common questions "concerning the presence of false statements and/or omissions o material fact in the registration statement … satisfy Rule 23(a)(2)'s commonality requirement"). Securities law claims "regularly proceed[] as a class action." *Schleicher*, 618 F.3d at 681.

Commonality is established here because Defendant Gonzalez made a uniform

8

misrepresentation to all Shire investors in the September 29th public statement, which was filed publicly with the SEC, on the first day the Class Period, and which remained uncorrected until the end of the Class Period. Comp. ¶¶ 59-62. The common questions of fact and law at issue in this litigation, include, but are not limited to:

- whether Defendants' statements to investors misrepresented material facts about the reasons for the proposed $54 billion Combination between AbbVie and Shire;
- whether Defendants knew or deliberately disregarded that Gonzalez's statement was false and misleading;
- whether Gonzalez was a controlling person of AbbVie under Section 20(a) of the Exchange Act;
- whether the price of Shire Securities was artificially inflated during the Class Period; and
- the extent of damage sustained by Class members and the appropriate measure of damages.

Proof of these common issues will necessarily be common to all members of the Class. *See Messner*, 669 F.3d at 818 (plaintiffs' burden at the class certification stage was to demonstrate claims are capable of proof at trial "through evidence that is common to the class rather than individual to its members." (citation and quotation omitted). Thus, the "low hurdle" of commonality is easily cleared in this case. *See, e.g., Schleicher*, 618 F.3d at 681 (finding similar issues are common to class members).

### 3. Plaintiffs' Claims are Typical of the Claims of the Class

Rule 23(a)(3) requires that "the claims . . . of the representative parties are typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). Like commonality, the typicality requirement of Rule 23(a)(3) is "liberally construe[d]." *Roth*, 238 F.R.D. at 606. The typicality requirement "primarily directs the district court to focus on whether the named plaintiff's claims have the same essential characteristics as the claims of the absent class members." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 598 (N.D. Ill. 2009); *see also De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (same).

9

Typicality is satisfied where, as here, "Plaintiff alleges that Defendants committed the same unlawful acts affecting the entire class." *Bank One*, 2002 WL 989454 at *4. Typicality is closely related to commonality and is usually met where commonality is established. *Id.* Typicality is "determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members," *Makor*, 256 F.R.D. at 598 (*quoting Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir.1996)). When analyzing typicality, "courts focus on the **conduct of the defendant** and determine whether the putative class representative and the members of the putative class claim similar injuries due to the defendant's alleged actions." *Brieger v. Tellabs, Inc.*, 245 F.R.D. 345, 350 (N.D. Ill. 2007) (emphasis added).

Here, the claims and injuries of proposed Class Representatives are typical of the claims and injuries of the proposed Class, because both arise out of and result from the same unlawful course of conduct by Defendants. Plaintiffs and all other Class members were injured in the same way by Defendant Gonzalez's public statement on September 29, 2014, the first day of the Class Period, which remained uncorrected throughout the remainder of the Class Period. Comp. ¶¶ 59-62. In addition, the legal theories upon which Plaintiffs rely apply equally to the claims of all other Class members, who suffered the same kind of harm from the wrongdoing.

### 4. Plaintiffs Will Fairly and Adequately Represent the Class

Finally, under Rule 23(a)(4), the class representative must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement is satisfied where: (a) the class representatives do not "have interests antagonistic to those of the class;" and (b) the class representatives are willing and able to vigorously pursue the litigation on behalf of the class, and have retained attorneys that are "qualified, experienced and able to conduct the litigation." *Roth,*

238 F.R.D. at 606-07 (quotation and citation omitted). The focus of the adequacy inquiry is uncovering conflicts of interest between proposed class representatives and the class they seek to represent. *See Amchem*, 521 U.S. at 625.

Plaintiffs easily meet this standard: Both Plaintiffs purchased Shire ADSs during the Class Period and are members of the Class, and each has suffered significant financial losses arising from Defendants' misconduct. *See* Dkt. No. 7-1, Ex. E. Both Plaintiffs are willing to prosecute the action on behalf of absent Class members, and have cooperatively done so to date. *Id*. They have been and will remain informed of important developments in the litigation. *Id*. Neither Plaintiff has any interest antagonistic to the other members of the Class.

