**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MURRAY RUBINSTEIN, *et al.*, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | No. 14-cv-9465 |
| | ) | Honorable Robert M. Dow, Jr. |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| RICHARD GONZALEZ and ABBVIE INC., | ) ) | |
| Defendants. | ) | |

**DECLARATION OF JENNIFER SARNELLI IN SUPPORT OF LEAD**
**PLAINTIFF'S MOTIONS FOR APPROVAL OF CLASS ACTION**
**SETTLEMENT AND AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT**
**OF EXPENSES AND APPROVAL OF PLAN OF ALLOCATION**

I, Jennifer Sarnelli, hereby declare and state as follows:

1.      I am a partner of Gardy & Notis, LLP, one of Plaintiff's Lead Counsel in the above-captioned action (the "Action").  I have personal knowledge of the following statements and if called as a witness to testify, I could and would testify competently thereto.

2.      I submit this declaration in support of Lead Plaintiff's motions, under Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the proposed settlement of the Action (the "Settlement"), an award of attorneys' fees and reimbursement of expenses and approval of the proposed plan for allocating the Net Settlement Fund to eligible Class members (the "Plan of Allocation").  The Court preliminarily approved the Settlement and Plan of Allocation by its Order dated July 2, 2019 (the "Preliminary Approval Order").  ECF No. 278.[1]

---

[1]     The Preliminary Approval Order also certified a Class and directed that Notice be sent to the Class. The preliminarily certified Class consisted of: all Persons who purchased or otherwise acquired comprised of all persons who purchased or otherwise acquired American Depository Shares or "ADS" or purchased call

3.     I also submit this declaration in support of Lead Counsel's motion, on behalf of Lead Counsel, for an award of attorneys' fees; reimbursement of Litigation Expenses in the amount of $530,133.17; and reimbursement of $9,937.20 to Lead Plaintiff Dawn Bradley.

4.     The proposed Settlement provides for the resolution of all claims in the Action in exchange for a cash payment of $16.75 million for the benefit of the class (the "Class") of investors who purchased or otherwise acquired American Depository Shares or "ADS" or purchased call options or sold put options (collectively, "Securities") of Shire plc ("Shire") during the period between September 29 and October 14, 2014, inclusive (the "Class Period"). The proposed Settlement provides a considerable benefit to the Class by conferring a substantial, certain, and immediate recovery while avoiding the significant risks and expense of continued litigation.

5.     This beneficial Settlement was achieved as a direct result of Lead Plaintiff's and Lead Counsel's efforts to investigate, prosecute, and aggressively negotiate an excellent settlement of this Action in the face of a challenging evidentiary record.

*Background of the Action*

6.     Lead Counsel on behalf of certain Shire investors commenced the Action with the filing of the initial complaint in this Court on November 25, 2014. ECF No. 1. The initial complaint alleged that AbbVie, Inc. ("AbbVie") and its CEO Richard Gonzalez ("Gonzalez") violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") by making untrue public statements and material omissions about the purported strategic benefits in connection with a proposed $54 billion merger of AbbVie and Shire (the "Combination"). The complaint alleged that the real reason for the Combination was for AbbVie to avoid paying U.S.

---

options or sold put options of Shire between September 29 and October 14, 2014, inclusive. Excluded from the Class are: Defendants and their families, the officers and directors of the Company during the Class Period, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest. Also excluded from the Class is any Class member that validly and timely requests exclusion in accordance with the requirements set by the Court.

corporate taxes by acquiring Shire, a foreign corporation, in a tax avoidance transaction known as a tax inversion. The initial complaint alleged that even after the U.S. Government notified the public that it was closing the loophole that would have allowed AbbVie to avoid paying U.S. taxes,[2] Defendants continued to deny the importance of the tax benefits to the Combination. As Defendants later admitted, without the tax inversion there would be no Combination. The initial complaint alleged that during the class period,[3] Defendants made seven public statements to disguise and downplay the importance of the tax inversion to the Combination, making it appear (falsely) to investors that the Combination offered significant strategic advantages to the combined company, and that the tax avoidance aspect was at most a secondary reason for the Combination. In truth, the supposed strategic benefits had little or nothing to do with the Combination.

7. On February 4, 2015, the Court entered an Order appointing Dawn Bradley and other investors as Lead Plaintiffs; approving their selection of Gardy & Notis, LLP and Wolf Haldenstein Adler Freeman & Herz LLP, who have extensive experience in the field of complex class action, as Lead Counsel. ECF No. 12.[4]

---

[2] On September 22, 2014, the U.S. Treasury Department issued a notice (the "Treasury Notice") that it would take steps to curb the practice of corporate inversions.