Plaintiffs' adequacy is further demonstrated by their choice of counsel, who are well "qualified, experienced and able to conduct the litigation." *See Roth,* 238 F.R.D. at 606-07. Gardy & Notis and Wolf Haldenstein are highly experienced in securities class actions and other complex litigation. Both firms have represented investors at every stage of litigation and at every level, from district courts to the U.S. Supreme Court. Each firm has helped investors recover billions of dollars in investment losses. Their deep experience has been found sufficient by many other federal courts, and will ensure that the Class here receives competent and qualified legal representation. *See, generally* Gardy & Notis and Wolf Haldenstein firm resumes. Dkt. No. 7-1 at Exhs. A and B.

### C.     The Class is Clearly and Objectively Defined

A class must be "defined clearly and based on objective criteria." *Mullins*, 795 F.3d at 659. The proposed Class undoubtedly meets the Seventh Circuit's ascertainability requirement. The Class is limited to those who purchased or otherwise acquired Shire ADSs or call options or

who sold Shire put options[4] during the Class Period. Whether Class members meet these objective criteria can be readily established or confirmed by routine trading records, including brokerage statements or trade confirmations. No extraneous considerations are necessary to establish Class membership.

### D. The Class Easily Meets the Requirements of Rule 23(b)(3)

Having established that all four prerequisites under Rule 23(a) are satisfied, Plaintiffs must also show that the Class satisfies at least of one of the provisions of Rule 23(b). Plaintiffs seek certification under Rule 23(b)(3), which requires a finding "that the questions of law or fact common to class members predominate over any questions affecting only individual members [predominance], and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy [superiority]." Fed. R. Civ. P. 23(b)(3). Both requirements are satisfied here.

#### 1. Predominance

Predominance requires that the proposed class be "'sufficiently cohesive to warrant adjudication by representation.'" *Kurgan*, 2014 WL 642092 at *8 (quoting *Amchem Prods.*, 521 U.S. at 623). Predominance is satisfied when "'common questions represent a significant aspect of [a] case and . . . can be resolved for all members of [a] class in a single adjudication.'" *Id*. (quoting *Messner*, 669 F.3d at 815) (internal quotation omitted)). "If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question.'" *Id*. at *29-30 (quoting *Messner*, 669 F.3d at 815) (internal quotation omitted)).

To determine whether common questions predominate, "courts look to whether there is a

---

[4] Purchasing a call option and selling a put option are equivalent transactions. Both are so-called "long" investments. The purchaser of a put option and the seller of a call option both expect the market value of the underlying security to increase over time.

12

common nucleus of operative facts." *Bank One*, 2002 WL 989454, at *7 (citation and quotation omitted). Rule 23(b)(3) "focuses on the relationship between the common and individual issues." *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 246 (N.D. Cal. May 6, 2013) (citation omitted). While predominance requires a more rigorous showing than does commonality, it "does not require a plaintiff to show that there are no individual issues." *In re IndyMac*, 286 F.R.D. 226, at 236 (S.D. N. Y. 2012) (citation omitted). Instead, predominance is concerned with "whether the putative named plaintiffs can, through their individualized cases, offer proof on a class-wide basis." *Roth*, 238 F.R.D. at 607.

Like commonality, the predominance inquiry focuses primarily on liability. Where liability can be established as a common issue by common proof, any individual damage issues do not preclude class certification. *See Kurgan*, 2014 WL 642092 at *8 (citing *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 801 (7th Cir. 2013); *Messner*, 669 F.3d at 815). If liability issues are common to all class members, the fact that damages might not be identical across the class does not preclude class certification "when the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses." *Kurgan*, 2014 WL 642092 at *8; *see also Healy v. Int'l Bhd. of Elec. Workers, Local Union No. 134*, 296 F.R.D. 587, 596 (N.D. Ill. 2013)) (need to determine individual issues of damages does not preclude certification).

Here, the elements of falsity, materiality, scienter, and loss causation that Plaintiffs must prove to prevail on their claims under Section 10(b) of the Exchange Act and Rule 10b-5 will all be subject to class-wide proof at trial, but need not be proven at the class certification stage. *See Amgen*, 133 S. Ct. at 1191 (materiality of misrepresentations and omissions "is a question common to all members of the class"); *Halliburton I*, 131 S. Ct. at 2185 (error to require

securities plaintiff "to show loss causation as a condition of obtaining class certification"); *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 52 (S.D.N.Y. 2012) (all elements of a Section 10(b) claim premised on fraud-on-the-market "are subject to class wide proof in securities litigation").