[3] The initial complaint set a class period between June 20, 2014 (when AbbVie publicly confirmed media reports that it had approached Shire with an initial combination proposal) through October 14, 2014 (the day AbbVie announced that it was reconsidering the Combination).

[4] ) Gardy & Notis, LLP and Wolf Haldenstein Adler Freeman & Herz LLP previously submitted their firm resumes in connection with Lead Plaintiff's Motion for Appointment as Lead Counsel (ECF No. 7-1, Ex. A-B) and Lead Plaintiff's Motion for Preliminary Approval of Settlement (ECF No. 275, Ex. A-B). Additional information about the firms can be found on their respective firm websites at: www.gardylaw.com and www.whafh.com.

*Defendants Motions to Dismiss*

8.      On March 29, 2016, this Court dismissed the original complaint with leave to amend.  ECF No. 37.

9.      On May 2, 2016, Lead Plaintiff and additional investors filed an Amended Complaint.  ECF No. 38.  The Amended Complaint identified three statements that were false or misleading by virtue of material omissions between July 21, 2014 (when the Combination was first publicly announced) and October 14, 2014 (when Gonzalez finally admitted that the tax avoidance part of the Combination was the only part of the Combination that mattered).

10.     Defendants again moved to dismiss and on March 10, 2017, the Court issued a Memorandum Opinion and Order granting in part and denying in part Defendants second motion to dismiss.  ECF No. 53.  The Court denied the motion as to one of the three statements set forth in the Amended Complaint.  Specifically, the Order found that Gonzalez's September 29, 2014 letter to Shire employees which claimed that he was "more energized than ever" about the Combination (the "Letter") was and actionable misstatement because it was likely that the Company began to actively re-evaluate the Combination after the Notice was issued on September 22, 2014.  *Id.* at 23.  The Court held that "Plaintiffs' allegations are sufficient to give rise to a strong inference that Gonzales' September 29, 2014 letter was sent with a reckless disregard of the truth, but not with the intent to deceive, manipulate, or defraud."  *Id.*

11.     That order effectively narrowed the Class Period to September 29, 2014 to October 14, 2014, and eliminated the claims for certain plaintiffs who had initially been appointed by the court as lead plaintiffs but who did not buy shares during the shortened Class Period.

***Full Fact and Class Certification Discovery Completed and Discovery Disputes***

12.    After Lead Plaintiff successfully defended against Defendants' Second Motion to Dismiss, Lead Counsel met and conferred with counsel for Defendants to set a discovery schedule to get fact discovery underway.

13.    The Parties presented this Court with a joint initial status report on March 27, 2017 (ECF No. 60) and on March 29, 2017 this Court held a status conference wherein it adopted the Partied proposed discovery plan. ECF No. 61.

14.    In addition, Lead Counsel retained Global Economics Group, a prominent economic consulting firm based in Chicago, to provide expert analyses relating to loss causation and damages and assist Lead Counsel in defining the scope of discovery being sought.

15.    Lead Plaintiff served requests for documents and interrogatories upon Defendants, and subpoenaed twenty-eight third parties including Shire, the Depository Trust & Clearing Corporation, JP Morgan, Citibank.  Lead Plaintiff also subpoenaed other investors who had filed individual state court "opt out" actions to individually pursue claims in connection with the Combination.

16.    On July 19, 2017, this Court entered an agreed upon Confidentiality Order.  ECF No. 78.

17.    The Parties also engaged in extensive meet and confers in connection with the discovery to be produced.  The meet and confers were often contentious and led to a practice whereby the Parties created minutes after meet and confer calls to memorialize in writing what was discussed.  The creation of these minutes often also led to disputes.

18.    While the Parties were able to reach resolution on some matters, Court intervention, on a regular basis, was required.  The Parties brought several discovery motions and attended

numerous discovery conferences throughout 2017 and 2018, including at least four formal motions to compel, and two motions for protective orders. The Parties appeared before Judge Dow or Magistrate Judge Valdez at least 17 times in connection with discovery matters. Many of these appearances were status conferences that resulted in oral motions being made and decided.[5]

19.     As a result of these efforts, Lead Plaintiff received and reviewed and analyzed approximately 50,000 pages of documents.

20.     Lead Plaintiff deposed ten fact witnesses:  (1) AbbVie's CEO Richard Gonzalez (a true and correct copy of the relevant excerpts from the Gonzalez deposition transcript are attached hereto as Exhibit A); (2) AbbVie's CFO William Chase; (3) the author of the September 29, 2014 letter that was identified as the operative misstatement in the Action, James Bozikis; (4-5) two members of AbbVie's communications staff in 2014, Angela Sekston and Adelle Infante; (6) AbbVie's Vice President for Enterprise Strategies, Chris Turek; (7) AbbVie's lead director, Glenn Tilton; (8) AbbVie's Vice President of Tax, Scott Reents; (9) AbbVie's current Chief Strategy Officer who had been a Managing Director at JP Morgan assigned to advise AbbVie regarding the proposed Combination in 2014, Henry Gosebruch; and (10) a 30(b)(6) witness from JP Morgan, the Company's financial advisor in connection with the Combination, Benjamin Wallace.  All but two of these depositions took place in Chicago; Angela Sekston's deposition took place in Florida and Benjamin Wallace's deposition took place in New York.