### a) Plaintiffs May Invoke the Presumption of Reliance

Plaintiffs are entitled to invoke the rebuttable fraud-on-the-market presumption of class-wide reliance adopted by the Supreme Court in *Basic v. Levinson*. The Supreme Court reaffirmed *Basic's* fraud-on-the-market presumption of reliance in *Halliburton II*. The Seventh Circuit has articulated the theory underlying *Basic*:

> When someone makes a false (or true) statement that adds to the supply of available information, that news passes to each investor through the price of the stock. And since all stock trades at the same price at any one time, every investor effectively possesses the same supply of information. The price both transmits the information and causes the loss. This approach, dubbed the fraud-on-the-market doctrine, supplants 'reliance' as an independent element by establishing a more direct method of causation.

*Schleicher*, 618 F.3d at 682. *See also Basic*, 485 U.S. at 241-42 (in an efficient market, "[m]isleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements").

"[T]o invoke the *Basic* presumption, a plaintiff must prove that: (1) the alleged misrepresentations were publicly known; (2) they were material; (3) the stock traded in an efficient market; and (4) the plaintiff traded the [security] between when the misrepresentations were made and when the truth was revealed." *Halliburton*, 134 S. Ct. at 2413. *First*, Defendants' misrepresentations were publicly known because they were made in AbbVie's SEC filings, press releases, earnings calls, and investor conferences. *Second*, although materiality must ultimately be proven at trial to invoke the *Basic* presumption, such "proof is not a prerequisite to class certification." *Amgen*, 133 S. Ct. at 1191. *Third*, Plaintiffs and all other Class members purchased Shire Securities during the Class Period, prior to disclosure of the truth on October 14,

14

2014. And *fourth*, as shown below, the Securities traded in an efficient market.

### b) Shire Securities Traded in an Efficient Market on NASDAQ

Securities are traded on the NASDAQ under the symbol "SHPG." Comp. ¶ 15. NASDAQ is "one of the two largest stock exchanges in the United States, the largest electronic-equity securities trading market in the United States, and one of the largest stock exchanges in the world." *Lumen v. Anderson*, 280 F.R.D. 451, 459 (W.D. Mo. 2012). It is such a large, open, and developed market that several courts have concluded that if a stock is listed on NASDAQ, then there is a rebuttable presumption that the stock trades in an efficient market. *E.g.*, *Todd v. STAAR Surgical Co.*, No. CV-14-05263-MWF-RZ, 2017 WL 821662, at *10 (C.D. Cal. Jan. 5, 2017) ("there a presumption that stocks traded on the NASDAQ are efficient"); *Lumen*, 280 F.R.D. at 459 ("It would be remarkable for a court to conclude NASDAQ is not an efficient market – which is why securities traded on NASDAQ are often presumed to be traded on an efficient market.") (quotation and citation omitted).[5]

At the very least, the listing of a stock on NASDAQ is a strong indicator of market efficiency. *See W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, No. CV 13-6731, 2016 WL 4138613, at *12 (E.D. Pa. Aug. 4, 2016) (collecting cases); *In re Initial Public Offering Sec. Litig.*, 544 F. Supp. 2d 277, 296 n.133 (S.D.N.Y. 2008) ("the federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of

---

[5] *See also Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 269 (N.D. Cal. 2011) ("[]Plaintiffs made a *prima facie* showing that the fraud-on-the-market presumption of reliance applied because Plaintiffs sufficiently established that Akeena's stock was actively traded on an efficient market-the NASDAQ."); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) (holding that "'at a minimum, there should be a presumption—probably conditional for class determination—that certain markets are developed and efficient for virtually all the securities traded [on NASDAQ]'") (quoting *Cammer v. Bloom,* 711 F. Supp. 1264, 1292 (D.N.J. 1989)); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05 Civ. 1898, 2006 WL 2161887, at *8 (S.D.N.Y. Aug. 1, 2006) (stating that if a security is listed on NASDAQ, "the market for that security is presumed to be efficient.").

efficiency"); *In re Accredo Health, Inc. Sec. Litig.*, No. 03-2216 DP, 2006 WL 1716910, at *8 (W.D. Tenn. Apr. 19, 2006) ("the overwhelming case authority holds that securities listed on the NASDAQ trade in an efficient market").