21.     Defendants deposed proposed Class Representative Dawn Bradley and her husband in Philadelphia.

---

[5]     In addition, Magistrate Judge Valdez ruled in favor of Plaintiff's in connection with Defendants' motion for protective order the afternoon prior to a hearing that was scheduled for the next morning. Counsel for Lead Plaintiff had arrived in Chicago prior to the issuance of the order.

22.     Defendants also deposed Lead Plaintiff's class certification expert, Chad W. Coffman of Global Economics Group, and Lead Plaintiff deposed Defendants' expert, Allan W. Kleidon of Cornerstone.  These depositions took place in Chicago.

**Plaintiff's Motion for Class Certification**

23.     On December 21, 2017, Lead Plaintiff filed a motion for class certification.  ECF No. 104.  The motion was fully brief, and included the filing of including a sur-reply and sur-sur-reply on August 28, 2018.  ECF No. 240.

24.     Lead Plaintiff sought to have Dawn Bradley, who had purchased approximately $440,000 worth of Shire ADRs during the Class Period, appointed as the Class Representative, and to have her counsel Gardy & Notis, LLP and Wolf Haldenstein Adler Freeman & Herz LLP appointed to serve as Lead Counsel on behalf of the Class.

25.     While a litigation class had not yet been certified, the proposed Class definition being set forth in this Settlement is the same as was proposed in Lead Plaintiff's motion for class certification.

**Defendants' Daubert Motion**

26.     After Lead Plaintiff's motion for class certification was fully briefed, on September 25, 2018, this Court entered an order directing the parties to file "supplemental materials on the Daubert issues relating to the pending motions for class certification in this case."  This Court requested Defendants file a motion seeking "to exclude the portions of Coffman's proposed testimony to which they object, along with a memorandum in support." ECF No. 253.

27.     This Court's September 25, 2018 order recognized "a hotly contested battle over the propriety of certifying a class, which is not surprising given the stakes involved in this case."  As a result of Defendants' arguments in connection with Lead Plaintiff's expert this Court sought a "full

8

Daubert analysis" to ascertain the parties' arguments in connection with disputes over the work performed by Lead Plaintiff's expert.

28.     In accordance with the Court's order Defendants filed a Daubert Motion (ECF No. 258) to which Lead Plaintiff opposed (ECF No. 261) and Defendant replied (ECF No. 262).

29.     This Court did not rule on Defendants' *Daubert* Motion prior to the parties reaching an agreement to settle the Action.

***Risks of Further Litigation Based on the Evidentiary Record***

30.     Securities class actions have become riskier and more difficult to prove in recent years as evidenced by a recent report finding that securities class actions in 2018 "were once again dominated by a record number of dismissals, which outnumbered settlements two-to-one for the first time." NERA, Stefan Boettrich and Svetlana Starykh, Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review (2019), at 23.

31.     Those cases that survive a motion to dismiss, such as this one, are often later lost at the class certification stage,[6] in connection with Daubert motions[7] or at summary judgment.[8] Lead Plaintiff faced each of these risks here.

32.     And even if Lead Plaintiff was to get over each of these hurdles, there was still a risk that at trial the jury would return a verdict of no recovery or substantially less recovery for class members than in a settlement.

---

[6]     *See, e.g., In re Northfield Labs., Inc. Sec. Litig.*, 267 F.R.D. 536, 549 (N.D. Ill. May 18, 2010)

[7]     *See, e.g*., *Bricklayers and Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd* 752 F.3d 82 (1st Cir. 2014) (granting summary judgment *sua sponte* in favor of defendants after finding that plaintiffs' expert was unreliable).

[8]     *See, e.g., Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 735 F. Supp. 2d 856, 928 (N.D. Ill. Aug. 13, 2010) (granting in large part defendants' motion for summary judgment); *Levie v. Sears Robebuck & Co.*, 676 F. Supp. 2d 680, 689-90 (N.D. Ill. Dec. 18, 2009).

33.     Given that the Parties had completed full fact discovery and class certification discovery, they had the ability to review and assess the strengths and weakness of their respective positions with the benefit of a full evidentiary record.