### c) The *Cammer* Factors of Market Efficiency

While the Supreme Court has not adopted a specific standard for determining whether a market is efficient enough to apply the *Basic* presumption, many courts have employed the so-called *Cammer* factors, which are:

> (1) whether the stock trades at a high weekly volume; (2) whether securities analysts report on the stock; (3) whether the stock has market makers and arbitrageurs; (4) whether the company is eligible to file SEC registration form S-3, as opposed to Form S-1 or S-2; and (5) whether there are empirical facts showing a causal relationship between unexpected corporate events or public releases and a subsequent response in the stock price.

*Schleicher v. Wendt*, No. 1:02-CV-1332-DFH-TAB, 2009 WL 761157, at *5 (S.D. Ind. Mar. 20, 2009) (citing *Cammer*, 711 F. Supp. at 1286-87).

As demonstrated more fully in Mr. Coffman's expert report on market efficiency, all the *Cammer* factors, along with three additional factors that have been applied by courts, establish that Shire Securities traded in an efficient market throughout the Class Period.

### (1) Average Trading Volume

The first *Cammer* factor is weekly trading volume. As the court explained:

> [T]he existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market . . . because it implies significant investor interest in the company. Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information.

*Cammer*, 711 F. Supp. at 1286. "[T]urnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one." *Id.* at 1293. During the Class Period, Shire's average weekly trading volume, as a

percentage of securities outstanding, was 14%, more than six times the threshold for a "strong presumption" of market efficiency. Coffman Rep. ¶ 29. Moreover, Shire's annualized share turnover ratio was 627%, more than four times higher than the average annualized turnover ratio of 179% for all stocks listed on NASDAQ. *Id.* at ¶ 30.

### (2) Number of Analysts

The existence of numerous analysts is another indicator of an efficient market, as it indicates that new information is rapidly being disseminated to and acted upon by investors. *See Cammer*, 711 F. Supp. at 1286. During the Class Period at least eleven analysts, many from the most prominent firms on Wall Street, followed Shire and collectively issued 581 separate reports on the Company. Coffman Rep. ¶ 34. In addition to that large number of analyst reports, Shire received extensive coverage in the media and at investor conferences. *Id.* at ¶ 36.

### (3) Presence of Market Makers

Next under *Cammer*, the Court considers market makers and arbitrage activity. "The existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286-87. Throughout the Class Period, Shire was actively traded by at least 43 market makers. Coffman Rep. ¶ 42.

Mr. Coffman examined the market prices for ADSs traded on NASDAQ and the market prices for Shire's underlying common stock traded on the London Stock Exchange ("LSE"). Mr. Coffman found very little divergence between the ADSs and the underlying common stock prices (which can be explained by the time difference between trading in New York and London), thus indicating no systematic arbitrage opportunities. Coffman Rep. ¶ 78.

### (4)     Eligibility to File an S-3 Registration Statement

Finally, under *Cammer* the Court considers whether the company is eligible to file Form S-3. SEC Form S-3 is a simplified security registration form that allows an issuer of stock to incorporate by reference its prior SEC filings. The explicit rationale for this form "is that information on companies which file on Form S-3 is widely available in the market and therefore need not be disseminated in the prospectus." *Cammer*, 711 F. Supp. at 1284-85; *see also* SEC Release No. 6331, 1981 WL 30765, at *4 (Aug. 6, 1981) ("This form is predicated on the Commission's belief that the market operates efficiently for these companies, *i.e.*, that the disclosure in Exchange Act reports and other communications by the registrant, such as press releases, has already been disseminated and accounted for by the market place.") Because Shire filed registration statements on Form S-3 both before and after the Class Period, it appears that Shire was an eligible Form S-3 filer during the Class Period. Coffman Rep. ¶ 45.