34.     Lead Plaintiff alleged that Defendants knew or should have known they would not continue with the Combination when the Treasury Notice was issued because the tax benefits were such a sizable portion of the benefit of the Combination.  The Company's filings with the SEC informed investors that the Combination was valued at $54 billion, ████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████  Compare, Exhibit B a true and correct copy of an excerpt of a management ██████████████████████████████████████████ ███████████████████████████████████████████████████████  with AbbVie's S-4 filing with the Securities Exchange Commission failing to disclose the value of the tax benefits in connection with the Combination available at: www.sec.gov/Archives/edgar/data/1616675/000104746914007148/a2221187zs-4.htm. ████████ ████████████████████████████████████████████

35.     Lead Plaintiff alleged that AbbVie began to reevaluate the Combination immediately after the Treasury Notice was issued.  See, e.g., Exhibit A at ██████████████████████████ ███████████████████████

36.     Lead Plaintiff alleged that after the Treasury Notice was issued the Combination was no longer financially beneficial to AbbVie and its stockholders, and Defendants knew they would need to terminate the Combination in light of the tax law change.

37.     Lead Plaintiff alleged that despite knowing AbbVie was ████████████████████ ███████████████████████████████████████████████████████████████████████████████

████████████████████████ Gonzalez published the September 29, 2014 Letter addressed to Shire's employees that said, "I'm more energized than ever about our two companies coming together. . . I'm more confident than ever about the potential of our combined organizations." ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

38.     After the Letter was filed with the SEC, *The Wall Street Journal* reported that "AbbVie's chief executive has sought to quash any doubts that AbbVie would go through with its acquisition of Shire PLC in the wake of the Treasury's proposed changes to US inversion rules." ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Exhibit C.

39.     On October 14, 2014, Defendants publicly announced that they had notified Shire that AbbVie's Board of Directors would be reconsidering the Combination in light of the tax law changes.   October 14, 2014 Press Release, available at: https://www.prnewswire.com/news-releases/announcement-of-notice-to-shire-of-abbvie-board-intention-to-reconsider-recommendation-279213722.html.

40.     The price of Shire's ADSs fell in repose to this news.

41.     While Lead Plaintiff argues that these facts demonstrate that Defendants acted with scienter and caused substantial harm to the Class, there is substantial risk that the jury would find otherwise.

42.     Defendants argued that they had no duty to inform the market ████████████

████████████████████████████████████████████████████████████

███████████

11

43. Defendants could also point to evidence that they were ██████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████ *See, e.g.,* Exhibit A ████████████████████████

44. Lead Plaintiff would counter that Defendants knew that renegotiation was not a viable option because the Combination was subject to U.K. law, which generally prohibits an offeror from subsequently making a lower-consideration offer to the offeree company, absent "wholly exceptional" circumstances and the tax law change would not qualify as wholly exceptional. U.K. Takeover Code Rule 2.5.

45. Defendant could respond that the ██████████████████████████ ████████████████████████████ Exhibit A at ███████████████████████

46. Defendants could also argue that the Letter was not intended to be a statement about the Combination in light of the Treasury Notice, but was simply a follow up letter to Shire's employees following an integration meeting. *See, e.g.*, Exhibit A at ██████████████

47. Indeed, the evidence established that the Letter ███████████████████ ████████████████ Attached hereto as Exhibit D █████████████████████ ███████████████████████████████████████

48. Defendants could also point to evidence that Gonzalez █████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████ Exhibit A at ███████ ██████████████████████████████████

49. Lead Plaintiff would counter that the Letter ████████████████████████ ███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████ Attached hereto as

Exhibit E ███████████████████████████████████████████████████

██████████████████████████

50.     Lead Plaintiff would also argue that Gonzalez's decision not to correct the market's perception of the Letter was evidence of his intent to deceive.

51.     Defendants' would counter that ████████████████████████████ ████████████████████████████████████████████████████████████ ██████████ Defendants would argue that ██████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████

52.     Defendants might also argue that under the U.K. Takeover Code, financial advisors were required to approve each widely disseminated statement by their client related to a transaction, to ensure the information provided was accurate and "adequately and fairly presented."   U.K. Takeover Code Rule 19.1 (2014).   Financial advisors were also required to ensure their clients made no "statements which, while not factually inaccurate, may be misleading or may create uncertainty."   *Id*.  Defendants would argue ██████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████████████████████████████████████████

53.     Finally, even if Lead Plaintiff was able to prove liability, Defendants would argue that she was not entitled to any damages.   Defendants characterized Lead Plaintiff's damages

method as backcasting.[9]  Under this method, if silence was an alternative to issuing the Letter then Defendants could argue that Lead Plaintiff is not entitled to damages under Lead Plaintiff's damage model.  "If no statement was an alternative, then the [backcasting] model is much less accurate because it measures the effect of the truth, not the effect of silence."  *Glickenhaus & Co. v. Household Int'l,* 787 F.3d 408, 417, n.4 (7th Cir. 2015).