### (5)     Reaction of Securities to Unexpected Corporate Events

"[S]howing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price . . . is the essence of an efficient market and the foundation for the fraud on the market theory." *Cammer*, 71 F. Supp. at 1287. A direct test of market efficiency is to conduct what is known as an 'event study' to examine whether security prices respond to new material information released to the market. In securities litigation such as this, expert economists commonly use event studies to correlate the disclosure of new material information to security price responses. Coffman Rep. ¶¶ 47-49.

Mr. Coffman performed a regression analysis – a standard methodology commonly used by economists – to determine whether there was a correlation between the public dissemination of information about company-specific events and measurable reactions in the market prices for

Shire Securities (after controlling for contemporaneous market and industry effects). Coffman Rep. ¶¶ 49-50. Mr. Coffman found "a clear cause-and-effect relationship between new public information about Shire and the market price of Shire's ADSs." *Id.* ¶ 66. Mr. Coffman found a positive correlation between changes in the market prices for Shire ADSs and relevant market indices. *Id.* at ¶ 52. Controlling for those predictable price movements, Mr. Coffman found that the market price for Shire ARSs reacted in statistically significant ways at the 95% confidence level or better to both the specific after-hours announcement on October 14, 2014, that the Combination was not going to take place after the tax inversion was lost and more generally to company-specific information disclosed over the Analysis Period from October 24, 2013, through July 23, 2015 (including the Class Period). *Id.* at ¶¶ 56-62. That correlation is "powerful scientific evidence of a cause-and-effect relationship between new publicly released information and changes in the price of Shire's ADSs." *Id.* ¶¶ 61-62. Mr. Coffman also observed significant increases in trading volume for Shire ADSs on days following the release of important company-specific information during the Analysis Period, including the Class Period, an additional indicator of the causal relationship. *Id.* ¶ 64-65.

### d) Other Factors Also Support Market Efficiency

In addition to the *Cammer* factors, courts have deemed a large market capitalization and a large public float (*i.e.*, the percentage of shares outstanding held by the public rather than insiders) as indicators of market efficiency. *See In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 212 (E.D. Pa. 2008); *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005); *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001). Shire's market capitalization, which averaged $10.3 billion for the ADSs and $48.7 billion for its common stock during the Class Period, fell between the 85th and 87th percentile among all companies listed on NASDAQ or the New York Stock

Exchange. Coffman Rep. ¶ 68. The vast majority of the public float – *i.e.*, the percentage of ADSs held by public investors rather than insiders – was in the hands of institutional investors, meaning that most of the ADSs were freely tradeable. *Id.* at ¶ 26.

Another additional factor is the bid-ask spread. The bid-ask spread, which reflects a measure of the cost to buy or sell shares in the market, is an important indicator of market efficiency. "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." *Krogman*, 202 F.R.D. at 478. Here, the percentage daily bid-ask spread for Shire's ADSs for ranged from 0.0042% and 0.056% during the Class Period, which is well below the average and median bid-ask spread of a random sample of 100 other common stocks trading on either NASDAQ or the NYSE at that time. Coffman Rep. ¶ 72.

Institutional ownership (such as mutual funds, pension funds, investment banks, and other large financial institutions that have substantial resources to analyze securities) is another indicator of market efficiency. During the Class Period, 526 such institutions reported owning Shire ADSs, holding between 48.1 million and 52.6 million shares, with an average of 50.3 million shares held during the Class Period – the vast majority of outstanding ADSs. Coffman Rep. ¶ 73. The substantial level of institutional ownership of Shire ADSs during the Class Period further supports a conclusion of market efficiency.

Another efficiency factor is autocorrelation. "A security exhibits autocorrelation if the change in price of the security on a given day provides an indication of [*i.e.*, is statistically correlated with] what the change in price for the security will be on the following day." *DVI*, 249 F.R.D. at 213. The absence of autocorrelation indicates market efficiency. *See id.* ("if new information about a company is incorporated slowly into the price of a security, then the security will exhibit autocorrelation, suggesting an inefficient market"); *Petrie v. Elec. Game Card, Inc.*,

308 F.R.D. 336, 356 (C.D. Cal. 2015) (low autocorrelation favors a finding of market efficiency). Using a well-accepted methodology, Mr. Coffman determined that Shire ADSs did not exhibit statistically significant autocorrelation during the Class Period. Coffman Rep. ¶ 77.