54.    Based on all the factors summarized above, Lead Plaintiff and Lead Counsel respectfully submit that it was in the best interest of the Settlement Class to accept the immediate and substantial benefit conferred by the $16.75 million Settlement, instead of incurring the significant risk that the Class would recover a lesser amount, or nothing at all, after additional years of litigation.

***The Settlement Process***

55.    The Settlement was reached as a result of extensive arms'-length negotiations.

56.    After the close of fact discovery, class certification discovery, and briefing and supplemental briefing on Lead Plaintiff's motion for class certification, the Parties began to engage in Settlement discussions.

57.    Accordingly, when Lead Plaintiff began to negotiate the terms of the Settlement, she was well-informed of the strengths and weaknesses of her case, and the inherent risks of continued litigation.

58.    ██████████████████████████████████ the Parties engaged in initial settlement negotiations ████████████████████████████████████████ ████████████████████

---

[9]    Backcasting is a method "to observe what happens when the truth is finally disclosed and use that to work backward, on the assumption that the lie's positive effect on the share price is equal to the additive inverse of the truth's negative effect."  *Id*. at 415.

59.     The Parties determined the best way to proceed was to employ the services of a private mediator to determine if a settlement of the Action would be possible.

60.     The parties agreed to hire an experienced mediator, David Murphy of Phillips ADR (the mediation group led by former U.S. District Court Judge Layn R. Phillips) to assess the strengths and weaknesses of the Parties respective legal and factual positions and assist the Parties in determining if an amicable resolution of the Action would be possible.  Mr. Murphy is a retired partner of Wachtel, Lipton, Rosen & Katz with experience in securities class action litigation.  *See* http://www.phillipsadr.com/bios/david-murphy/.

61.     The Parties, including representatives of AbbVie's insurance carriers, held a full-day in-person mediation session on March 14, 2019 with Mr. Murphy in New York.

62.     In advance of the in-person mediation, the Parties exchanged written submissions and held pre-mediation telephonic conferences with Mr. Murphy.  At the mediation, the Parties debated the legal and factual claims and defenses in significant detail.  Although the Parties were unable to reach a settlement at the end of the mediation session, they made substantial progress.

63.     Over the next several weeks, the Parties continued to negotiate through the mediator by telephone on a near-daily basis.  On April 5, 2019, the Parties were able to reach an agreement to settle the Action for $16.75 million.  That agreement was memorialized in a Stipulation of Settlement signed by the Parties on June 18, 2019.[10]

***Lead Plaintiff Complied with the Court's Preliminary Approval Order***

64.     The Court's Preliminary Approval Order directed that the Notice of the proposed Settlement be provided to potential Class members.  The Preliminary Approval Order also set an

---

[10]    A copy of the Stipulation of Settlement was previously submitted to the Court in connection with Lead Plaintiff's Motion for Preliminary Approval.  ECF No. 274 as Appendix 1.  The parties also engaged in a confidential Supplemental Agreement that establishes the conditions under which Defendants can terminate the Settlement and is available for the Court's *in camera* inspection if so requested.

October 1, 2019 deadline for Class members to submit objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application, or to request exclusion from the Settlement Class, and set a final approval hearing date of October 22, 2019.

65.     In accordance with the Preliminary Approval Order, Lead Counsel instructed Epiq Class Action & Claims Solutions, Inc. ("Epiq"), the Court-approved Claims Administrator, to disseminate copies of the Notice and the Claim Form by mail and to publish the Summary Notice. The Notice contains, among other things, (i) a description of the Action and the Settlement; (ii) the terms of the proposed Plan of Allocation; (iii) an explanation of Settlement Class members' right to participate in the Settlement; and (iv) an explanation of Settlement Class members' rights to object to the Settlement, the Plan of Allocation, or the Fee and Expense Application, or exclude themselves from the Settlement Class.  The Notice also informs Settlement Class members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 30% of the Settlement Fund and for reimbursement of litigation expenses in an amount not to exceed $750,000 and reimbursement to the Lead Plaintiff in an amount not to exceed $10,000. To disseminate the Notice, Epiq utilized information that Lead Plaintiff had subpoenaed from the Depository Trust & Clearing Corporation and a proprietary Epiq list of brokers and dealers regarding the names and addresses of potential Class members.

66.     In compliance with the Preliminary Approval Order, mailed notice first went out on August 6, 2019 and the Summary Notice was transmitted over the *Business Newswire* on August 20, 2019.  In compliance with this Court's Preliminary Approval Order, Epiq will submit an affidavit detailing the notice process and the opt-outs received on October 7 2019.