And finally, Mr. Coffman examined the efficiency of the market for options on Shire ADSs. According to published data, there were 28,675 Shire ADS put contracts and 31,235 Shire ADS call contracts that traded during the Class Period. Coffman Rep. ¶ 78. Using a standard methodology for evaluating market efficiency in options trading, known as "put-call parity," Mr. Coffman determined that put-call parity held for options trading 100% of the time during the Class Period, which is strong evidence that Shire's options traded efficiently and that any pricing mispricing due to the alleged misstatements and omissions translated into the prices of Shire's Options. Coffman Rep. ¶ 86.

### e)    Plaintiffs are Also Entitled to Rely on the *Affiliated Ute* Presumption of Class-Wide Reliance

A presumption of class-wide reliance also exists regarding Defendants' omissions of material fact. Where a plaintiff alleges "a failure to disclose, positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Id.* at 153-54. *See also SEC v. Gorsek*, 222 F. Supp. 2d 1099, 1109 (C.D. Ill. 2001) ("[T]he case law in the Seventh Circuit is clear. Reliance is presumed in omission cases under Section 10(b) and Rule 10(b)(5)."); *Nauman v. Abbott Labs.*, No. 04 C 7199, 2007 WL 1052478, at *2 (N.D. Ill. Apr. 3, 2007); *Fogarazzo v. Lehman Bros., Inc.*, 263 F.R.D. 90, 106 (S.D.N.Y. 2009); *Cooper v. Pac. Life Ins. Co.*, 229 F.R.D. 245, 259 (S.D. Ga. 2005).

Plaintiffs allege that Defendant Gonzalez's September 29th statement about the

Combination was materially misleading because it omitted the crucial fact that the inversion would not take place without the tax inversion, and it remained uncorrected for the remainder of the Class Period. Comp. ¶¶ 59-62. These allegations are sufficient to invoke the *Affiliated Ute* presumption at the class certification stage.

### f) Calculation of Class-Wide Damages

It is well-settled that individual damages issues do not defeat predominance in securities class actions. *See Schleicher*, 618 F.3d at 685 ("possibility that individual hearings will be required for some plaintiffs to establish damages does not preclude certification"); *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975) (same). Mr. Coffman's expert affidavit provides a "general economic framework for quantifying per-share damages on a class-wide basis" in securities actions, ultimately concluding that damages incurred by purchasers of Shire Securities during the Class Period can be calculated on a class-wide basis using a well-settled methodology. Coffman Rep. ¶¶ 99-100. Once the class-wide damages are established, each investor's damages calculation "usually can be established mechanically." *Schleicher*, 618 F.3d 679 at 682.

Importantly, Plaintiffs' theory of injury flows directly from their theory of liability in this case. Simply stated, Defendants' actionable false and misleading Class Period statement about the Combination misled investors to believe that the Combination would take place for strategic reasons even if the tax inversion was lost. That false and misleading statement reassured public investors about the strategic significance of the merger and its likelihood of being completed, which in turn artificially inflated the market price for Shire Securities. Relying on the integrity of the market prices, Class members purchased Shire Securities during the Class Period and did so at those artificially inflated prices. When the tax inversion was lost, Defendants were forced to admit the truth that the Combination would not take place without the inversion and to withdraw

from the Combination. Plaintiffs and Class members were injured when the market price for Shire Securities collapsed upon the revelation of the true facts.[6]

### 2.     Superiority

The second prong of Rule 23(b)(3) is met when a class action is shown to be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Here, a class action allows for consistency of judgments, and that judicial economy and efficiency would dictate a certification of this class.

The factors pertinent to the second prong of Rule 23(b)(3), superiority, include: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). Here, each of these factors demonstrates that a class action is the superior method for adjudicating the Class's securities claims.

*First*, Shire's public investors during the Class Period would benefit from class treatment instead of having to litigate separate actions: [C]lass actions are often the most fair and practical vehicle for plaintiffs' claims in securities fraud suits because those who have been injured are in a poor position to seek legal redress . . . [B]ecause individual claims might be small in monetary value, they might not be prosecuted on an individual basis due to the costs of litigation. *Roth*, 238 F.R.D. at 608 (quoting *Brosious v. Children's Place Retail Stores*, 189 F.R.D. 138, 147 (D.N.J. 1999)). *Second*, Plaintiffs are aware of just two other securities litigations by individual investors arising out of the Combination. None of the shareholder-plaintiffs in those two

---

[6] As discussed above, any potential individualized questions of damages do not preclude class certification. *See Kurgan*, 2014 WL 642092 at *8 (citing *Butler*, 727 F.3d at 801).