67.     In addition, I personally sent notice of the Settlement to counsel for each of the plaintiffs in the related state court actions noting the process for opting out of the Settlement.  *See*

Ex. F. The State Court Actions are: *Elliott Associates, L.P, et al. v. AbbVie Inc.*, No. 2016-L-006279; *Farallon Capital Partners, L.P., et al. v. AbbVie, Inc. et al.,* No. 2018-L-005487; *First New York Securities LLC, et al. v. AbbVie, Inc.*, No. 2017-L-009229; *Hudson Bay Master Fund Ltd., et al. v. AbbVie, Inc., et al.*, No. 2017-L-010407; *Mason Capital, L.P. v. AbbVie, Inc., et al.*, No. 2017-L-010409; *ODS Capital LLC v. AbbVie, Inc., No. 2017-CH-08448*; and *WCM Alternatives: Event Driven Fund, et al. v. AbbVie, Inc.*, et al., No. 2017-L-010408.

68. Lead Counsel also caused Epiq to establish a dedicated Settlement website, www.AbbVieSettlement.com, to provide potential Settlement Class members with information concerning the Action and the Settlement and access to downloadable copies of the Notice and Claim Form, as well as copies of the Settlement Stipulation, and the Preliminary Approval Order.

69. As noted above, the deadline for Settlement Class members to file objections to the Settlement, the Plan of Allocation, and the Fee and Expense Application, or to request exclusion from the Settlement Class, is October 1, 2019. To date, no objections to the Settlement, the Plan of Allocation, or Fee and Expense Application have been received, and two requests for exclusion have been received. Each of the requests for exclusions made to date are on behalf of investors who have filed an individual fraud action in Illinois state court. Lead Counsel will file reply papers on or before October 15, 2019, after the deadline for submitting objections and requests for exclusion has passed, which will address any objections and all requests for exclusion received.

***Plan of Allocation***

70. In accordance with the Preliminary Approval Order, and as described in the Notice, all Class members who want to participate in the distribution of the Net Settlement Fund (i.e., the Settlement Fund less (i) any Taxes; (ii) any Notice and Administration Costs; any Litigation Expenses awarded by the Court; (iv) any attorneys' fees awarded by the Court; and (v) any other

17

costs or fees approved by the Court) must submit a valid Claim Form with all required information postmarked no later than December 4, 2019. As described in the Notice, the Net Settlement Fund will be distributed on a *pro rata* basis among eligible Class members according to the Plan of Allocation approved by the Court.

71.     Lead Plaintiff's damages expert developed the proposed Plan of Allocation in consultation with Lead Counsel. Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Class members who suffered losses as a result of the conduct alleged in the Amended Complaint and is consistent with methods used in other securities class action cases.

72.     The Plan of Allocation is set forth in the mailed Notice. As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover at trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. Instead, the calculations under the Plan are only a method to weigh the claims of Settlement Class members against one another for the purposes of making an equitable allocation of the Net Settlement Fund.

73.     Lead Plaintiff alleged that Defendants made false statements and omitted material facts during the period between September 29, 2014 through and including October 14, 2014, which had the effect of artificially inflating the prices of Shire ADSs and Shire Call Options and artificially deflating the price of Shire Put Options ("Shire Securities"). Lead Plaintiff alleged that when the artificial inflation was removed from Shire ADSs and Call Options and artificial deflation was removed from Shire Put Options on October 15, 2014, in reaction to information disclosed on October 14, 2014 (after-market hours).

74.     Under the Plan of Allocation each Shire ADS purchased or otherwise acquired from September 29, 2014 through and including October 14, 2014, had a Recognized Loss Amount of $50.69.  This amount represents the maximum potential dollar artificial inflation applicable to each such ADS on the date of purchase/acquisition accounting for the 90-day lookback as required by the PSLRA.

75.     The Plan of Allocation also accounts for the fact that Section 28(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78bb(a), requires that no party recover an amount in excess of that persons' "actual damages" by netting out pre-class period gains.

76.     For each Shire ADS sold from September 29, 2014 through and including October 14, 2014 the Recognized Gain Amount for each such ADS is $50.69, the maximum potential dollar artificial inflation applicable to each such ADS on the date of sale.

77.     The Plan of Allocation also accounts for losses on behalf of Class members that purchased option contracts.  Lead Plaintiff's expert created two tables that are attached to the Notice that set out the dollar amount of inflation per share for call options and deflation per share for put options that were traded in the Class Period.