23

individual actions have expressed any interest in controlling this class action and, indeed, both sought to be remanded to state court after Defendants removed them to this Court.[7] *Third*, in securities actions such as this, "'[j]udicial economy and efficiency' will be promoted by certifying th[e] class, and resolving these matters in one suit." *Id.*; *see also Ingram v. Corporate Receivables, Inc.*, No. 02 C 6608, 2003 WL 21982152, at *5 (N.D. Ill. Aug. 19, 2003) ("interests of judicial economy and avoiding duplicative litigation and potentially inconsistent results underscores the desirability of concentrating the claims in one forum"). This Court is the best forum for adjudicating the Class's securities claims because AbbVie maintains its headquarters in this District, and this Court has already decided Defendants' two motions to dismiss. And *fourth*, securities claims such as this are routinely certified as class actions and present no unusual manageability issues.

Therefore, common questions of fact and law predominate over questions affecting only individual members, and a class action is undoubtedly superior to the available methods for the fair and efficient adjudication of the controversy.

## IV. THE COURT SHOULD APPOINT GARDY & NOTIS AND WOLF HALDENSTEIN AS CLASS COUNSEL

Pursuant to Rule 23(g), "[c]lass counsel must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4). In appointing class counsel, the Court must consider: (1) the work counsel has done in identifying or investigating potential claims in the action; (2)

---

[7] One of those actions, captioned *Elliott Associates, L.P. et al v. AbbVie Inc.*, No. 2016-L-006279, is an individual state court action by five hedge funds that was originally commenced in the Circuit Court of Cook County on June 24, 2016. After Defendants removed it to this Court, the *Elliott* action was remanded to state court on November 1, 2017. The other action, captioned *ODS Capital LLC v. AbbVie Inc.*, No. 2017-CH-08448, is an individual opt-out state court action that was commenced in the Circuit Court of Cook County on June 16, 2017. After Defendants removed the ODS Capital action to this Court, it too was remanded to state court on November 1, 2017.

counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A). All of these factors favor appointing Gardy & Notis and Wolf Haldenstein as Class Counsel.

Gardy & Notis and Wolf Haldenstein easily meet each of these prerequisites and will fairly, vigorously, and adequately represent the interests of the Class. Both firms have extensive experience prosecuting complex securities class actions on behalf of injured investors, and all of the attorneys involved in this action devote substantial parts of their practices to securities litigation. *See, generally* Gardy & Notis and Wolf Haldenstein firm resumes. Dkt. No. 7-1 at Exhs. A and B. Gardy & Notis and Wolf Haldenstein have successfully worked together as co-counsel in prior securities litigation. They have vigorously and zealously prosecuted this action for nearly three years, having conducted an extensive investigation of the claims, developed a detailed plan for the prosecution of the case, defeated Defendants' motions to dismiss, served discovery requests upon Defendants and subpoenas to third parties, and now pursuing class certification. Both firms will continue to devote the resources necessary to represent the Class zealously, as they have in other securities class actions.

## V. CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court enter an Order certifying this action as a class action pursuant to Rules 23(a) and (b)(3) on behalf of the Class defined herein; appointing Plaintiffs as Class Representatives; and appointing Gardy & Notis and Wolf Haldenstein as Class Counsel pursuant to Rule 23(g).

Dated: December 21, 2017                                 Respectfully submitted,

                                              By:      /s/  Mark C. Rifkin
                                                       Mark C. Rifkin

Benjamin Y. Kaufman
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
Tel: 212-545-4600
Fax: 212-545-4758

Theodore Bell
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLC
70 West Madison Street
Suite 1400
Chicago, IL 60602
Tel: 312-984-0000
Fax: 312-214-3110

Mark C. Gardy
James S. Notis
Jennifer Sarnelli
Meagan Farmer
GARDY & NOTIS, LLP
Tower 56
126 East 56th Street, 8th Floor
New York, NY 10022
Tel: 212-905-0509
Fax: 212-905-0508

*Co-Lead Counsel for Lead Plaintiffs*