78.     Lead Plaintiff recognized there was a high risk that this Court would not certify a class that included persons who purchased or sold options.  Defendants vigorously challenged the inclusion of option holders and challenged Plaintiff's expert's analysis as to these potential Class members.  In addition, the Court requested formal Daubert briefing in connection with Defendants arguments regarding the validity of Plaintiff's claims as to persons that purchased calls or sold puts during the Class Period.  As a result, the Plan of Allocation discounts the recovery for options by 60%.

79.     To date no objections to the Plan of Allocation have been received.

*Fee and Expense Application*

80.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying to the Court for an award of attorneys' fees and reimbursement of Litigation Expenses on behalf of Plaintiff's Counsel.

81.     Specifically, Lead Counsel is applying for a fee award of 30% of the Settlement Fund, or $5,025,000 million, and for reimbursement of $530,133.17 in Lead Counsel's litigation expenses and $9,937.20 in expenses to Lead Plaintiff. The amount of Lead Counsel's incurred expenses for which Lead Counsel seek reimbursement, together with the amount of the award requested by Lead Plaintiff pursuant to the PSLRA, is well below the maximum expense amount of $750,000 stated in the Notice.  To date no objections to the fee and litigation expenses have been received.

82.     Lead Counsel is applying for a fee award to be paid from the Settlement Fund on a percentage basis. As discussed in the accompanying Fee Memorandum, the percentage method is the preferred method of fee recovery for common-fund cases in the Seventh Circuit.

83.     Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is reasonable and should be approved.  As discussed in the Fee Memorandum, a fee award of 30% of the Settlement Fund is fair and reasonable for attorneys' fees in common-fund cases like this and is well within the range of percentages awarded in class actions in this Circuit and elsewhere for comparable settlements.

84.     Dawn Bradley actively oversaw the litigation and the work performed by Lead Counsel and has endorsed the Settlement and the requested fee and expense award.  Lead Plaintiff's

endorsement of the requested fee demonstrates its reasonableness and should be given weight in the Court's consideration of the fee award.

85.     Attached as Exhibits G-H are Declarations from Gardy & Notis, LLP and Wolf Haldenstein Adler Freeman & Herz LLP in support of an award of attorneys' fees and litigation expenses.  As noted in Lead Counsel's declarations, no time expended in preparing the application for fees and expenses has been included.  Lead Counsel has and will continue to invest substantial time and effort in this case after the August 31, 2019 cut-off imposed for their lodestar submissions on this application.

86.     As shown in table below, Lead Counsel collectively expended a total of 3,828.40 hours in the investigation, prosecution, and settlement of the Action from its inception through August 31, 2019, for a total lodestar of $2,755,862.75 at current hourly rates.  The requested fee of 30% of the Settlement Fund represents $5,025,000 million, and therefore represents a multiplier of approximately 1.82 of Lead Counsel's lodestar.   As discussed in further detail in the Fee Memorandum, the requested multiplier cross-check is within the range of multipliers typically cited in comparable securities class actions and in other class actions involving significant contingency-fee risk in this Circuit and elsewhere.

| FIRM | HOURS | LODESTAR |
|---|---|---|
| Gardy & Notis | 2,647.50 | $1,928,943.75 |
| Wolf Haldenstein | 1,180.90 | $826,919.00 |
| **TOTALS:** | **3,828.40** | **$2,755,862.75** |

87.     As detailed above, throughout this case, Lead Counsel devoted substantial time to the prosecution of the Action.   While I personally devoted substantial time to this case, and personally appeared in Court, liaised with the Lead Plaintiff, attended the mediation, reviewed and edited all pleadings, motions, and correspondence prepared on behalf of Lead Plaintiff, other experienced attorneys at my firm were involved in the litigation and settlement negotiations.

Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

88. The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Here, the Defendants were represented by Kirkland & Ellis, LLP, an experienced defense firm, which vigorously represented its clients. Lead Counsel was able to persuade Defendants to settle the case on terms that are favorable to the Class despite their formidable defense of the Action.

89. This prosecution was undertaken by Lead Counsel entirely on a contingent-fee basis. The risks assumed by Lead Counsel in bringing these claims to a successful conclusion are described above. Those risks are also relevant to an award of attorneys' fees.

90. Lead Counsel understood that it was taking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. The case required a thorough understanding of complex issues, including a basic understanding of the U.K. Takeover Code. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable litigation costs that a case like this requires. Lead Counsel received no compensation during the course of the Action and have collectively incurred over $530,000 in litigation expenses in prosecuting the Action for the benefit of the Class.

91. Lead Counsel also bore the risk that no recovery would be achieved. As discussed above, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever. Success in contingent-fee litigation like this Action is never assured.

22

92.     Lead Counsel's extensive and persistent efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Class.

93.     Lead Counsel also seek reimbursement from the Settlement Fund of $530,133.17 in Litigation Expenses that were reasonably incurred by Lead Counsel in connection with commencing, litigating, and settling the claims asserted in the Action as detailed in the table below.

| CATEGORY | AMOUNT |
|---|---|
| Service of Process | $1,601.50 |
| Filing & Court Fees | $150.00 |
| Postage & Express Mail | $688.60 |
| Copying/Printing | $3,389.75 |
| Out of Town Travel | $38,591.83 |
| Working Meals | $3,108.13 |
| Court Reporting & Transcripts | $26,227.23 |
| Class List from DTCC | $11,320.00 |
| Experts | $421,993.63 |
| Mediation | $18,605.00 |
| Contract Attorneys | $3,487.50 |
| PSLRA Notice | $970.00 |
| **TOTAL EXPENSES:** | **$530,133.17** |

94.     From the outset of the Action, Lead Counsel have been cognizant of the fact that they might not recover any of their expenses, and, further, if there were to be reimbursement of expenses, it would not occur until the Action was successfully resolved, often a period lasting several years. Lead Counsel were therefore motivated to and did take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the case.

95.     Of the total amount of counsel's expenses, Lead Counsel incurred $421,993.63, or approximately 79%, for the retention of experts and consultants. As noted above, Lead Counsel consulted with experts in the fields of class certification, loss causation and damages. In addition, in connection with Lead Plaintiff's opposition to Defendants' *Daubert* Motion, Lead Plaintiff hired a consulting expert to serve as a cross check to the work being challenged by Defendants.

23

96.     Another large component of the Litigation Expenses was for travel and meals, totaling $41,699.96 (less than 8% of total expenses).  Lead Counsel traveled to Chicago for Court appearances or depositions more than 25 times.

97.     Lead Counsel have also incurred expenses totaling $18,605.00 (approximately 4% of total expenses) for mediation fees charged by the Mediator.

98.     The other expenses for which Lead Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, service of process, copying, and postage.

99.     All of the litigation expenses incurred by Lead Counsel were reasonable and necessary to the successful litigation of the Action.

100.    In accordance with the PSLRA, Dawn Bradley seeks reimbursement of her reasonable costs and expenses incurred directly in connection with her representation of the Settlement Class, in the amount of $9,937.20.  Ms. Bradley actively oversaw the litigation and participated in the Action as required.  I personally spoke to Ms. Bradley frequently throughout the litigation by email, telephone and in-person to consult with her about the status of the Action, discovery obligations and production, and to get her input on the work Lead Counsel was undertaking on behalf of the Class.  I also consulted with Ms. Bradley on a near daily basis regarding the Settlement negotiations.

101.    The Notice informed potential Class members that Lead Counsel would seek reimbursement of litigation expenses in an amount not to exceed $750,000, and Lead Plaintiff would seek reimbursement of expenses not to exceed $10,000.  The total amount requested in reimbursement of costs and expenses incurred is significantly below the $750,000 that Class

members were notified could be sought. To date, no Class member has objected to the maximum amount of expenses disclosed in the Notice.

102.    The expenses incurred by Lead Counsel and Lead Plaintiff were reasonable and necessary to represent the Settlement Class and achieve the Settlement. Accordingly, Lead Counsel respectfully submit that the litigation expenses should be reimbursed in full from the Settlement Fund.

***Unreported Cases***

103.    Attached hereto are true and correct copies of the following unreported decisions:

Exhibit I: *City of Sterling Heights Gen. Emps. Ret. Sys. v. Hospira*, No. 11-cv-08332-AJS, slip. op. at 1-2 (N.D. Ill. Aug. 5, 2014), ECF No. 207

Exhibit J: *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, No. 09 C 7666, slip op. at 2 (N.D. Ill. Jan. 22, 2014), ECF No. 693

Exhibit K: *Roth v. AON Corp.*, No. 04-C-6835, slip op. at 1 (N.D. Ill. Nov. 18, 2009), ECF No. 220

Exhibit L: *In Re Akorn, Inc. Sec. Litig.*, 1:15-cv-1944 Memorandum Opinion and Order (N.D. Ill Jun. 5, 2018), ECF No. 182

Exhibit M: *Duncan v. Joy Global Inc., et al*., No. 16-cv-1229-pp, slip op. at 2 (E.D. Wis. Dec. 27, 2018), ECF No. 79

*          *          *

104.    For all the reasons discussed above, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate.  Lead Counsel further submit that the requested fee in the amount of 30% of the Settlement Fund should be approved as fair and reasonable, and the request for reimbursement of total litigation expenses in the amount of $530,133.17, in addition to $9,937.20 in reimbursement of expenses to Lead Plaintiff should also be approved.

I hereby certify under the penalty of perjury under 28 U.S.C. §1746 that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: September 17, 2019

_____
JENNIFER SARNELLI